IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

SHERRI McSWAIN,          )
                          )
      Plaintiff,       )
                          )
vs.                     )     CASE NO. 1:06 CV-1009-WKW
                          )
PROVIDENT LIFE AND     )
ACCIDENT INSURANCE     )
COMPANY,             )
                          )
      Defendant.     )

---

**DEFENDANT'S EVIDENTIARY SUBMISSIONS IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

---

Defendant Unum Life Insurance Company of America ("Unum Life"), improperly identified in the Complaint as Provident Life and Accident Insurance Company,[1] hereby files its evidentiary submissions in support of its motion for summary judgment. Unum Life has filed contemporaneously herewith a brief in support of its motion. The evidentiary materials, listed by exhibit number, include:

Exhibit 1 ..... Declaration of Gretchen Roberts;

Exhibit 2 ..... Pertinent excerpts from the claim file;

---

[1] Unum Life Insurance Company of America ("Unum Life") issued the applicable policy and is the only proper Defendant.

Exhibit 3..... The Unum Life Insurance Company of America Policy issued to Southeast Alabama Medical Center, No. 578048 001;

Respectfully submitted,

s/ **John S. Johnson**
JOHN S. JOHNSON
Bar ID ASB-7114-H67J

OF COUNSEL:
HAND ARENDALL, L.L.C.
1200 Park Place Tower
2001 Park Place North
Birmingham, Alabama 35203
Telephone:  (205) 324-4400
Facsimile:  (205) 397-1307
E-mail:       jjohnson@handarendall.com

HENRY T. MORRISSETTE
Bar ID ASB-7622-E54H

OF COUNSEL:
HAND ARENDALL, L.L.C.
Post Office Box 123
Mobile, Alabama 36601
Telephone:  (251) 432-5511
Facsimile:  (251) 694-6375
E-mail: hmorrissette@handarendall.com

Attorneys for Defendant improperly styled as Provident Life & Accident Insurance Company

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SHERRI McSWAIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 1:06 CV-1009-WKW |
| | ) | |
| PROVIDENT LIFE AND | ) | |
| ACCIDENT INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

---

## CERTIFICATE OF SERVICE

---

I hereby certify that on August 31, 2007, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send notification of

such filing to the following:

Joseph W. Lewis          bblbjlaw@centurytel.net
John E. Byrd, Jr.
P.O. Box 536
Dothan, Alabama 36302

s/ **John S. Johnson**
OF COUNSEL

3

EXHIBIT

1

# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

SHERRI McSWAIN,                    )
                                   )
          Plaintiff,               )
                                   )
vs.                                )          CASE NO. 1:06 CV-1009-WKW
                                   )
PROVIDENT LIFE AND                 )
ACCIDENT INSURANCE                 )
COMPANY,                           )
                                   )
          Defendant.               )

---

## DECLARATION OF GRETCHEN ROBERTS

---

I, Gretchen Roberts, declare the following is true and correct:

1.       My name is Gretchen Roberts. I am over the age of nineteen.  I am

Manager for Unum Life Insurance Company of America.  As Manager for Unum

Life Insurance Company of America, I have personal knowledge with respect to all

of the matters set forth herein.

2.       Southeast Alabama Medical Center afforded its full-time employees

both Voluntary Workplace Benefits disability insurance through a policy issued by

Provident Life and Accident Insurance Company ("Provident Life") and group

long-term disability insurance coverage through a policy issued by Unum Life Insurance Company of America ("Unum Life").

3.    Provident Life paid McSwain Voluntary Workplace benefits for the period from January 23, 2004, to July 23, 2004.

4.    For ease of reference, Exhibit 2 hereto constitutes true and correct copies of pertinent excerpts from McSwain's claim file. Exhibit 3 hereto is a true and correct copy of the applicable long-term disability insurance Policy issued by Unum Life to Southeast Alabama Medical Center.

5.    The term "disability" is specifically defined in Unum Life's disability insurance policies, including the policy covering McSwain, for the purpose of clarifying the conditions which will make a person eligible to receive benefits under the policy.

6.    Unum Life is responsible for investigating and evaluating claims to determine whether claimants are eligible under the terms of the long-term disability insurance policy. This ensures that Unum Life pays only those claimants who actually meet eligibility requirements, and that the employer can provide disability coverage to employees at an affordable cost. The decisions that claims employees within the Unum Life organization make or recommend in connection with disability claims do not affect their pay, advancement within the company, or other privileges of employment in any way.

7.     On June 10, 2004, Unum Life determined that McSwain qualified for disability benefits under the 24-month own-occupation provisions of the long-term disability policy.  As a result, Unum Life paid McSwain benefits for the period from March 23, 2004, through May 9, 2006.

8.     Toward the end of the 24-month own-occupation period, Unum Life reevaluated whether or not McSwain continued to qualify for disability benefits under the any-occupation provisions of the policy.

9.     Unum Life's determination that McSwain was not eligible for further benefits after May 9, 2006, was based upon the medical records and other information contained in her claim file, and the reasons for the termination were set forth in correspondence to Ms. Burney, which is also included in the claim file.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _29th_ day of August, 2007.

_Gretchen Roberts_
Gretchen Roberts, Declarant.



**UNUMPROVIDENT**

**INCOME PROTECTION CLAIM**
Mail to: Chattanooga Customer Care Center, P.O. Box 12030,
Chattanooga, TN 37401-3030
Claim Questions: 800.633.7478    Fax To: 423.755.3009

Received from USPO

EXHIBIT **2**

## C. EMPLOYEE'S STATEMENT (PLEASE PRINT)

**1. Employee's Name (as printed on your Social Security Card)**
Sherri Ann McSwain

**Home Telephone Number** 334-714-1439

**Date of Birth** 9-8-64    ☐ Male ☐ Female

**Social Security Number** 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

**Home Address (Street, City, State, ZIP)**
16685 Cottonwood Rd Gordon, Alabama 36343

**The state in which you work** Alabama

**Preferred e-mail address where you can be reached**

**Policy Number** E-6854082

**2. Is this disability due to** ☐ Motor Vehicle Accident ☑ Other Accident ☐ Sickness ☐ Work-related Injury/Sickness ☐ Pregnancy

**For any accident related claim, describe the injury including how, where and when it occurred**

**4. Date Last Worked** 12/28/03    **Number of Hours Worked on Date Last Worked**

**3.** Check the other income benefits you are receiving or are eligible to receive as a result of your disability and complete the information requested. If you have been approved or denied for any of these benefits, please send a copy of Award or Denial Notification.

| | Yes | No | | Yes | No | | Yes | No | | Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Social Security/Retirement | ☐ | ☑ | Social Security/Disability | ☐ | ☑ | Canada Pension Plan | ☐ | ☑ | State Disability | ☐ | ☐ |
| Worker's Compensation | ☐ | ☑ | Pension/Retirement | ☐ | ☑ | Pension/Disability | ☐ | ☑ | Unemployment | ☐ | ☑ |

Other (include Individual Disability or Group Disability Benefits)  ☐ Yes ☐ No – Ins. Co. Name and Policy #

**6. For Fully-Insured Plans –** If your request for benefits is approved, do you want Federal Income Tax withheld from your check? ☑ Yes ☐ No
(Note: Minimum withholding is $20.00 per week)
If yes, please indicate dollar amount $500
Do you want State Income Tax withheld from your check? ☑ Yes ☐ No
If yes, please indicate dollar amount $100

### CLAIM FRAUD WARNING STATEMENTS

For your protection, the laws of several states, including Alaska, Arizona, Arkansas, Delaware, Idaho, Indiana, Kentucky, Louisiana, Minnesota, New Hampshire, Ohio and Oklahoma, and others require the following statement to appear:

**Fraud Warning**

Any person who knowingly, and with intent to injure, defraud, or deceive an insurance company, files a statement of claim containing any false, incomplete, or misleading information is guilty of insurance fraud, which is a felony.

**Fraud Warning for California Residents**

For your protection, California law requires the following to appear:

Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Fraud Warning for Colorado Residents**

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Fraud Warning for District of Columbia, Idaho, Tennessee and Virginia Residents**

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purposes of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Fraud Warning for Florida Residents**

Any person who knowingly and with intent to injure, defraud or deceive any insurance company, files a statement of claim or an application containing false, incomplete or misleading information is guilty of a felony of the third degree.

**Fraud Statement for New Jersey, New Mexico and Pennsylvania Residents**

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Fraud Statement for New York Residents**

Any person who knowingly and with the intent to defraud any insurance company or other person files an application for insurance or statement of claim containing materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

The above statements are true and complete to the best of my knowledge and belief. (Your signature is required for benefit consideration.)

**Signature** Sherri A McSwain

**Date** 1/3/04

UACL00026


**UNUMPROVIDENT**

**INCOME PROTECTION CLAIM**
Mail to: Chattanooga Customer Care Center, P.O. Box 12030,
Chattanooga, TN 37401-3030
Claim Questions: 800.633.7479   Fax To: 423.755.3000

## A. ATTENDING PHYSICIAN'S STATEMENT (PLEASE PRINT)

**Name of Patient** Sherri A. McSwain  **Home Telephone Number** 334-714-1468  **Date of Birth** 4-8-64  **Social Security Number** 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

**Employer Name** Southeast Alabama Med. Center  **Employer Telephone Number** 334-793-8033

Instructions: If this claim is related to normal pregnancy, complete the Normal Pregnancy section. For all other claims, including complicated pregnancy, complete the All Other Conditions section. In all situations, you must complete the signature block at the bottom of this form.

### Normal Pregnancy   N/A

**1. Expected Delivery Date.**   **If Delivered, Actual Delivery Date**   **Type of Delivery** ☐ Vaginal  ☐ C-Section

**2. Has patient been released to work in her own occupation?** ☐ Yes ☐ No  In any occupation? ☐ Yes ☐ No
If not, when should the patient be able to return to work?  Full Time   Part Time

### All Other Conditions

**1. Diagnosis - Please include the primary diagnosis and list any secondary conditions.**
Diagnosis (including any complications) include ICD9 and/or DSM IV Multi Evaluation Nomenclature and Code Number   lumbar disc herniation

HNP    722.10

**2. Date First Unable to Work** 12-23-03   **Date Hospitalized** none

**3. Has patient been released to work in his/her own occupation?** ☐ Yes ☑ No  In any occupation? ☐ Yes ☑ No
If not, when should the patient be able to return to work?  Full Time  2-23-04   Part Time

**4. Is this disability related to the patient's employment?** ☐ Yes ☐ No ☑ Unknown

**5. If complicated pregnancy**  Expected Delivery Date  N/A  If Delivered, Actual Delivery Date  Type of Delivery ☐ Vaginal ☐ C-Section

**6. Date of first visit for this illness or injury** 12-23-03

**7. Nature of treatment (including surgery and medications prescribed)**   **Date of Surgical Procedure**   **CPT Code**
PT, Meds

**8. If the patient has demonstrated a loss of function, please describe restrictions and limitations in the space provided below:**
RESTRICTIONS (What the patient should not do)

Dr. requests pt not work for 2 months

LIMITATIONS (What the patient cannot do)

See above

**Date restrictions and limitations began.** 12-23-03

**9. Referring physician or other treating physicians (names, addresses, telephone numbers):**

None

Please include copies of all applicable office notes and test results.
FRAUD NOTICE: Any person who knowingly files a statement of claim containing false or misleading information is subject to criminal and civil penalties. This includes Employer and Attending Physician portions of the claim form.

**Print or Type Name** Nicholas F. Voss   **Degree** MD   **Medical Specialty** Neurosurgery

**Street Address** 2323 W. Main St. Ste 11B   **Telephone Number** 334-793-6573

**City** Dothan   **State** AL   **ZIP Code** 36301   **Fax** 334-793-5546

**Signature of Physician** [signature] (Voss, MD)   **Date** 1-9-04

**SSN or Employer's I.D. Number** 16-5-1088908   Are you, the physician, related to the patient? ☐ Yes ☑ No
If yes, what is the relationship?

UACL00028

**UNUMPROVIDENT**

January 21, 2004

Sherri McSwain
16685 Cottonwood Road
Gordon, AL 36343

Policy#08F6854082

Dear Ms. McSwain:

With this letter we acknowledge receipt of your claim for Voluntary Workplace disability benefits. When calling our offices, please refer to the policy number above.

As you may know, your policy contains a 30-day elimination period during which benefits are not payable, nor do they accrue. We have determined that your date of disability was December 24, 2003, the date after your last day worked. Your elimination period will be satisfied on January 22, 2004 and benefits began to accrue on January 23, 2004. Because we pay in arrears, your payment will be due to you on or about February 23, 2004 for the period of December 24, 2003 through February 23, 2004, less your 30-day elimination period.

Your policy requires proof of disability every 30 days. Enclosed is a supplemental form, which must be filled out by your Attending Physician and returned to our office on or about February 23, 2004. If it is more convenient, the form may be faxed to us at 423-755-1834.

It is a pleasure to be of service to you in your time of need. If you have any questions, please feel free to contact us at 1-800-633-7479, extension 44530.

Sincerely,

Mundy Moore
Associate Disability Benefits Specialist
Provident Life and Accident Insurance Company

UACL00066

Claimant Name: Sherri Ann McSwain    Claim #: 1304988

UNUM.

**CLAIMANT TPC DOCUMENTATION**

**Placed Call To:**       **Telephone Number:**

Date:        Time: 8:52pm  a.m./p.m.  Contact Made: Y ☒ N ☐ Message Left Y ☐ N ☐
Date:        Time:          a.m./p.m.  Contact Made: Y ☐ N ☐ Message Left Y ☐ N ☐

**Received Call From:  Sherri McSwain  Telephone Number**

Date: 5/14/04 Time: 8:52pm a.m/p.m,  Contact Made: Y ☒ N ☐ Message Left Y ☐ N ☐
Date:       Time:          a.m/p.m,  Contact Made: Y ☐ N ☐ Message Left Y ☐ N ☐

**Set expectation with clmt that the call will take          minutes. Ask them if this is a good time for the TPC. If no, when would be a good time?

**HISTORY/ONSET OF CONDITION:** When did your condition begin? What caused you to leave work? Ask open ended questions: How so? Why? Examples? When did you last feel well? Then what happened?

Claimant said that she was pulling a 300 pound patient over and hurt her back at work. She said that the ER will not honor it, so WC has been denied. Claimant said that she has an Attorney for that. Claimant said that she has a herniated disc at L5-S1. She has been through PT and is taking some pain medication. Dr. Voss told her that a herniated disc may take 6 to 8 months of conservative treatment before she may be well enough to work or may have to have surgery. Claimant said that she has had ESIs as well. Claimant is not feeling any better, and is to see Dr. Voss on 6/7/04 for evaluation. Claimant is worried because she does not want surgery, but may have to have it due to the pain. She said that she is having trouble sleeping at night as well due to the pain.

**MEDICAL TX PLAN? OTHER MEDICAL CONDITIONS IMPEDING RECOVERY?**
Is return to work a goal of your current treatment plan? Frequency of treatment?

See above

**RESTRICTIONS & LIMITATIONS** What has your physician(s) indicated you can and cannot do? How do these prevent you from doing your occupation?
*If pain is mentioned as a problem, get a complete description of the type of pain, where the pain is located, what precipitates the pain, and when it is present. Rate the pain on 1-10 scale in severity. Are you ever pain free/when? What reduces your pain?

Can not lift anything over 5 pounds, no bending/stooping, sit/stand/walk prolonged periods..

**NAME OF ALL PRIOR MEDICAL PROVIDERS** (Physicians, hospitals, physical therapy, etc.) &
**WHO IS CURRENT TREATING AP?** (Address and phone #'s)  **ANY TESTING COMPLETED?**
(Where, when & by which AP)

UACL00080

Claimant Name:  Sherri Ann McSwain      Claim #: 1304988

SAMC PERSONNEL          ID:1-334-793-8044          MAY 19'04     5:41 No.001 P.02



**UNUMPROVIDENT**

**DISABILITY CLAIM** (PLEASE HAVE ALL SECTIONS COMPLETED)
Mail to: UnumProvident, Chattanooga Customer Care Center, P.O. Box 12030, Chattanooga, TN 37401-3030
Claim Questions: 800.633.7479    Fax To: 423.755.3009

## C. EMPLOYMENT STATEMENT (continued)

**10.** Date of last Salary/Wage Increase **10/22/03**  Work Schedule at time last worked:  **5** Days/Week  **8** Hours/Day  **40** Hours/Week

Check off regular work days: ☐ Sun ☒ Mon ☐ Tues ☒ Wed ☒ Thurs ☒ Fri ☐ Sat.  Number of hours on date last worked: **7.10**

Date paid through? **1-15-04**  For: ☐ Salary Continuation ☒ Vacation Pay ☒ Accrued Sick Pay ☐ Other

**11.** Has claimant returned to work? ☐ Yes ☒ No  If yes, date:          ☐ Full Time ☐ Part Time  Hours Per Week

**12.** Does the claimant have an ownership interest in this business? ☐ Yes ☒ No  If yes, what is the % of ownership?      %
Type of business entity? ☐ Regular Corporation ☐ S corporation ☐ Partnership ☐ Sole Proprietorship

**13.** If this is a Flexible Benefits Plan, indicate which option of coverage this claimant has chosen.
Previous Plan Year - Date of Open Enrollment:          Option          Current Plan Year - Date of Open Enrollment:          Option

**14.** Prior LTD Carrier Name                                                          Effective Date

Address (Street, City, State, Zip)                                                  Termination Date

| **15.** Is claimant eligible for: | Yes | No | If yes, weekly or monthly amount | Weekly | Monthly | When do benefits begin? | When do benefits end? |
|---|---|---|---|---|---|---|---|
| Salary Continuation | ☐ | ☒ | $ | ☐ | ☐ | | |
| State Disability | ☐ | ☒ | $ | ☐ | ☐ | | |
| Other Disability Benefits | ☒ | ☐ | $ ? | ☐ | ☒ | STD w/ Unum Provident | |
| Social Security | ☐ | ☐ | $ | ☐ | ☐ | | |
| Worker's Compensation | ☐ | ☐ | $ | ☐ | ☐ | | |

Is the claim the result of a work related injury or sickness? ☐ Yes ☒ No

If so, has Workers' Compensation claim been filed? ☒ ☐  If yes, Name and Address of Carrier

Health Insurance ☐ ☐  If yes, Name and Address of Carrier

Life Insurance ☐ ☐  If yes, please provide the amount of coverage: $

If Workers' Compensation claim has been denied, please submit a copy of denial with this claim.

**16.** If New York DBL or New Jersey TDB applies, complete this question.

| | Week Ending | | | | | | Week Ending | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mo. | Day | Yr. | No. Days Worked | Amount | | Mo. | Day | Yr. | No. Days Worked | Amount |
| 1 | | | | | | 5 | | | | | |
| 2 | | | | | | 6 | | | | | |
| 3 | | | | | | 7 | | | | | |
| 4 | | | | | | 8 | | | | | |

Earnings 8 weeks prior to disability

**17.** Information about your pension plan (Please send copy of Plan Summary) (Do not complete for maternity claim)

Do you have a pension plan? ☒ Yes ☐ No  If yes, what type? ☐ Defined benefit ☒ Defined contribution ☐ 401(k)/403(b) ☐ Profit Sharing ☒ Other: (specify) **401(a) + 457**

Is claimant eligible for your pension plan? ☒ Yes ☐ No  If eligible, does the claimant participate? ☐ Yes ☒ No  What % does claimant contribute? **0**

If the claimant is participating, when is he or she eligible for benefits under the plan? **N/A**

**FRAUD NOTICE:**
Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties. This includes Employer and Attending Physician portions of the claim.

The above statements are true and complete to the best of my knowledge and belief.

Name of Person Completing Form  **Kecia Culp**          Telephone Number ( **334** ) **793-8001**

Title of Person Completing Form  **Benefits Specialist**          Fax Number ( **334** ) **793-8044**

Signature  **Kecia Culp**          Date Signed **5-18-04**

1322-99 (8/01)

UACL00152

Claimant Name: Sherri Ann McSwain     Claim #: 1304988

SAMC PERSONNEL        ID:1-334-793-8044        MAY 19'04    5:42 No.001 P.03



**UNUMPROVIDENT.**

**DISABILITY CLAIM** (PLEASE HAVE ALL SECTIONS COMPLETED)
Mail to: UnumProvident, Chattanooga Customer Care Center, P.O. Box 12030,
Chattanooga, TN 37401-3030
Claim Questions: 800.633.7479   Fax To: 423.755.3009

## C. EMPLOYMENT STATEMENT (PLEASE PRINT)

**Type of Coverage** (CHECK ALL THAT APPLY)
☒ Short Term Disability ☒ Long Term Disability ☐ Individual Disability ☐ Waiver of Premium (Life Insurance) ☐ Voluntary Benefits/Payroll Deduction

**1. Employer Name** Southeast Alabama Medical Center    **Employer's Phone Number** ( 334 ) 793· 8001

**Employer Address** (Street, City, State, Zip) 1108 Ross Clark Circle Dothan, AL 36301

**Policy Numbers** STD- F6854082   Group# LTD- 578048   **Division Number / Class Number**    **Division / Class Description**

**2. Claimant's Name** Sherri McSwain

**Claimant's Address** (Street, City, State, Zip) 16685 Cottonwood Rd. Gordon, AL 36343

| Claimant's Home Phone | Date of Birth | Social Security Number | Date of Hire | Effective Date of Insurance | Date Last Worked |
|---|---|---|---|---|---|
| 334-714-1429 | 9·8·64 | 260·37·4091 | 7·25·00 | | 12·23·03 |

**Claimant's Work Status:** ☒ Full Time ☐ Part Time ☐ Exempt ☒ Non-exempt ☐ Bargaining ☒ Non-Bargaining

**Has the claimant's employment been terminated?** ☐ Yes ☒ No   If yes, please provide termination date:

**General Information About the Claimant's Job**

**3. Job Title** Registered Nurse        **Minimum education or training required**

**Does the claimant perform supervisory function?** ☐ Yes ☒ No   If yes, how many people are supervised?

**4. Describe job duties:**

| Duty | See attached job description | # of Weekly Hours Spent at Duty |
|---|---|---|
| Duty | | # of Weekly Hours Spent at Duty |
| Duty | | # of Weekly Hours Spent at Duty |
| Duty | | # of Weekly Hours Spent at Duty |

**Name of Direct Supervisor** Karry Clark    **Telephone Number of Direct Supervisor** ( 334 ) 793·8033

**Please attach a copy of the claimant's job description.**

**5. How was claimant paid?** (please check one)
☒ Hourly ☐ Commissions ☐ Salaried ☐ Salary and Bonus ☐ Commissions Only ☐ Salary and Commissions

**What is the earnings figure you use to compute premium payments for this claimant?** $ 19.84 per hour

**Salary/Wage prior to date last worked** (refer to Earnings definition in your contract):

| ☐ Weekly ☒ Bi-Weekly ☐ Semi-Monthly | Bonuses (per week) | Overtime (prior year) | Commissions (per week) | W-2 Earnings |
|---|---|---|---|---|
| $ 1,587.20 | $ | $ | $ | $ |

**6. Does the claimant contribute toward the premiums?** (Complete all that apply)

| | | | | % paid by employer | | % paid by claimant |
|---|---|---|---|---|---|---|
| STD: | ☒ Yes ☐ No: | If yes: ☐ Pre-Tax ☒ Post-Tax | If Post Tax: | 0 % paid by employer | | 100 % paid by claimant |
| State Plans: | ☐ Yes ☐ No: | If yes: ☐ Pre-Tax ☐ Post-Tax | If Post Tax: | % paid by employer | | % paid by claimant |
| LTD: | ☒ Yes ☐ No: | If yes: ☒ Pre-Tax ☐ Post-Tax | If Post Tax: | % paid by employer | | % paid by claimant |
| IDI: | ☐ Yes ☐ No: | If yes: ☐ Pre-Tax ☐ Post-Tax | If Post Tax: | % paid by employer | | % paid by claimant |
| Life: | ☐ Yes ☐ No: | If yes: ☐ Pre-Tax ☐ Post-Tax | If Post Tax: | % paid by employer | | % paid by claimant |

**7. Year to Date Earnings as of Date of Disability (For FICA % Deductions)** $

**8. Financial Documentation** (please refer to your contract for your Earnings definition and attach the appropriate documentation).
Salary Only/Current Earnings definition: Attach copy of payroll records or paystubs for 2 periods just prior to disability.
Bonus/Commissions included: Attach copy of payroll records for the 12 or 24 months (see definition) just prior to disability.
Other Earnings definitions: Attach referenced document per Earnings definition (W-2, K-1's, Schedule C's, teacher's contract, etc.).

**9. Claimant Pre-Tax Withholdings:** Indicate pre-tax withholdings in effect just prior to disability:
401(k)/403(b) 0 %;   Pre-tax medical and other insurance $ 151.02 /week;   Flexible spending account $ 0 /week
biweekly

1922-99 (5/01)

---

Claimant Name: Sherri Ann McSwain        Claim #: 1304988

UACL00153

SHMC PERSONNEL          ID:1-334-793-8044          MAY 19'04    5:42 No.001 P.04

**Southeast Alabama**
**MEDICAL**
**CENTER**

## POSITION DESCRIPTION / PERFORMANCE EVALUATION                    Position Number: 680

Performance Period    From: _____          To: _____
Employee Name: McSwain, Sherri            Employee Number:
Job Title: RN II/Surgery                  Supervised By: OR Team Leader, Surgery Management
Department: Surgery                       Workers Supervised: LPN, CST, unlicensed personnel
                                          Promotion To: Team Leader, Facilitator, Schedule
Promoted From: No formal line, may be entry   Coordinator
Salary Grade: N12                         FLSA Status: Non-exempt

### POSITION SUMMARY:
- Provides professional nursing care to patients of all ages undergoing a surgical procedure.
- Uses the nursing process in assessing, planning, implementing, and evaluating care provided to individuals in the Receiving Room.
- Actively accepts, understands, and practices appropriate standards of Medical/Surgical and Critical Care Nursing.
- Actively supports the mission, vision, and values of the hospital and department.
- Performs various activities related to the needs of adult and geriatric Medical/Surgical patients in accordance with the hospital's established policies and procedures.
- Provides leadership in maintaining standards of care and direction of health care personnel.

### QUALIFICATIONS:
1. Graduate of school of nursing with current registration as an RN in the State of Alabama.
2. One year of O.R. nursing experience preferred.
3. CNOR preferred.

### LANGUAGE/COMMUNICATION SKILLS:
1. Must be able to read, write and speak English.
2. Must be able to maintain, complete, concise and legible documentation.
3. Must be able to use effective communication skills.

### SKILLS:
1. Successful course completion in Basic Cardiac Life Support.
2. Successful course completion of Institutional Intermediate EKG Course.
3. Successful completion of Advance Cardiac Life Support course (preferred).
4. Annual completion of "Unit Specific" competency requirements as delineated in unit specific competency tool.
5. Successful completion of math competency requirements.
6. Experience in operating computers, including operation of computer software in a Windows environment preferred.

### PHYSICAL DEMANDS:
For physical demands of this position, including vision, hearing, repetitive motion and environment, see attached
**DESCRIPTION OF PHYSICAL DEMANDS.**

---

**Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions of the position without compromising patient care.**

---

Under the Americans with Disabilities Act (ADA) an employee must be able to perform the essential job functions (with or without accommodation). This refers to tasks that are fundamental, and not marginal or unnecessary, to fulfillment of the position objectives. In the following position description, an "E" to the left of the numbered criteria indicates the functions that are essential to the position.

UACL00155

Claimant Name: Sherri Ann McSwain        Claim #: 1304988

SAMC PERSONNEL        ID:1-334-793-8044        MAY 19'04    5:45 No.001 P.10

**Southeast Alabama**
**MEDICAL**
**CENTER**

## POSITION DESCRIPTION / PERFORMANCE EVALUATION        *Position Number:* 680

### DESCRIPTION OF PHYSICAL DEMANDS AND WORK ACTIVITIES:

The checks in the boxes below describe the extent of the specific activity performed by the staff members in this position.

| PHYSICAL DEMANDS | AMOUNT OF TIME SPENT PERFORMING ACTIVITY | | | |
|---|---|---|---|---|
| | None | Up to ⅓ | ⅓ to ⅔ | ⅔ and more |
| Stand | | | | X |
| Walk | | | | X |
| Sit | | X | | |
| Talk or hear | | | | X |
| Use hands to finger, handle or feel | | | | X |
| Push/Pull | | | | X |
| Stoop, kneel, crouch, or crawl | | X | | |
| Reach with hands and arms | | | | X |
| Taste or smell | X | | | |
| Lift up to 10 pounds | | | | X |
| Lift up to 25 pounds | | | X | |
| Lift up to 50 pounds | | X | | |
| Lift up to 100 pounds | X | | | |
| Lift more than 100 pounds | X | | | |

| WORK ENVIRONMENT | AMOUNT OF TIME SPENT PERFORMING ACTIVITY | | | |
|---|---|---|---|---|
| | None | Up to ⅓ | ⅓ to ⅔ | ⅔ and more |
| Wet, humid conditions (non-weather) | X | | | |
| Work near moving mechanical parts | | | X | |
| Fumes or airborne particles | | | X | |
| Toxic or caustic chemicals | | | X | |
| Outdoor weather conditions | X | | | |
| Extreme cold (non-weather) | X | | | |
| Extreme heat (non-weather) | X | | | |
| Risk of electrical shock | | | X | |
| Work with explosives | X | | | |
| Risk of radiation | | X | | |
| Vibration | X | | | |

| REPETITIVE MOTION ACTIONS | | NUMBER OF HOURS | | | | |
|---|---|---|---|---|---|---|
| | | 0 | 1-2 | 3-4 | 5-6 | 7+ |
| Repetitive use of foot control | A. Right only | X | | | | |
| | B. Left only | X | | | | |
| | C. Both | X | | | | |
| Repetitive use of hands | A. Right only | X | | | | |
| | B. Left only | X | | | | |
| | C. Both | | | | | X |
| Grasping: Simple/light | A. Right only | X | | | | |
| | B. Left only | X | | | | |
| | C. Both | | | | | X |
| Grasping: Firm/heavy | A. Right only | X | | | | |
| | B. Left only | X | | | | |
| | C. Both | | | X | | |
| Fine dexterity | A. Right only | X | | | | |
| | B. Left only | X | | | | |
| | C. Both | | | | | X |

**SPECIAL VISION REQUIREMENTS:**
X  Close Vision (clear vision at 20 inches or less)
X  Distance Vision (clear vision at 20 feet or more)
X  Color Vision (ability to identify and distinguish colors)
X  Peripheral Vision (ability to observe an area that can be seen up and down or to the left and right while eyes are fixed on a given point)
X  Depth Perception (three-dimensional vision; ability to judge distances and spatial relationships)
X  Ability to Adjust Focus (ability to adjust eye to bring an object into sharp focus)
___ No Special Vision Requirements

**TYPICAL NOISE LEVEL: WORK SETTING**
___ Very quiet
___ Quiet
X  Moderate noise
___ Loud Noise
___ Very Loud Noise

**HEARING ABILITY:**
X  Ability to hear alarms on equipment
X  Ability to hear patient/client call
X  Ability to hear instructions

**Specific demands not listed:**

UACL00161

7



June 10, 2004


SHERRI ANN MCSWAIN
16685 COTTONWOOD RD
GORDON, AL 36343


RE:   McSwain, Sherri Ann          DOB: September 08, 1964
      Claim Number:                1304988
      Policy Number:               578048


Dear Ms. McSwain:

We have received and reviewed your Long Term Disability claim, and are pleased to inform you that we have approved your request for benefits.  Please review this entire letter because it reviews the information we have on file for your claim and provides further details about the benefits you will receive.

Your first check, in the amount of $3,811.02, is for the period of disability from March 23, 2004 through May 22, 2004.  This check was mailed under separate cover on June 07, 2004.  All future benefit checks will be mailed directly to you.

We know that a disabling illness or injury creates emotional, physical and financial challenges.  As your insurer, we want to do whatever we can to help you deal with these challenges.  We are committed to serving you well during this time.

You may be aware that the policy through your employer states:

*"HOW DOES UNUM DEFINE DISABILITY?*

You are disabled when Unum determines that:

–   you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
–   you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

Unum Life Insurance Company of America
The Benefits Center
PO Box 12030
Chattanooga, TN 37401-3030
Phone: 1-800-633-7478
Fax: 1-800-494-4516
www.unumprovident.com

1242-03

UACL00251

Claimant Name:  Sherri Ann McSwain      Claim #: 1304988

Claimant Name: McSwain, Sherri Ann
Claim Number: 1304988

June 10, 2004
Page 2 of 3

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience."

"Material and substantial duties means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified."

As you may know, benefits are not payable during the elimination period, which extended from December 24, 2003 through March 22, 2004.

Your plan provides you with 60% of your basic monthly earnings reduced by certain other income benefits you may receive, such as Social Security, State Disability, Workers' Compensation, and Pension. For full details, please refer to the monthly benefit reductions in your Certificate of Insurance.

Monthly benefits will be paid on an accrued basis. We will make every effort to ensure that you receive future benefit checks on or before the 22nd of the month.

Please read your check stub carefully each month. We may include occasional messages requesting information from you, and we encourage you to reply promptly to avoid any delay in future benefit payments.

We would like to take this opportunity to explain the terms of the policy provided through your employer. In order to qualify for ongoing benefits, you must continue to meet the definition of disability. Periodically, we will request medical evidence and vocational information to support the continuation of your disability benefits.

Since your disability has extended beyond five months, to receive an unreduced disability benefit, we encourage you to apply for Social Security Disability Insurance (SSDI) benefits and Family Social Security (FSS), if applicable. We are enclosing information on some of the advantages of SSDI benefits. Please note that these advantages make it worth applying even if you will be returning to work after a relatively short period of time. If you are awarded SSDI benefits, your LTD benefit will be reduced by the amount of your monthly SSDI benefit.

If you would like assistance with the application process, we will refer you to GENEX, a wholly owned subsidiary of UnumProvident. GENEX's staff of trained SSDI representatives will work with you throughout the SSDI application process, assist you with your initial SSDI application and will represent you at any hearings or appeals that are needed. If you have not yet applied for SSDI benefits, we will be happy to make a referral to GENEX.

If you prefer, you may initiate your SSDI claim by calling the Social Security Administration directly at 1-800-SSA-1213. In addition to applying for benefits, you may also use the Social Security toll-free number to request information about your application, to request a benefit estimate, to inquire about lost checks, or to make almost any other Social Security inquiry. Please save that number for future use. If GENEX is representing you in your SSDI application, they will make all the above inquiries on your behalf.

UACL00252

1242-03

Claimant Name: McSwain, Sherri Ann
Claim Number: 1304988

June 10, 2004
Page 3 of 3

If you decide to contact the Social Security Administration and apply for benefits on your own, please obtain a Receipt of Application once your claim has been filed, and send a copy of that receipt to us. This serves as proof that you have filed a claim for SSDI benefits.

The enclosed Disability Payment Options form should be fully completed by July 12, 2004 and returned to our office.

If you wish to have your benefit payment transferred directly into your bank account, please complete and return the enclosed Direct Deposit Request form.

In completing your application for disability benefits, you have indicated that you want us to withhold federal income tax. Please complete the enclosed form to indicate the exact dollar amount to be withheld each month. Current Internal Revenue Service regulations have established a minimum withholding amount of $87.00 per month.

Ms. McSwain, if you have any questions about the information in this letter or your claim, please feel free to contact me at 1-800-633-7479.

Notice to Employer: This employee is eligible for a waiver of LTD premium beginning April 01, 2004. Please take the appropriate credit on your next billing statement.

Sincerely,

*Kenan Enoch*

Kenan Enoch
Disability Benefits Specialist
Unum Life Insurance Company of America


Enclosures:     Direct Deposit Form (1432-94)
                Disability Payment Options (1160-01)
                Income Tax Request (1126-02)
CC:             SOUTHEAST ALABAMA MEDICAL/KECIA CULP/PERSONAL &
                CONFIDENTIAL

1242-03

UACL00253



**UNUMPROVIDENT**

December 6, 2005

NICHOLAS F. VOSS
NEUROSURGICAL ASSOCIATES OF DOTHAN
ATTN: MEDICAL RECORDS
2323 W MAIN ST
SUITE 113
DOTHAN, AL 36301

RE:    McSwain, Sherri Ann        DOB: September 08, 1964
       Claim Number:             1304988
       Policy Number:            578048
       Unum Life Insurance Company of America

Dear Dr. Voss:

We are currently reviewing continued disability benefits for your patient, Sherri McSwain. We would certainly appreciate your assistance on our review. As of March of 2006, we are going to be reviewing if Ms. McSwain can perform another type of occupation (less demanding). Based on your knowledge and treatment of Ms. McSwain, please answer the following questions as completely as possible.

1. What is the patient's current diagnosis?

   *lumbar degenerative disc disease*

2. Previously, on a June 2, 2005 Attending Physician's Statement, you wrote that Ms. McSwain has restrictions of "no lifting, twisting, turning, or bending." On July 27, 2005, you responded to a weight restriction clarification that Ms. McSwain could lift in the 21-30 pound range. Do these restrictions still apply? If not, please list any additional restrictions you feel that apply to Ms. McSwain's current condition.

   *These restrictions still apply*

3. What is the current course of treatment? Additionally, how often do you see her and when was her last office visit?

   *We have no F/u with her.*
   *She is at MMI.*

Unum Life Insurance Company of America
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843
Fax: 1-800-447-2498
www.unumprovident.com

1242-03                                    02875000514297601

UACL00828

Claimant Name: McSwain, Sherri Ann                                    December 6, 2005
Claim Number: 1304988                                                 Page 2 of 2

4.  What is your prognosis for return to gainful employment on a part-time or full-time basis?

    *good*

Enclosed is a signed Authorization for release of this information.

If there is a fee for providing this information, please attach a statement including to whom the
check should be made payable, as well as the tax ID number. We will promptly reimburse any
reasonable and customary fees upon request.

If you wish, you may respond directly on this letter. Please sign and date in the space provided
below and return this completed questionnaire with any additional information.

_____          _____
Signature                                Date    12/8/05

Please respond by January 06, 2006, as further consideration of benefits depends on your
reply. If possible, please fax this information to 423-763-6189.

Thank you for your time and cooperation. If you have any questions, please feel free to contact
me at 1-800-858-6843.

Sincerely,

*Kenan Enoch*

Kenan Enoch
Senior Disability Benefits Specialist
Unum Life Insurance Company of America


Enclosures:    Claim Form: Authorization
CC:            Sherri McSwain

UACL00829

1242-03



0287500051429760 2

Vocational Assessment
Sherri McSwain
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
Page 2 of 3

| Operating Room Registered Nurse | 075.374-420 | 7 | Medium | 6 ½ | $3438.93/ Month |
|---|---|---|---|---|---|
| Machine Operator | 619.685-062 | 4 | Medium | 3 | $7.25/hour |

**Skills:** *Skills are defined as an ability to do something that has been acquired by experience, training or education.*

Adjusting to performing repetitious, uncomplicated work; following simple directions or instructions; observing safety rules; uses hands, arms, and fingers to move or lift varying weights; loading, unloading, or tending assorted machines; and being exposed to heat, dust, noise, and hazards.

Applying technical knowledge, common sense, and special medical skills to care for or treat sick or handicapped people; using eyes, hands, and fingers skillfully; adapting quickly to emergency situations; instructing, planning, and directing work of others; keeping accurate records; and distinguishing shapes, forms, and colors.

**Specific Vocational Preparation:** *The amount of time required to learn the techniques, acquire the information and develop the facility needed for average performance in a specific job-worker situation.*

The maximum demonstrated SVP Level is: 7 (2 to 4 years)

**General Education Development Levels:** *Those aspects of education that contribute to the worker's reasoning development, language and mathematical skills.*

Educational abilities demonstrated through education and/or work history:

| GED | LEVEL | GRADE EQUIVALENT |
|---|---|---|
| Reasoning Development | 5 | Grades 13-14 |
| Mathematical Development | 4 | Grades 9-12 |
| Language Development | 5 | Grades 13-14 |

## RESTRICTIONS AND LIMITATIONS

The Attending Physician's Statement dated 6/2/05, completed by Dr. Voss, neurosurgeon, gives restrictions and limitations of no lifting, twisting, turning, bending, etc. In July 27, 2005 correspondence, Dr. Voss clarified the weight restriction to be 21-30 lbs. In December 6, 2005 correspondence, Dr. Voss indicated that these restrictions still apply.

## VOCATIONAL OPTIONS

| Occupation Title | eDOT # | SVP | Strength | Wages per hour* |
|---|---|---|---|---|
| School Nurse | 075.124-010 | 7 | Light | $15.68 |
| **Description:** Provides health care services to students. | | | | |

| Occupation Title | eDOT# | SVP | Strength | Wages per hour* |
|---|---|---|---|---|
| Office Nurse | 075.374-014 | 7 | Light | $16.90 |
| **Description:** Provides care for and treats patients in medical office, as directed by physician. | | | | |

UACL00839

Vocational Assessment
Sherri McSwain
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
Page 3 of 3

*Stooping is required occasionally in this occupation. Stooping is defined by the "Revised Handbook of Analyzing Jobs" as "Bending body downward and forward by bending spine at the waist, requiring full use of the lower extremities and back muscles." Based on review of the statistical information provided in the eDOT, bending/stooping is not a significant requirement of this occupation and would not be more than what is required in the activities of daily living.

| Occupation Title | eDOT# | SVP | Strength | Wages per hour* |
|---|---|---|---|---|
| Hospital Admitting Clerk | 205.362-018 | 4 | Light | $8.72 |
| **Description:** Obtains all preliminary information required for a patient's record for their admission to a hospital, clinic, or other medical facility. | | | | |

*Wages are 1st year mean.

## SUMMARY

It is the professional opinion of this writer that the occupations listed above are consistent with Ms. McSwain's prior work history, skills, education/training, restrictions and limitations provided, and labor market.

Ms. McSwain resides in Gordon, Alabama which is 24.3 miles from Dothan, Alabama. Dothan has a population of 57,737.

I have reviewed all occupational and vocational evidence provided to me by Company personnel, including analysis of current limitations and restrictions by medical and clinical personnel, bearing on the vocational assessment which I am by training and experience capable to perform.

Christy N. Searcy, MS, CRC
Senior Vocational Rehabilitation Consultant
1/20/06

UACL00840

Claimant Name: Sherri Ann McSwain    Claim #: 1304988

Fax to 7521809 (FISTD800) received at 01/31/2006 14:06:34 from (Unavailable).                    Page 2 of 3 pages (C)

JAN-31-2006 14:01 FROM:
UPC RFB02-5            1/31/2006 12:29     PAGE 002/008    Fax Server          P.2/3
                                                          TO:UPC RFB01 26



**UNUMPROVIDENT**

January 31, 2006

DAVID EVANS
SOUTHEAST ALABAMA MEDICAL CENTER
ATTN: MEDICAL RECORDS
1108 ROSS CLARK CIRCLE
DOTHAN, AL 36302

RE:   McSwain, Sherri Ann          DOB: September 08, 1964
      Claim Number:                1304988
      Policy Number:               578048
      Unum Life Insurance Company of America

Dear Dr. Evans:

We are currently reviewing disability benefits for your patient, Sherri McSwain. We would appreciate your help in providing additional information.

Based on Sherri McSwain's current condition, please provide the information requested below, answering the questions as completely as possible.

1.  What is the patient's current diagnosis?

    ① POSTOP L5-S1 LUMBAR FUSION c̄
    FAILED BACK SURGERY PAIN SYNDROME
    ② CHRONIC L5 RADICULAR PAIN

2.  What are the patient's current restrictions and limitations? Please be specific. PLEASE
    SEE M. VOSS' OFFICE NOTES AND FCE
    IF ONE HAS BEEN OBTAINED

3.  What is the current course of treatment? Additionally, how often do you see her and when was her last office visit?

    PT IS BEING FOLLOWED FOR CHRONIC PAIN
    MANAGEMENT

4.  What is your prognosis for return to gainful employment on a part-time or full-time basis?

    SEE #3

Unum Life Insurance Company of America
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843
Fax: 1-800-447-2498
www.unumprovident.com

1242-03

0287500066373630 1

UACL00851

JAN-31-2006 14:01 FROM:
UPC RFB02-5          1/31/2006 12:29    PAGE 003/006    TO:UPC RFB01 26    P.3/3
                                                        Fax Server

Claimant Name: McSwain, Shorri Ann                                January 31, 2006
Claim Number: 1304988                                                Page 2 of 2

*#4) DEFER TO #5*

5.  Complete the enclosed Functional Capacities Evaluation form.

    *I MUST DEFER TO DR. VOSS' EVALUATION
    AS WELL AS FCE, EMG/NCV'S AS NEEDED
    TO MAKE SUCH DETERMINATION*

6.  Send copies of all office notes, test results and consultative reports that support the
    information you have provided.

    *PLEASE MAKE SUCH REQUEST to MEDICAL
    RECORDS @ SAMC*

Enclosed is a signed Authorization for release of this information.

If there is a fee for providing these records, please attach a statement including to whom the
check should be made payable, as well as the tax ID number. We will promptly reimburse any
reasonable and customary fees upon request.

If you wish, you may respond directly on this letter. Please sign and date in the space provided
below and return this completed questionnaire with any additional information.

Signature _____    Date _1/31/06_

Please respond by February 15, 2006, as further consideration of benefits depends on your
reply. If possible, please fax this information to 423-763-6189.

Thank you for your time and cooperation. If you have any questions, please feel free to contact
me at 1-800-858-6843.

Sincerely,

*Kenan Enoch*

Kenan Enoch
Senior Disability Benefits Specialist
Unum Life Insurance Company of America

Enclosures:    Claim Form; Authorization
               Estimated Functional Abilities (1099-02)

1242-03

UACL00852

0287500056373B302

Claimant Name: Sherri Ann McSwain    Claim #: 1304988

Claim Document
----------------------------------------------------------------------------------

          Type: Placed call

       Subject: 221p OTC EE FCE

      Priority: No

        Status: Completed

         Notes:



Called claimant to discuss the outstanding FCE.

I first asked claimant what the status of the FCE report was.
She responded by saying that Dr. Voss has the report. I advised that I
will obtain this report.

I asked claimant if she knew what the report was going to state. She
said that it said that her capacity was within the sedentary to light capacity
and could lift up to 20 pounds. I explained to the claimant that based on
the past assessment of Dr. Voss and this FCE, it appears that she will not
be disabled from any occupation, and her claim would likely close as of
3/23/06. Claimant immediately stated that Dr. Evans disagrees with Dr.
Voss. I advised that if Dr. Evans disagrees, then he needs to respond with
some sort of letter. I advised claimant that up to this point, Dr. Evans
has continually deferred his opinion to Dr. Voss.

Claimant voiced her understanding of what I have in the file.
Claimant then started to say that she can't work due to her medication at this
time. She said that she is on morphine 3 times a day, and there is no way
that she could function at a full time job. I explained to the claimant
that if her medication is such an issue, then her APs would be sure to document

that information. I advised claimant that my next step is to obtain the
FCE from Dr. Voss and any updated notes from him, then have our clinical team
review it. I advised that I will contact her once I have more
information.

Claimant also stated that she has not applied for SSDI.

-K. Enoch, Sr. DBS



        Created By: Enoch, Kenan
      Created Date: 02/21/2006 - 14:46:28
        Create Site: Chattanooga

      Completed By: Enoch, Kenan
    Completed Date: 02/21/2006 - 14:46:28
     Complete Site: Chattanooga

----------------------------------------------------------------------------------

UACL00858

FROM :PHYSICAL THERAPY SPECIALISTS    FAX NO. :334 673 2425    Jan. 12 2006 10:37AM P2



Chuck Outlaw, PT, OCS[1]
Bobby Perkins, PT, OCS, SCS[2]

1 Board Certified Orthopaedic Physical Therapist
2 Board Certified Orthopaedic & Sports Physical Therapist

Date December 27, 2005

Dr. Nicholas Voss
2323 West Main Street
Dothan, AL 36301

RE:   Sherri McSwain

Dear Dr. Voss:

Thank you for referring Sherri McSwain for a Functional Capacity Evaluation performed on 12/27/05.

**Validity Criteria:**   70%.  Tests that equal or exceed 81% are tests in which maximal effort is felt to be demonstrated on a consistent basis.  The patient did participate in all activities of the test.  There were a couple of discrepancies noted during the test.

The dissimulation profile is a series of pain ratings, pain questionnaires, and observed movement patterns.  As it relates to movement pattern inconsistencies, during the musculoskeletal evaluation the patient states numbness, which does not follow any specific dermatomal pattern.  She does demonstrate give way strength when testing muscles of the lower extremity, which is not consistent with her demonstrated function.  This includes give way strength in the muscles of the ankle but she does show the ability to both heel walk and stand on her toes.

During the material handling portion of the test the patient was limited by a combination of stated low back, right leg, as well as bilateral hip pain.  She states the inability to lift from floor level due to back pain and related weakness of the right leg.  It should be noted on the knuckle to shoulder lift at 20 pounds; when she terminates she does show better force production on this lift than the previous lift.  She terminates pushing and pulling at 25 pounds but did demonstrate a greater force requirement than this in the same anatomical position at a different part of the test.  With frequent lifting, while she was limited due to stated pain, she demonstrated good force production on these lifts.

**FCE Results:**

Evaluation results indicate that Ms. McSwain's present strength and functional capacities meet guidelines between the sedentary to light physical demand level based on various ranges tested as evidenced by lifting and carrying between 10-20 pounds.

UACL00876

---

3118 Ross Clark Circle  Suite 1 • Dothan, AL 36303
Phone: (334) 673-2422 • Fax: (334) 673-2425

---

Claimant Name:  Sherri Ann McSwain     Claim #:  1304988

FROM :PHYSICAL THERAPY SPECIALISTS      FAX NO. :334 673 2425      Jan. 12 2006 10:38AM  P3

Sherri McSwain                                    FCE                                      Page 2
12/27/05

Lifting tolerances demonstrated include 20 pounds knuckle to shoulder, 10 pounds shoulder to overhead, and 10 pounds for carrying activities. All were demonstrated on an occasional basis. Functional abilities of kneeling, crouching, as well as overhead reach were demonstrated occasionally. Bending would rate on an occasional to frequent basis. It would be felt for full body bending this would rate occasional while in less significant ranges, such as 20 inches fingertips to floor, she could do this frequently. Shoulder reach, in terms of repetitive lifting, would rate occasional while in non-weight bearing situations it is felt it could be performed frequently.

She performed activities of simple grasping, fine manipulation, push/pulling, and climbing stairs. Balancing is rated okay for ordinary locomotion. She stood on her feet at the longest interval for 25 minutes and was able to complete a walk for 12 minutes 47 seconds with the longest interval for this being 9 minutes.

<u>Comments:</u>

The patient's pre-test pain was a 3 and her post-test pain was a 5. She states she formally worked as a RN. It is felt this job would rate medium based on DOT descriptions. She did not meet this from a strength standpoint. It was felt there was some self limitation with lifting and she did not demonstrate the ability to lift from floor level due to stated weakness of the right leg and low back pain. As it relates to her former job, she currently demonstrates deficits as it relates to gross strength. Based on her sedentary to light physical demand level, there may be other duties within this job that she would possibly be applicable for; this may include taking temperature, pulse, blood pressure, preparing rooms, sterilizing instruments, record physical findings, administering medication. Currently, based on the test results, she does not meet the physical demand level for her previous occupation as a nurse.

Again, thank you for this referral.

Bobby Perkins, PT, OCS                           Tony Bridges, MS, CSCS, CDE, CEES

Sherri McSwain                                      FCE                                    Page 3
12/27/05

## EVALUATION SUMMARY

This data was obtained from the Functional Capacity Evaluation given at Physical Therapy Specialists of Dothan. It informs the physician of the patient's limitations and capabilities demonstrated during the evaluation.

1.    Occasional and Frequent Lifting/Carrying Parameters:

| | Occasional |
|---|---|
| Shoulder - Overhead | 10 |
| Knuckle - Shoulder | 20 |
| Carry | 10 |

2.    Functional Activities

| | Never | Occasional | Frequent |
|---|---|---|---|
| Bend | | X to —— | X |
| Kneel | | X | |
| Crouch | | X | |
| Shoulder Reach | | | X |
| Overhead Reach | | X | |

3.    The patient can perform the following:

| | |
|---|---|
| Simple Grasping | Yes |
| Fine Manipulation | Yes |
| Pushing/Pulling | Yes |
| Climb Stairs | Yes |
| Balancing | Yes   okay for ordinary locomotion |

4.    Physical Demand Classification:  Sedentary to light.

Weight Range:  10-20 lbs. occasional

UACL00878

FROM :PHYSICAL THERAPY SPECIALISTS     FAX NO. :334 673 2425     Jan. 12 2006 10:39AM P5

Sherri McSwain                                FCE                                      Page 4
12/27/05

## FUNCTIONAL CAPACITY EVALUATION

I.     **Patient:**  Sherri McSwain; 3395
       **Date of Attendance:**  12/27/05
       **Evaluators:** Bobby Perkins, PT, OCS; Tony Bridges, MS, CSCS, CDE, CEES
       **Occupation at Time of Injury:** RN
       **Employer at Time of Injury:** Southeast Medical Center
       **Date of Injury:** 2003
       **Diagnosis:** Low back pain
       **Referred By:** Dr. Voss

II.    1.    **Present Physical Demand Level:** Sedentary to light.
       2.    **Job Demand Level:** Medium.
       3.    **Symptom Response:** Verbal complaints of pain, guarding body part.
       4.    **Pain Rating:**          Pre-test:  3   Post test:  5
       5.    **Heart Rates Taken During Evaluation:**

             **Prior to Testing:**                   110
             **Following Lifting Tasks:**
             **Shoulder to Overhead:**               103
             **Carrying:**                           105
             **Knuckle to Shoulder:**                104
             **Frequent Lift:**                      97
             **Walking:**                            98
             **Stair Climbing:**                     122
             **Kneeling Repetitively:**              119
             **Crouching Repetitively:**             111
             **Post Evaluation:**                    72

III.   **HISTORY:**
       The patient is a 41 year old female who presents with low back pain. She states she
       injured herself back in 2003 when pulling a patient over to a stretcher. She reports she
       had surgery in July of 2004 in which she had a fusion by Dr. Voss. She reports past
       treatment history has included physical therapy, injections, medication, and a TENs unit.

IV.    **MUSCULOSKELETAL AND POSTURE ASSESSMENT:**
       The patient has a diagnosis of S/P lumbar spine fusion with chronic low back pain. With
       regards to range of motion in the standing position, the patient was able to forward flex to
       60 degrees. This also measures 16 inches fingertips to toes. In the supine position with
       straight leg raise, the patient showed 70 degrees on the left and 45 degrees on the right.
       With right straight leg raise, the patient complains of low back and right leg pain. With
       regards to sensation, the patient shows non-specific right foot involvement. With the pin
       wheel, the patient states changes throughout the entire test, particularly of the toes. The
       patient states on a regular basis, her right foot goes to sleep. She states that she must
       stand up and walk about for her foot to regain some sensation. The patient is able to

UACL00879

Sherri McSwain
12/27/05

FCE

Page 5

demonstrate active range of motion of the right lower extremity as well as the right foot. With regards to strength, there is noted some inconsistency with manual strength testing. She shows 4/5 strength of her foot with dorsiflexion, inversion, and eversion. She tends to have give way strength of the right foot with manual muscle testing. It is noted that patient is able to stand on her toes. She is also able to walk on her heels with the toes and foot off the floor. With palpation, the patient does complain of tenderness about the lumbar spine and of the superior buttocks. With palpation, she does tend to react with moving the body part away from the therapist. She tolerated this musculoskeletal evaluation without any difficulty.

## V.   NON-PHYSIOLOGICAL SIGNS:

The patient was tested for non-physiological responses in order to separate physical pathology from patients who may require greater psychological assessment. The patient produced a positive response in 2 of 4 categories, representing 50 %.

## VI.   MAXIMUM VOLUNTARY EFFORT TESTING: % difference of CV>15% = submaximal or inconsistent effort

### 1.   5 POSITION HAND GRIP TEST

| | 3 * | 1 | 2 | 3 * | 4 | 5 | 3 * |
|---|---|---|---|---|---|---|---|
| L | 46 | 40 | 60 | 52 | 51 | 39 | 50 |
| R | 51 | 30 | 59 | 56 | 52 | 40 | 61 |

* Left:          CV: 6.19          AVE: 49.3
* Right:         CV: 8.92          AVE: 56

* Bell Shape:     L - ME
                  R - ME

ME - Maximal Effort                SME = Submaximal Effort

0 of 4 were inconsistent, 0% inconsistent

The patient was tested on performance of maximum voluntary effort using the Jamar hand grip dynamometer. Testing included analyzing coefficient of variation at position 3, ability to produce a modified bell-shaped curve, percent difference between trials at position 2, and percent difference at position 2 correlating different tests.

The patient produced scores indicating sub-maximal effort in 0 of 4 tests, representing 0%.

## Total for Maximum Voluntary Effort:

0 of 4 were inconsistent, 0 % Inconsistent

UACL00880

Sherri McSwain                                    FCE                                    Page 6
12/27/05

An overall review of maximum voluntary effort testing to include hand tests and static
strength testing reveal the patient produced scores indicating sub-maximal effort in 0 of 4
tests, representing 0% of failed validity criteria.

## VII.   MATERIAL HANDLING, EXTRAPOLATIONS & STRENGTH PROFILE

### 1.   OCCASIONAL LIFTING TASK          WT. (lbs.)

| | |
|---|---|
| Shoulder - Overhead | 10 |
| Knuckle - Shoulder | 20 |
| Floor - Waist | 0 |
| Carrying | 10 |
| Push/Pull | 25/25 |

### 2.   FREQUENT LIFTING

The patient performed the frequent lifting task with weights of 5-10 pounds in
ranges from knuckle to shoulder and shoulder to overhead. She performed the
task for a duration of 3 minutes 20 seconds, achieving 22 repetitions during this
time frame. The patient terminated each segment due to stated bilateral hip as
well as low back pain.

### 3.   PRESENT WORK STATUS

Evaluation results indicate that Ms. McSwain's present occasional strength
capacities meet guidelines between sedentary to light level work. These
capacities require the worker to be able to lift up to 10-20 pounds of force
occasionally and up to 10 pounds of force frequently. Specific results indicate her
strength parameters are 10-20 pounds on an occasional basis at various ranges
tested.

## VIII.   FUNCTIONAL ACTIVITIES

| | |
|---|---|
| **Walking** | was achieved for 1488 feet in 12 minutes 47 seconds. The patient terminates task stating low back and right leg pain. She did take a break at 9 minutes during this task. |
| **Standing/Walking** | was maintained at the longest interval for 25 minutes, performed intermittently throughout the evaluation. |
| **Sitting** | was observed for 10 minutes with a stated ability of 30 minutes. |
| **Bending repetitively** | was achieved for 25 repetitions in 1 minute 48 seconds. She achieves 20 inches fingertips to floor. |
| **Crouching repetitively** | with limited range of motion (1/4) was achieved for 7 repetitions in 27 seconds with stated low back and bilateral hip pain. |
| **Kneeling repetitively** | to the right knee was achieved with use of external support for 3 repetitions in 38 seconds with stated hip, back, and leg pain. |
| **Balancing** | was maintained for 7 seconds on the right foot and 30 seconds on the left foot. |

UACL00881

FROM :PHYSICAL THERAPY SPECIALISTS    FAX NO. :334 673 2425    Jan. 12 2006 10:40AM P9

Sherri McSwain                          FCE                          Page 7
12/27/05

**Reaching**                    to shoulder and overhead levels was achieved for 10 minutes.

**Stair climbing**              was achieved for 5 repetitions in 1 minute 33 seconds.

UACL00882

**PHYSICAL THERAPY SPECIALISTS OF DOTHAN**
**3118 Ross Clark Circle**
**Suite 1**
**Dothan, AL  36303**
**(334) 673-2422**

PATIENT NAME: Sherri McSwain (DOB 9/8/64)
DATE OF SERVICE: February 22, 2006

Dear Dr. Voss:

The following is based on the measurements I obtained from my evaluation of the patient. **They are intended solely to aid you in your rating of the patient's impairment.** Measurements performed on the patient follow the procedures as outlined in the Guides to the Evaluation of Permanent Impairment, 4th Edition, by the American Medical Association.

The patient is assigned impairment using the DRE categories of the guides. The patient has a history of anterior lumbar diskectomy as well as anterior interbody fusion for disk herniation at L5/S1. It is felt the patient would fall into DRE lumbosacral category III, page 102 or Table 70, pg. 108 of the guides. Recommended impairment for this category is 10%.

**Recommended whole person impairment is 10%.**

Bobby Perkins, PT, OCS                    Tony Bridges, MS, CSCS, CDE, CEES

UACL00908

```
                            Activity
-------------------------------------------------------------------------
Type: Doctoral Resource          Name: Written IME/IRR/FCE Review
Status: Completed
Notify Date: 03/08/2006
Owner: Seiters, George
Mark As Priority: No
Subject: FCE Review
Upon Completion Notify: Activity Creator
Due Date: 03/22/2006

Request Fields
-------------------------------------------------------------------------
Brief Summary / History of File: This claim is approaching CID this month.
Claimant has had a previous fusion.  She has treated with two APs, Dr.
Evans, and Dr. Voss.  Dr. Evans will not comment on R&Ls as he
continues to defer to Dr. Voss.  Dr. Voss has given R&Ls, as seen on
the recent narrative in 1/06.  He feels that claimant has a good chance
returning to gainful work.  Also, received an FCE which was requested by
claimant's AP.  This report is now in the file.

Statement of Issue: Please review FCE and comment if the results appear
reasonable.  Thank you.


Created By: Enoch, Kenan
Created Date: 03/08/2006          Create Site: Chattanooga

Response Fields
-------------------------------------------------------------------------
Response: Seiters, George 03/22/2006: ORTHOPEDIC REVIEW

Claimant:  Sherri Ann
McSwain
 #1304988
Date
Referred:
3/8/06
Date
Completed:
3/22/06

CLINICAL DATA
REVIEWED: I have reviewed all clinical and medical evidence provided to me by
Company personnel bearing on the impairment(s) which I am by training and
experience capable to assess.

CLINICAL
SUMMARY:  The available clinical
information documents a 41 year-old female with a history of back and bilateral
leg pain following a November 2003 lifting incident
work.

A December 2003
MRI indicated an L5-S1 central disc bulge with nerve root
involvement.

Following failed
conservative treatment, Ms. McSwain underwent anterior disc excision and
interbody fusion with instrumentation in July
2004.

Postop notes
documented satisfactory progression of fusion but persistent back and bilateral
leg pain with normal neurologic findings.
```

UACL00927

A postop MRI in
November 2004 indicated postop scarring with no recurrent
disc.

Neurosurgery
follow-up in May 2005 indicated continued significant pain noted with lifting
her 35 pound child.  X-rays were
satisfactory at that time.

A myelogram/CT
scan in October 2005 noted mild stenosis at T11-12 and L2-3 and noted at least
partial incorporation of the graft and L5-S1 but noted some lucency indicated
incomplete incorporation.

Neurosurgery
follow-up in September 2005 noted that the CT scan was satisfactory and the
neurosurgeon opined successful fusion.
The note indicated continued back and leg pain but noted that Ms. McSwain
was taking care of a farm and noted some pain with that activity.  Physical exam
did not indicate focal
neurologic deficit.  The treating
neurosurgeon opined that the pain may be related to
"arthralgia".

In December 2005,
Dr. Voss responded to a narrative and indicated R&Ls for no lifting greater
than 21-30 pounds and no twisting/turning/bending.  He noted maximum medical
improvement at
that time and opined a good prognosis for
employment.

Pain management
notes are reviewed through October 2005.
The notes are hand written and difficult to interpret but indicate
continued back and bilateral leg pain and for a period of time indicated
cervical spine and right upper extremity pain.  The notes contain references to
continued smoking, depression and sleep disorder.  Treatment included
antidepressants,
muscle relaxants, and narcotic analgesics and included frequent adjustments or
changes in medication.  Recent
medications included Ambien, Cymbalta, Topromax and MS
contin.

The pain
management physician, Dr. Evans, has noted on several occasions, most recently
in January 2006, that R&Ls were deferred to Dr. Voss or to an
FCE.

An FCE dated
12/27/05 opined strength and functional capacity between sedentary to light
physical demand level.  Validity
criteria did not meet maximum effort level.  Testing was self-limited due to
pain
symptoms particularly for lifting from floor to waist level.  Specific findings
included occasional
lifting knuckle-shoulder 20 pounds, shoulder-overhead 10 pounds, carry 10
pounds, lifting floor-waste 0 pounds (self-limited).  Functional activities were
stated for
occasional to frequent bend, occasional kneel, occasional crouch, frequent
shoulder height reaching, occasional overhead reaching.  Capacity was noted for
simple grasping,
fine manipulation, pushing, pulling, stair climbing and balancing.
Nonphysiologic signs were noted at
50%.  Validity testing by grip
strength measure indicated maximum effort.
Functional activities involving walking, standing, sitting, repetitive

UACL00928

bending, repetitive crouching, repetitive kneeling, reaching, stair climbing and

balancing were expressed as actual observed times with no extrapolation to capacity per eight hour day.

ANALYSIS OF MEDICAL INFORMATION: The available clinical information is consistent with persistent lumbar spine and bilateral leg symptoms status post anterior discectomy and instrumented interbody fusion in July 2004. Imaging studies have suggested at least
partial fusion. Symptoms have
persisted despite intensive medical pain management. The treating surgeon has provided
R&Ls for 21-30 pounds lifting and no twist
to/turn/bend.

A December 2005
FCE indicated sedentary to light capacity but based on validity testing the results may represent a baseline level of what Ms. McSwain was willing to perform. Clarification provided in
a phone call of 3/22/06 to Tony Bridges, M. S. who performed the FCE indicated that he would determine the walking capacity to be at the occasional level, the standing/walking capacity to be at the occasional to low frequent level and the sitting capacity to be at the frequent
level.

It is my opinion
that the FCE represents the most detailed assessment of functional capacity and is somewhat consistent with the clinical findings especially considering the significant continuing chronic pain issues; however, due to validity issues Ms. McSwain may have greater functional capacity than measured and it would be helpful to know the treating neurosurgeon's assessment of the
IME.

It is noted that
Dr. Voss has not provided R&Ls since the FCE that he ordered and his office was contacted on 3/22/06 to request his opinion on the R&Ls following the FCE. His office staff requested a
fax outlining the requested information and indicated he would respond by fax. A fax requesting this
information is prepared on 3/22/06.

REFERRAL
QUESTIONS:

1. Please review
the FCE and comment on whether the results appear reasonable.

Please see
discussion above in the analysis of medical information.

George Z.
Seiters, M.D.
Consultant
Orthopedic Surgery
License Physician
(TN)
Board Certified
in Orthopedic Surgery

UACL00929



**UNUMPROVIDENT**

Thursday, March 23, 2006

Nicholas F. Voss, M.D.
Neurosurgical Associates of Dothan

Phone: 334-793-6573
Fax: 334-793-5346

Dear Dr. Voss,

I am an orthopedic consultant at Sherri McSwain's disability insurance carrier, UnumProvident. Your office staff indicated that you would prefer to respond to a fax rather than a phone conference. If you prefer a phone conference, I can be reached at 423-294-2493. The purpose of this fax or phone conference is to gain a better understanding of your medical opinion and address questions we have regarding our interpretation of the medical data available.

The records available for our review indicate continued back and leg pain despite successful anterior discectomy and interbody fusion at L5-S1 and despite intensive continued pain management. The pain management physician has deferred R&Ls to you or to an FCE. Your office provided R&Ls as of December 2005 for no lifting greater than 21-30 pounds and no lifting, twisting, turning or bending. Your office obtained an FCE in December 2005 that indicated more restrictive R&Ls of sedentary to light physical demand level but noted indication of possible submaximal effort.

*It would be helpful to our assessment of Ms. McSwain if you could review the FCE and provide your thoughts on current R&Ls.*

Enclosed is a signed authorization for release of this information. You may fax your written response to me at 423-386-2089 or if you prefer, please mail to my attention at UnumProvident Corporation, 1 Fountain Square, Chattanooga, TN 37402. We are required by law to make timely claim decisions and are committed to providing your patient and our insured with the best possible claim service in accordance with those requirements. I would appreciate it if you could respond within 10 business days to ensure that your response is included in our evaluation.

We very much appreciate your time in providing this information and analysis to assist in our claim evaluation efforts. We will be happy to reimburse you for your time on a pro rata basis at your customary office consultation rate. Please attach a statement including to whom the check should be made payable, as well as the tax ID number.

Thank you for your time and assistance.

Sincerely,

*George Z. Seiters, M.D.*

George Z. Seiters, M.D.
Consultant Orthopedic Surgery
License Physician (TN)
Board Certified in Orthopedic Surgery

UACL00935

Confidential                          Page -1 -                          3/23/2006
Sherri Ann McSwain                    NL# 1304988                        DOB: 09/08/1964

## Neurosurgical Associates of Dothan, P.C.
### Brain and Spine Surgery
1118 Ross Clark Circle, Suite 301
P.O. Box 2247
Dothan, Alabama 36302
(334) 793-6573

D. Bruce Woodham, M.D.                                      Nicholas F. Voss, M.D.

April 5, 2006

George Z. Seiters, M.D.
Unum Provident
1 Fountain Square
Chattanooga, TN 37402

Re: Sherri Ann McSwain
DOB: 09-08-1964

Dear Dr. Seiters,

In response to your letter dated March 23, 2006 regarding Mrs. McSwain's FCE results, I have reviewed these and agree with the assessment. I have nothing further to add to the restrictions and limitations.

Sincerely,

Nicholas F. Voss, M.D.

NFV/kst

UACL00950

.                                    **Activity**
--------------------------------------------------------------------------------
Type: Voc Resource          Name: Vocational Assessment
Status: Completed
Notify Date: 04/21/2006
Owner: Searcy, Christy N
Mark As Priority: No
Subject: VA
Upon Completion Notify: Claim Owner
Due Date: 05/05/2006
Action: Occupations Identified

Request Fields
----------------------------------------------------------------------
Brief Summary / History of File: A VA was previously performed, but with different
R&Ls.  At this point now, there has been an FCE in which claimant's AP and our OSP agree with the results.  The R&Ls from the FCE are: Lifting 10-20 pounds.  Can bend occasionally to frequently.  Can occasionally kneel, crouch, and reach overhead.  Can frequently lift over shoulder.  Can simple grasp, fine manipulate, push/pull, climb stairs, and balance.  FCE states claimant can perform sedentary to light work. Gainful is $11.90 per hour.  TEE is in file as well.  Please complete a VA on this claim based on information above.  Thanks.

Statement of Issue: Please see summary.


Created By: Enoch, Kenan
Created Date: 04/21/2006        Create Site: Chattanooga

Response Fields
----------------------------------------------------------------------
Response: Searcy, Christy N 05/02/2006: I reviewed the new medical information which includes
a FCE dated 12/27/05.  The FCE results indicate Ms. McSwain is capable of functioning in the sedentary to light physical demand level with lifting/carrying between 10-20 lbs. occasionally.  Kneeling, crouching and overhead reaching were demonstrated occasionally.  Bending was demonstrated occasionally to frequently.  Capacity was noted for simple grasping, fine manipulation, pushing, pulling, stair climbing and balancing.  Functional activities involving walking, standing, sitting, repetitive bending, repetitive crouching, repetitive kneeling, reaching, stair climbing and balancing were expressed as actual observed times with no extrapolation to capacity per eight hour day.

I
reviewed the vocational assessment conducted on 1/20/06 which provides light physical demand level vocational options within the restrictions and limitations

noted above.  The vocational assessment would still be appropriate given the updated medical information.


I have reviewed all occupational
and vocational evidence provided to me by Company personnel, including analysis of current limitations and restrictions by medical and clinical personnel, bearing on the vocational assessment(s) which I am by training and experience capable to perform.

Christy N. Searcy, MS,
CRC
Senior Vocational
Rehabilitation Consultant

UACL00953

```
                              Activity
----------------------------------------------------------------------
Type: Management        Name: Change in Definition Review
Status: Completed
Notify Date: 05/08/2006
Owner: Roberts, Gretchen M
Mark As Priority: No
Subject: CID Closure Recommendation
Upon Completion Notify: Activity Creator


Request Fields
----------------------------------------------------------------------
```

Request: CID had a 3/23/06.  Claimant had a L5-S1 fusion on
7/1/04.  Claimant has continued with pain since the fusion process has gone
very slowly.  Claimant has treated with Dr. Evans (pain management) and Dr.
Voss (neurosurgeon).  On 6/2/05, Dr. Voss gave restrictions and limitations
of no lifting, twisting, turning, or bending.  A clarification of the
lifting restrictions was obtained from Dr. Voss on 7/27/05 stating that she can
lifti 21-30 pounds.  After this clarification, there was still some testing
to confirm that the claimant's fusion had solidified.  After updated
records had been requested, a narrative was sent to Dr. Voss which is in the
file imaged on 1/6/06.  The narrative asked specifically if the
restrictions and limitations given in June and July still were applicable to Ms.

McSwain's condition.  Dr. Voss agreed that yes, they were.  VA was
completed on 1/20/06 which identified 2 gainful occupations.  Before
proceeding with any other direction, a narrative was sent to claimant's other AP

Dr. Evans for his comment.  Dr. Evans deferred any restrictions and
limitations comments to Dr. Voss.  During a discussion with the claimant on
1/31/06, it became known that she had a FCE on 12/27/05.  This report was
finally received and reviewed.  The 3/22/06 doctoral response regarding the
FCE stated, "The available clinical information is consistent with persistent
lumbar spine and bilateral leg symptoms status post anterior discectomy and
instrumented interbody fusion in July 2004.  Imaging studies have suggested
at least partial fusion.  Symptoms have persisted despite intensive medical
pain management.  The treating surgeon has provided R&Ls for 21-30
pounds lifting and no twist to/turn/bend.  A December 2005 FCE indicated
sedentary to light capacity but based on validity testing the results may
represent a baseline level of what Ms. McSwain was willing to perform.
Clarification provided in a phone call of 3/22/06 to Tony Bridges, M. S. who
performed the FCE indicated that he would determine the walking capacity to be
at the occasional level, the standing/walking capacity to be at the occasional
to low frequent level and the sitting capacity to be at the frequent
level.  It is my opinion that the FCE represents the most detailed
assessment of functional capacity and is somewhat consistent with the clinical
findings especially considering the significant continuing chronic pain issues;
however, due to validity issues Ms. McSwain may have greater functional capacity

than measured and it would be helpful to know the treating neurosurgeon's
assessment of the IME.
It is noted that Dr. Voss has not provided R&Ls
since the FCE that he ordered and his office was contacted on 3/22/06 to request

his opinion on the R&Ls following the FCE.  His office staff requested
a fax outlining the requested information and indicated he would respond by
fax.  A fax requesting this information is prepared on 3/22/06."
Finally, Dr. Voss' response was received on 4/12/06 which indicated that he
agreed with the FCE results.  On 4/18/06, the OSP responded and agrees with
the FCE and the AP.  Supported R&ls from the FCE were sent to Voc for a
follow up on the VA previously completed.  On 5/2/06, the vocational review
stated that the previous VA still applies.  On 1/31/06, a discussion with a
VRC confirmed that the 2 gainful occupations identified exist in claimant's
area.  Based on all of the medical and vocational information in the file,
claimant is not disabled from performing any occupation.  Recommending to
close claim.

UACL00956

Created By: Enoch, Kenan
Created Date: 05/08/2006          Create Site: Chattanooga

Response Fields
-----------------------------------------------------------------------
Response: Roberts, Gretchen M 05/08/2006: Agree with non compensable CID
decision.  Most
current functional ability is from the FCE and her AP agrees with the FCE
findings.  Gainful occs have been identified.  Will review letter and
forward to QCC.


Completed By: Roberts, Gretchen M
Completed Date: 05/08/2006          Create Site: Chattanooga

UACL00957



May 11, 2006

SHERRI ANN MCSWAIN
16685 COTTONWOOD RD
GORDON, AL 36343

RE:   McSwain, Sherri Ann         DOB: September 08, 1964
      Claim Number:               1304988
      Policy Number:              578048
      Unum Life Insurance Company of America

Dear Ms. McSwain:

After completing our review of your disability claim, we regret that we are unable to continue paying benefits.

As you may know, your employer's policy states:

**"HOW DOES UNUM DEFINE DISABILITY?**

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience."

You must be under the regular care of a physician in order to be considered disabled.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

Unum Life Insurance Company of America
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843
Fax: 1-800-447-2498
www.unumprovident.com

1242-03

UACL00965

Claimant Name: Sherri Ann McSwain     Claim #: 1304988

We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Unum Representative."

We have based our decision on medical and vocational information obtained, and on the policy provisions. Based on your functional capacity and employment history, we have determined that you are not eligible for benefits as defined above. Our rationale is detailed below.

We understand that you had a L5-S1 lumbar fusion on July 1, 2004. Our records indicate that you have continued with pain after the surgery. We have continuously updated medical records from both of your treating physicians, Dr. Voss and Dr. Evans. Periodically, we must also request specific restrictions and limitations from your physicians, so that we can understand what functional capacity your physicians feel that you are capable of. On June 2, 2005, Dr. Voss gave restrictions and limitations that you could not lift, twist, turn, or bend. Dr. Voss later clarified the lifting as 21-30 pounds. On December 8, 2005, Dr. Voss still felt that the previously mentioned restrictions and limitations applied.

As part of the claim review, we referred your file to a vocational consultant for evaluation. The consultant reviewed your restrictions and limitations, as well as your employment and educational history, and concluded that you would be able to work in the following occupations:

| Occupation | Physical Demand Level | Monthly Wage |
|------------|----------------------|--------------|
| School Nurse | Light | $2,717.87 |
| Office Nurse | Light | $2,929.33 |

"Gainful Occupation means an occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work."

After the vocational assessment was completed, we discussed on the telephone with you that our records indicate that there will be no benefits beyond 24 months. At that time you had indicated that Dr. Voss was doing more testing and that you had had a functional capacities evaluation in December of 2005. We also advised that we will send a narrative to Dr. Evans to give him the opportunity to provide any restrictions and limitations that he feels necessary.

We received a response from Dr. Evans who did not give any specific restrictions and limitations as he deferred that information to Dr. Voss.

We later received the December 27, 2005 functional capacities evaluation. The restrictions and limitations provided by the functional capacities evaluation report were that you could lift 10-20 pounds, bend occasionally to frequently, can occasionally kneel, crouch, and reach overhead, can frequently lift over shoulder, can simple grasp, fine manipulate, push/pull, climb stairs, and balance. The evaluation stated that you could perform sedentary to light work.

The reviewing physician of your claim submitted the functional capacities evaluation to Dr. Voss for comment, and Dr. Voss responded stating that he agrees with the report.

UACL00966

After receiving the response from Dr. Voss that he agrees with the functional capacities evaluation, your file was sent back to our vocational team to see if the results alter the previous vocational assessment. The vocational review stated that there is no change in the previous vocational assessment. Therefore, the information in the file supports that you are not disabled from performing any occupation.

Because you no longer meet the contractual definition of disability, we regret that we cannot continue paying benefits. A check for benefits paid up to the date of this letter is being sent separately.

If you disagree with our determination and want to appeal this claim decision, you must submit a written appeal. This appeal must be received by us within 180 days of the date you receive this letter. You should submit your written appeal to the following address:

The Benefits Center Compliance Department
Appeals Unit—1 North
PO Box 180136
Chattanooga, TN 37401-3030
Fax Number: 1-423-755-8383

A decision on appeal will be made not later than 45 days after we receive your written request for review of the initial determination. If we determine that special circumstances require an extension of time for a decision on appeal, the review period may be extended by an additional 45 days (90 days in total). We will notify you in writing if an additional 45 day extension is needed.

If an extension is necessary due to your failure to submit the information necessary to decide the appeal, the notice of extension will specifically describe the required information, and you will be afforded at least 45 days from receipt of the notice to provide the specified information. If you deliver the requested information within the time specified, the 45 day extension of the review period will begin after you have provided that information. If you fail to deliver the requested information within the time specified, we may decide your appeal without that information.

You will have the opportunity to submit written comments, documents, or other information in support of your appeal. You will have access to all relevant documents as defined by applicable U.S. Department of Labor regulations. The review will take into account all new information, whether or not presented or available at the initial determination. No deference will be afforded to the initial determination.

The review will be conducted by us and will be made by a person different from the person who made the initial determination and such person will not be the original decision maker's subordinate. In the case of a claim denied on the grounds of a medical judgment, we will consult with a health professional with appropriate training and experience. The health care professional who is consulted on appeal will not be the individual who was consulted during the initial determination or a subordinate. If the advice of a medical or vocational expert was obtained by the Plan in connection with the denial of your claim, we will provide you with the names of each such expert, regardless of whether the advice was relied upon.

UACL00967

1242-03

Claimant Name: McSwain, Sheri Ann
Claim Number: 1304988

May 11, 2006
Page 4 of 4

If your request on appeal is denied, the notice of our decision will contain the following information:

a.  the specific reason(s) for the appeal determination;
b.  a reference to the specific Plan provision(s) on which the determination is based;
c.  a statement disclosing any internal rule, guidelines, protocol or similar criterion relied on in making the adverse determination (or a statement that such information will be provided free of charge upon request);
d.  a statement describing your right to bring a civil suit under federal law;
e.  a statement that you are entitled to receive upon request, and without charge, reasonable access to or copies of all documents, records or other information relevant to the determination; and
f.  a statement that "You or your plan may have other voluntary alternative dispute resolution options, such as mediation.  One way to find out what may be available is to contact your local U.S. Department of Labor office and your State insurance regulatory agency."

Notice of the determination may be provided in written or electronic form.  Electronic notices will be provided in a form that complies with any applicable legal requirements.

If you dispute this determination, you have the right to bring a civil action under 502(a) of the Employee Retirement Income Security Act following an adverse benefit determination on review.  Unless there are special circumstances, this administrative appeal process must be completed before you begin any legal action regarding your claim.

If we do not receive your written appeal within 180 days of the date you receive this letter, our claim determination will be final.

Please be aware that we have not evaluated your claim with respect to any provisions other than those discussed above, and that the Company reserves its right to enforce any and all provisions of the policy.

Ms. McSwain, if you have any questions, please contact me at 1-800-858-6843.

Sincerely,

*Kenan Enoch*

Kenan Enoch
Senior Disability Benefits Specialist
Unum Life Insurance Company of America

UACL00968

1242-03

**LAW OFFICES**

JOHN E. BYRD, JR., JOSEPH W. LEWIS & DAVID A. JONES
211 WEST MAIN STREET, SUITE 1
DOTHAN, ALABAMA 36301

Phone (334) 794-0759
Fax (334) 792-0163

JOHN E. BYRD, JR.
JOSEPH W. LEWIS
DAVID A. JONES

May 15, 2006

MAILING ADDRESS:
P.O. BOX 536
DOTHAN, ALABAMA 36302

The Benefits Center Compliance Department
Appeals Unit-1 North
P.O. Box 180136
Chattanooga, Tennessee 37401-3030

RE:  **Claim No.:  1304988**
     **Policy No:  578048**
     **My Client:  Sherri Ann McSwain**
     **DOB:       09/08/1964**

> Benefits Center
> Compliance Department
>
> MAY 19 2006

Dear Sir or Madam:

Pursuant to your letter of May 11, 2006 regarding the discontinuance of Ms. McSwain's disability benefits, request is hereby made for an appeal of this decision.

Thank you very much.

Very truly yours,

Joseph W. Lewis
John E. Byrd, Jr.
Attorneys for Sherri McSwain

JWL/tnm

UACL00981

**LAW OFFICES**

JOHN E. BYRD, JR., JOSEPH W. LEWIS & DAVID A. JONES
211 WEST MAIN STREET, SUITE 1
DOTHAN, ALABAMA 36301

Phone (334) 794-0759
Fax (334) 792-0163

JOHN E. BYRD, JR.
JOSEPH W. LEWIS
DAVID A. JONES

May 16, 2006

MAILING ADDRESS:
P.O. BOX 536
DOTHAN, ALABAMA 36302

Benefits Center
Compliance Department

JUN 19 2006

Unum Life Insurance Company of America
The Benefits Center Compliance Department
Attn: Sibley Evans, Appeals Consultant
P.O. Box 180136
Chattanooga, Tennessee 37401-3030

RE:  *Claim No.:*  *1304988*
     *Policy No:*  *578048*
     *My Client:*  *Sherri Ann McSwain*
     *DOB:*  *09/08/1964*

Dear Sir or Madam:

As part of your upcoming review, we are including herewith all of Ms. McSwain's medical records. We ask that you take note of a recent vocational assessment conducted on Ms. McSwain by Dr. Michael McClanahan, wherein he rated her vocational disability at 100%. If you use additional information in analyzing this appeal, we ask that you forward such to us, in order to allow us to make a determination if such may be rebutted.

We look forward to any further notices from you regarding this appeal.

Very truly yours,

John E. Byrd, Jr.

JWL/tmm
Enclosures
cc:  Joseph W. Lewis, Esq.

UACL01018

86/03/2006  16:13    3348265678                                          PAGE  02

## *Vocational & Rehabilitation Consultants*

Auburn, Alabama
Phone (334) 826-7345
Facsimile (334) 826-5678

Michael M. Christian  Ph.D.

Mail:
Post Office Box 2782
Auburn, Alabama  36831-2782

### VOCATIONAL EVALUATION REPORT

#### I. Background Information

June 5, 2006

|  |  |
|---|---|
| Regarding: | Ms. Sherri A. McSwain |
| Social Security Number: | 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 |
| Address: | 16685 Cottonwood Road |
|  | Gordon, Alabama 36343 |
| Telephone Number: | (334) 714-1429 |
| Date of Birth: | 9/8/64 (Age = 41) |
| Date of Alleged Onset: | 10/2003 |
| Employer at Time of Onset: | Southeast Alabama Medical Center |
| Employer at Time of Testing: | None |
| Referral Source: | Mr. Joe Lewis & Mr. John Byrd, Attorneys at Law |
| Date of Testing: | 4/5/2006 |

Benefits Center
Compliance Department

JUN 1 9 2006

This is an attorney referral for assessment of vocational disability in relation to an alleged on the job injury. Testing, conducted on April 5, 2006, included:

> Vocational Interview
> Visual Analog Pain Rating Scale Technique
> Wide Range Achievement Test-Revision 3
> Kaufman Brief Intelligence Test
> Wonderlic Personnel Test
> Sage dexterity tests
> Purdue Pegboard
> Zung Depression Self-Rating Scale
> Review of referral information
> LifeStep software

**Referral Information.** Functional Capacity Evaluation by Mr. Bobby Perkins, P.T., OCS, and Mr. Tony Bridges, MS, CSCS, CDE, CEES, dated December 27, 2005.

#### II. Vocational Interview

> *The information contained within this section was obtained directly from the claimant and may not be corroborated by other sources (e.g., medical and educational records, etc.).*

**History of Onset/Background Information.** Ms. McSwain related a history of an on the job back injury that occurred in October 2003 while she was working for Southeast Alabama Medical Center as a Registered Nurse. She was transferring a surgical patient from the operating table to the stretcher when she felt "a little pull" in the low back. The next day, "I was in excruciating pain." When she reported to work following a three-day weekend, her legs failed and she fell. She was treated for about two weeks at the hospital, then placed on workers compensation. On December 23, 2003, she was taken out of work by the employer, and in July 2004, underwent a back fusion by Dr. Voss. She remains unemployed.

UACL01019

Ms. Sherri A. McSwain (continued)                                                                page -2-

On the date of testing, Ms. McSwain presented with complaints of pain and dysfunction of the low back, right leg, and knees. Prescribed medications included MS Contin, Topamax, Baclofin, Ibuprofen, Prozac, Ambien, and Provigil, all by Dr. David Evans. Experienced side effects include sleepiness/drowsiness. She occasionally uses a TENS unit.

Ms. McSwain's medical history, other than the above, includes a tonsillectomy (1978), left knee arthroscopic surgery (1987), and surgery to repair two breaks in the nose (2000). She gave her height at 5'7", and she weighs 175 pounds, up 25 pounds from time of onset. She attributed the weight gain to "Not been able to be as active as I used to be."

**Claimant's Perception of Abilities.** Ms. McSwain is able to sit about 20 minutes before shifting, and she can stand about five minutes. She is able to walk 200 feet. She is able to drive short distances. She is able to reasonably lift about 10 pounds. She has difficulty with balance secondary to leg/back pain and dysfunction, and she avoids climbing, stooping, kneeling, crouching and crawling as these are painful activities. She is left-handed.

**Pain Assessment.** Ms. McSwain indicated that she is constantly in pain in multiple areas. She rated the intensity of the pain using *the Visual Analog Scale Technique* (zero is no pain and 10 requires an immediate trip to the emergency room) for the 30 days prior to the evaluation. In addition, she was asked for the number of days in the month prior to testing that the pain reached 7 or greater. Her ratings:

| Location | At beginning / end of testing | Typical (past 30 days) | Worst (past 30 days) | Least (past 30 days) | # Days ≥7 (past 30 days) |
|----------|---------|---------|---------|---------|---------|
| Low back | 6/7 | 4 | 7 | 4 | 30 |
| Right leg | 5/7 | 4 | 7 | 4 | 30 |
| Knees | 7/7 | 7 | 7 | 6 | 30 |

**Emotional Adjustment.** Ms. McSwain admitted to "periodic depression" and indicated a need for treatment. She denied current severe symptoms such as suicidal ideation, psychosis, etc.

**Education and Training History.** Ms. McSwain dropped out of school in the eleventh grade and later obtained a GED. In 1996, she completed a three year nursing program at Troy State, and finished with a 3.7/4.0 GPA.

**Employment History.** Ms. McSwain began working at Southeast Alabama Medical Center in July 2000, as a Registered Nurse. She was paid $19.67 hourly (plus benefits), and worked 40 hours per week. Her description of the position is in the heavy exertional class, and skilled.

Prior to Southeast Alabama Medical Center, Ms. McSwain worked as an RN for Baptist Surgery Center (10/97 - 7/00), Jackson Hospital (5/97 - 10/97), and Columbia Regional Hospital (11/96 - 5/97). She was in nursing school from 1993 - 96. Employment prior to nursing school is beyond the accepted vocationally relevant time period (15 years), and unskilled.

UACL01020

## III. Test Results

**Academic.** Ms. McSwain's *Wide Range Achievement Test-Revision 3 (WRAT-3)* scores:

|            | Raw score | Standard score | Grade score     |
|------------|-----------|----------------|-----------------|
| Reading    | 49        | 102            | post high school|
| Spelling   | 44        | 102            | 12              |
| Arithmetic | 41        | 96             | 9-10            |

**Intelligence.** The *Kaufman Brief Intelligence Test (K-BIT)* was administered to obtain an estimate of intellectual ability. The *K-BIT* consists of three sub-tests covering two areas, Vocabulary and Matrices. The Vocabulary test measures verbal, school related skills such as language development, understanding of verbal concepts, fund of information, and word knowledge. The Matrices measure nonverbal skills that include the ability to solve new problems, to understand relationships among pictures and designs, and to reason by analogy. Ms. McSwain obtained a Composite, or full scale IQ of 96, which is in the Average range. Sub scales: Vocabulary - 92; Matrices - 101. The 9 point disparity between scales is not statistically significant.

**Personnel Assessment:** The *Wonderlic Personnel Test* is a short form test of general cognitive ability. It is used to assess the level at which an individual learns, understands instructions and solves problems. It can provide insight into how easily individuals can be trained, how well they can adjust and solve problems on the job, and how well satisfied they are likely to be with the demands of a job. Ms. McSwain's score is indicative of the ability to learn semi to skilled work tasks, in the central tendency of persons with ten years of formal education, and a predicted *WAIS-R* IQ of 95.

**Vocational Aptitudes.** Aptitudes are the capacities or specific abilities that an individual must have in order to learn to perform a given work activity. For this analysis, Ms. McSwain's work history, educational background, the previously referenced achievement, IQ, and personnel scores, the *Purdue Pegboard*, and selected components from the *Sage Vocational Aptitude Battery* were considered. Her scores are compared to competitively employed workers and presented in DoL's classification system.

| Aptitude          | Percentile Ranking | Normative Comparison |
|-------------------|--------------------|----------------------|
| General Learning  | 34-65%             | below average        |
| Verbal            | 34-65%             | below average        |
| Numerical         | 34-65%             | average              |
| Spacial           | 34-65%             | average              |
| Form Perception   | 34-65%             | average              |
| Clerical Perception| 34-65%            | below average        |
| Motor Coordination| 10-33%             | below average        |
| Finger Dexterity  | 34-65%             | average              |
| Manual Dexterity  | 34-65%             | average              |

**Depression Self-Rating.** Ms. McSwain's score (SDS Index = 63) on the *Zung Depression Self-Rating Scale* is in the "moderate to marked" range.

**Functional Rating Index (FRI).** The *FRI* combines the content of the *Oswestry Low Back Disability Questionnaire* and the *Neck Disability Index* in a 10-item format that measures pain and function of the spinal musculoskeletal system. Eight items refer to activities of daily living, and two refer to different attributes of pain. Ms. McSwain's score of 74% is in "very severe disability" category.

UACL01021

JJ48265670

Ms. Sherri A. McSwain (continued)                                                                page -4-

## VOCATIONAL APPRAISAL

This is a 41-year-old female Registered Nurse who was referred for an assessment of vocational disability in relation to an alleged on the job back injury that occurred in October 2003. Subsequent to the injury, she underwent a back fusion, but she continues to present with complaints of debilitating pain and dysfunction to multiple areas. She has not successfully worked since the injury.

Ms. McSwain's self described functional limitations and pain do not allow for competitive employment. She can handle about ten pounds, requires postural changes (sit-stand) or shifting at five to 20 minute intervals. Any activity involving bending or flexion of the spine is painful, so she avoids climbing, stooping, kneeling, crouching, and crawling. She described chronic and persistent pain in the low back, right leg, and knees, and rated the intensity in the moderate to moderately severe range daily, even with medication. Moderately severe to severe pain is considered occupationally debilitating due to the effect it has on concentration, persistence, and pace.

The scores generated from present testing are felt to be valid estimates of Ms. McSwain's true abilities, as there is good internal consistency among the measures, and they are within the range of expectation given her history. Ms. McSwain obtained a GED after dropping out of school in the eleventh grade, and completed a three year nursing program. Accordingly, she demonstrated functional academics at the post high school level in Reading (word recognition), twelfth grade in Spelling, and at the 9th to 10th grade in Arithmetic. A comparison of the mean of standard scores from achievement testing (100) to the Composite IQ score (96) is an indication of consistency of effort and overall validity of the scores. Corroborating the achievement and IQ scores is her performance on the *Wonderlic Personnel Test*. On this test, used in industry for selection and promotion and used in the present context for assessment of "work IQ," her score is in the central tendency of persons who have ten years of education (she has a GED plus three years of nursing school), indicative of the ability to learn semi-skilled work tasks (her history is skilled), and predictive of a *WAIS-R IQ* of 95 (we obtained 96 on a different instrument). Finger and manual dexterity scores are in the average range, whereas, motor coordination is below average.

The 12/27/2005 Functional Capacity Evaluation *(FCE)* resulted in the finding of "sedentary to light physical demand level . . . as evidenced by lifting and carrying between 10-20 pounds . . . she does not meet the physical demand level for her previous occupation as a nurse." It is noteworthy that Ms. McSwain's pretest pain was three, and post test five, less than the ratings she gave during the present evaluation (5-7), an indication her condition may be deteriorating. Ms. McSwain recalled that for two or three days following the FCE, "I was in a lot of pain."

Based on the information available, the following ratings are offered for consideration:

1.  The December 27, 2005, *Functional Capacity Evaluation* does not allow for work that is both suitable and gainful as defined in the Alabama Code. and indicates a Vocational Disability Rating of 100%;

2.  Ms. McSwain's self described abilities and pain do not allow for full time work and indicate a Vocational Disability Rating of 100%.

Mr. Lewis, I appreciate this referral. If I can be of further assistance, please let me know.

Sincerely,

Michael McClanahan, Ph.D.

UACL01022

**MICHAEL C. McCLANAHAN, Ph.D.**
Post Office Box 2782
Auburn, Alabama 36831-2782
(334) 826-2345 (Office) / (334) 826-5678 (Fax)
(334) 826-6645 (Residence)

## Education

| | | | |
|---|---|---|---|
| Ph.D. | 1994 | Auburn University | Rehabilitation Services |
| M.Ed. | 1981 | University of Georgia | Rehabilitation Counseling |
| B. S. | 1977 | Auburn University | Rehabilitation Services |

## Employment

1983 - Present
*Vocational Consultant*     *Vocational & Rehabilitation Consultants*  Auburn, Alabama

September 1994 - June 1995 &
May 2002 - December 2002
*Instructor / Adjunct*     *Auburn University*     Auburn, Alabama

September 1988 - February 28, 1994
*Project Director*     *Auburn University*     Auburn, Alabama

September 1983 - June 1986
*Extension Associate*     *Auburn University*     Auburn, Alabama

June 1982 - September 1983
*Vocational Consultant*     *Crawford Rehabilitation Services, Inc.*     Savannah, Georgia

June 1981 - June 1982
*Rehabilitation Specialist*     *International Rehabilitation Associates*     Savannah, Georgia

February 1979 - June 1981
*Vocational Evaluator*     *Goodwill Industries*     Savannah, Georgia

September 1977 - February 1979
*Assistant Director*     *Touch Point, Inc.*     Athens, Georgia

## Professional Presentations/Lectures

Coordinator and presenter at more than 150 conferences, training programs, and workshops in addition to numerous professional presentations over the past 25 years.

## Professional Writing

Author or coauthor of (a) 14 Rehabilitation Services Administration Long-Term Training Grant Applications, (b) one textbook, (c) eight articles published in professional journals, and (d) 19 training manuals for use in rehabilitation related training. Assisted with research studies, theses, dissertations.

## Affiliations, Achievements, Certifications

Senior Disability Analyst and Diplomate, American Board of Disability Analysts
Certified Vocational Evaluator (CCWAVES) 1990-2000
Certified Rehabilitation Counselor (CCRC)
Member,
    National Association of Rehabilitation Professionals in the Private Sector (NARPPS)
    Alabama Association of Rehabilitation Professionals in the Private Sector
    NARPPS Forensics Division
President, Alabama VEWAA, 1990-91
President-Elect, Rehab Interest Group - 1983-84
Town Council Member, Waverly, Alabama - 1984-86

UACL01023

*A detailed CV is available upon request*

---

Claimant Name:  Sherri Ann McSwain     Claim #: 1304988

Neurosurgical Associates of Dothan, P.C., 1118 Ross Clark Circle, Ste 301, Dothan, AL 36301
Telephone: (334) 793-6573    Fax: (334) 793-5346
D. Bruce Woodham, M.D.        Nicholas F. Voss, M.D.

**PATIENT NAME:**  McSwain, Sherri              **DOB:**     09/08/1964

**DOS:**            04/07/2006

**CHIEF COMPLAINT:** Right leg pain, right back pain, numbness in the second, third and fourth toes of the bilateral feet. Pins and needles in the bottom of her feet.

**HISTORY OF PRESENT ILLNESS:** The patient is a 41-year-old female who underwent an anterior lumbar interbody fusion in July of 2004 for an L5-S1 disk herniation. Since that time, she has had continued right leg pain, low back pain, and numbness in her feet. She has undergone multiple radiologic tests, and it is the impression of the radiologist that she has a fusion at L5-S1. She states her pain is debilitating and she is not able to work in her home the way she would like to. She states she is also unable to hold down a job because she does not feel she is physically able to work. She sees Dr. Evans for her pain, and he has tried Lyrica and Elavil for her neuropathic pain. She is currently on Topamax which she states does not give her relief from the neuropathic pain.

**PHYSICAL EXAMINATION:**
VITAL SIGNS:  Blood pressure 136/84. Pulse 78. Temperature 98.0.
SKIN: Warm, dry and intact.
LUNGS:  Clear to auscultation.
HEART:  Regular rate and rhythm.
ABDOMEN: Soft, without masses or tenderness.
EXTREMITIES:  Warm and dry without atrophy, clubbing, cyanosis or edema.
NEUROLOGIC:  Shows normal strength in the arms and legs. She feels as if her right leg is a little bit weaker but when tested, she has good strength. Her reflexes are diminished throughout. Her sensory exam is diminished in the second, third and fourth toes on the right.

**RECOMMENDATION:** The patient was reviewed with Dr. Voss. Dr. Voss went in to talk to the patient. He explained to the patient that there is no further surgical intervention that could relieve her pains. He explained to her that she should pursue a pain management approach. She was concerned about her disability claim. Dr. Voss explained to her that he does not decide if she can return to work or not. He sends patients for FCE and impairment rating. He has not found the patient to be disabled from working. He has not restricted her from working. We will see her again on an as needed basis.

Dictated for Nicholas F. Voss, M.D.

Jennifer Parrish, MSN, CRNP

JP/TC/1494887-000

UACL01448

**UNUMPROVIDENT**

**Medical Response**

_____

Claimant: Sherri McSwain
SS#: 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
Date Referred: 06/21/06
Date Completed: 06/29/06

CLINICAL DATA REVIEWED: see below
Medical Records from:
Dr. Voss, neurosurgeon
Dr. Evans, pain mgt
Dr. O'Brien, pcp
Dr. Lacour, rheumatologist
FCE
Vocational Evaluation
*"I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairments which I am by training and experience capable to assess."*

CLINICAL SUMMARY: According to the medical records, this 42 yr old RN, who went out of work on 12/24/03, reportedly failed several months of conservative treatment for a disc herniation at L5-S1 and ultimately underwent an anterior lumbar disc interbody fusion on 07/01/04.

She has continued to complain of low back and leg pain and has been followed by Dr. Evans for pain mgt. Her most recent meds include: MS contin, Topamax, Baclofen, Ibuprofen, Prozac, Ambien and Provigil.

Repeat imaging studies include **Lumbar myelogram with post-myelogram CT of the lumbar spine** on 10/10/05 which showed some lucency along the graft site in the disc suggesting it may not be completely fused. Incidental note is made of a tiny disc bulge with very mild stenosis, L2-3 mild generalized stenosis due to disc bulge and at least partial incorporation of the graft into the endplates at L5-S1

**12/27/05 FCE** was consistent with results that indicated the clmt's present strength and functional capacities met the guidelines between the sedentary and light physical demand level based on various ranges tested as evidenced by lifting and carrying between 10-20 lbs. She did not meet the physical demand level for her previous occupation as a nurse.

**04/05/06** A copy of the FCE was forwarded to her neurosurgeon, **Dr. Voss**, who advised he agreed with the assessment and did not have further anything to add to the R/L's. Her pain mgt specialist, **Dr. Evans**, had previously advised that he deferred any R/L's to Dr. Voss and the FCE.

UACL01518

Although initial benefits were provided thru her Own Occ period, the decision was made to close her claim after Other Occs were identified based on her demonstrated capabilities. The clmt's attorney submitted additional documentation on appeal, the majority of which appear to be duplicate records. The updated information includes: evaluation by Drs. O'Brien and Lacour for knee pain and questionable arthritis, a Vocational Evaluation Report and a recent note from Dr. Voss.

**04/04/06** Evaluated by **Dr. O'Brien**, pcp, for painful knees. Has been on Motrin without improvement. Exam reveals grinding over the medial and lateral meniscus both knees, popping sensation in the right knee. Arthritis of knee, questionable etiology. Changed to Lodine 400mg bid. X-rays of knees noted to be negative for any abnormality. She returned for f/u reporting her pain level has decreased from 10/10 to 6-7/10 but not totally resolved. Subsequent lab work showed RA factor and sed rate to be normal. ANA + 1:80, CCP-IgG weakly +. Decreased grinding in the knees. Changed to Mobic, will discuss with Dr. Evans and lab.

**04/05/06 Vocational Evaluation:** See actual report. Clmt presented with complaints of pain and dysfunction of the low back, right leg and knees. She advised she experienced side effects of sleepiness and/drowsiness from her medications. She perceived she was able to sit about 20 mins before shifting, can stand about 5 mins. Able to walk 200 ft. Can drive short distances. Can reasonably lift approx 10 lbs. Has difficulty with balance 2nd to leg/back pain and dysfunction, avoids climbing, stooping, kneeling, crouching and crawling. Ms. McSwain maintains she is in constant pain in multiple areas. She admitted to "periodic depression" and indicated a need for treatment. *Zung Depression Self-rating Scale* was noted to be in the "moderate to marked" range (SDS index 63%). Her score of 74% in the FCI (Functional Rating Index) was said to be in the "very severe disability" category. "Ms. McSwain's self-described functional limitations and pain do not allow for competitive employment." She can handle approx 10 lbs and requires postural changes every 5-20 mins. She is said to avoid any activity involving bending or flexion of the spine. The clmt reports chronic and persistent pain in her low back, right leg and knees, from moderate to moderately severe intensity, even with medication. This level of pain is considered to be occupationally debilitating due to the effect it has on concentration, persistence and pace. Based on the information available, as well as the clmt's self-described abilities and pain, the vocational/rehab consultant concludes the clmt has a Vocational Disability Rating of 100%.

**04/07/06** Office note from **Dr. Voss**: s/p anterior lumbar interbody fusion in 07/04 with continued low back and right leg, as well as numbness in her feet. She states she does not feel she is physically able to work. Has tried Lyrica and Elavil and is currently on Topamax for her neuropathic pain which she states is not relieved. Reflexes in lower extremities are diminished throughout. Sensory exam is diminished in the 2nd, 3rd and 4th toes on the right. AP advised no further surgical intervention and recommended pain mgt approach. While he notes the clmt was concerned about her disability claim, he explained he does not decide if she can RTW or not. Dr. Voss' nurse practitioner advised, "He has not found the patient to be disabled from working. He had not restricted her from working." She is to return prn.

**05/01/06** Seen for further evaluation of knee pain by **Dr. Lacour**. Reports began developing bilateral knee pain in Feb with morning stiffness and difficulty rising from chair. Takes Provigil for fatigue, reports some intermittent tingling in her feet. Exam reveals very mild discomfort

UACL01519

with ROM in both knees. No redness, swelling, warmth or instability. Does indicate noticeable discomfort when going from sitting to standing position. Assessment: inflammatory quality pain in both knees with low + anti-CCP antibody and family history of RA. Low + ANA is also supportive. Need to consider the possibility of early RA. Rx for Plaquenil 200mg bid. Advised to increase Mobic from 7.5mg to 15mg daily and return in 8 weeks.

**ANALYSIS OF MEDICAL INFORMATION AND R&LS:** FCE done in 12/05 indicates performance in the sedentary to light physical demand level of work. After having an opportunity to review this data, Dr.Voss, the clmt's neurosurgeon, advised he agreed with the assessment and did not add further R/L's. His nurse practitioner also noted he has not found the patient to be disabled and has not restricted her from working. Her pain mgt specialist has not offered specific R/L's but has deferred those to Dr. Voss.

The clmt's attorney sent her for a Vocational Evaluation "for assessment of vocational disability." Based on his testing and the clmt's "self-described" functional limitations and pain, he concluded she had a 100% Vocational Disability rating with no allowances for competitive employment.

The records are consistent with reports of a chronic pain syndrome following an anterior interbody fusion for disc herniation at L5-S1 with residual low back and right leg pain accompanied by radicular symptoms of intermittent numbness and tingling of her feet. Exam findings reflect diminished reflexes in her lower extremities bilaterally, as well as sensory changes in the toes of her right foot.

Her repeat imaging studies are negative for new or recurrent disc herniation, however there was a question of whether her graft had completely fused. Dr. Voss noted that after discussion with several other physicians, "they are convinced she has a fusion at L5-S1." The clmt has continued to treat with pain mgt and has recently consulted a rheumatologist for bilateral knee pain at which time she was started on Plaquenil for possible early RA (x-rays and lab work appear to be unremarkable.)

**REFERRAL QUESTIONS:**

1) Are the R & L's of the 12/27/05 supported ? Yes, it appears so based on the available data. Please see above analysis.

2) Does it appear that the insured's condition has deteriorated since that FCE ? No, although the clmt has consulted a rheumatologist for bilateral knee pain and has begun treatment for possible early RA, this would not appear to impact the R/L's that she has already or cause further restrictions.

3) Does the medical support that the insured is 100% disabled ? No, the clmt's neurosurgeon has advised that she is not disabled and he has not restricted her from work, that whether or not she works is her decision. The 100% disablity rating was given a vocational consultant that was chosen by the clmt's attorney and while some of his testing appears to be based on objective data, he also appears to defer the assessment of the clmt's abilities and limitations to her own reports and self-perception.

UACL01520

**Psychological/Psychiatric Issues:** Of note, there are several references in the file to "reactive depression" and the clmt being depressed about her condition. The records show she was placed on Wellbutrin om 9/22/04 to help with her mood and as an aid to assist in her attempts to stop smoking. Dr. Voss noted on 11/23/04 that she was tearful thru much of exam and "has always been that way in the post-op period." In 09/05, she was noted to have been prescribed Cymbalta. During her Vocational Evaluation, she reported she was taking Prozac and was given a score of 63 on the *Zung Depression Self-rating Scale*. Otherwise, there is no description of depressive symptoms or evidence of intensity of treatment (referral for formal psych evaluation, treatment or counseling) to support a BH condition consistent with impairment. *Discussed above with Dr. Malcolm Spica who advised that he agreed that the information did not reflect the intensity of treatment nor did the clmt report a level of symptomatology consistent with a debilitating psychiatric condition. He further advised he deferred any comments on her physical condition to the other specialties but would be glad to review any additional psychiatric records that may be submitted.*

**OSP: Please respond to questions posed by RA consultant. Thank you.**

**SIGNATURE BLOCK: Karen S. York, RN, CCM-Senior Clinical Consultant    DATE: 06/29/06**

UACL01521



JULY 10, 2006

VICTORIA LANGA, M.D.
MERCY HEALTH CENTER
1515 LOCUST STREET
2ND FLOOR, SUITE 225
PITTSBURGH, PA 15219

Dear Dr. Langa:

At this time, Unum Life Insurance Company of America is requesting your expertise for a file review of one of our existing disability claims, **Sheri Ann McSwain**. We ask that you review the material and render your opinion on the findings along with answering the attached questions. Also enclosed is a copy of "Your Medical Review Report" which is recommended for use in preparing this report. Please note your Board Certification next to your signature.

**Summary:** Sherri Ann McSwain is a 42 year old RN, schedule coordinator, for the Southeast Alabama Medical Center who stands 5'7" 175 pounds. She presented a claim with the Date Of Disabiltiy of 12/24/03 and a diagnosis of HNP at L5-S1. Ms. McSwain had surgery (fusion) 7/1/04 peformed by neurosurgeon, Nicholas Voss, M.D. Following the surgery she began seeing a pain management physician, David Evans, M.D. The initial Restrictions and  Limitations were" no lifting,twisting, turning, bending, etc.". On December 27, 2005, Dr. Voss initiated an Functional Capacity Evaluation which indicated that the claimant had the functional capacity to meet the guidelines between the sedentary to light physical demand, lifting and carrying between 10-20 pounds. A letter (3/23/06) was ultimately completed from Dr. George Seiters to Dr. Voss regarding the Restrictions and  Limitations of Ms. McSwain. Dr. Voss agreed with Dr. Seiters and the Functional Capacity Evaluation. The claim was brought to an end at Change In Definition.

**Questions:**

**1) Are the Restriction and  Limitations of the 12/27/05 supported ?**

**2) Does it appear that the claimant's condition has deteriorated since that Functional Capacity Evaluation ?**

**3) Does the medical support that the insiured is 100% disabled ?**

We appreciate your services and please send your report to **Professional Disability Associates, c/o Jane Kremer**. If you have any questions, feel free to contact me at the number listed below.

Respectfully,

*Shane Ashley*

Shane Ashley
Independent Assessment Coordinator
UnumProvident Corporation
1-888-321-9343, ext. 48183
sashley@unumprovident.com

Unum Life Insurance Company of America • 1 Fountain Square, Chattanooga, TN 37402 • 888-321-9343 • www.unumprovident.com

Claimant Name:  Sherri Ann McSwain      Claim #:  1304988



## DISABILITY REVIEW

**CLAIMANT: Sheri McSwain**
**DOB: September 8, 1964**
**DOD: December 24, 2003**
**CLAIM #: 1304988**
**REPORT DATE: July 18, 2006**
**REFERRED BY: Shane Ashley**
**TYPE OF REVIEW: Independent Medical Review**
**CLIENT: Unum Provident**

### DISCLAIMER

The opinions expressed by the undersigned are based on review of the medical records provided by the referral source and any direct written or verbal correspondence with the claimant's attending physician(s). This review did not involve evaluation of the claimant.

### SYNOPSIS

Ms. McSwain is a 41-year-old female registered nurse. The records reflect dates of injury of November 13, 2003, and November 17, 2003 with a date of disability of December 24, 2003. This is a long-term disability claim with benefits having been terminated on May 11, 2006 on the basis of Ms. McSwain not being disabled from any gainful occupation. The date of appeal is May 15, 2006. The basis of the appeal is the assertion that Ms. McSwain remains totally disabled from all employment. This is an independent medical review. The diagnosis is chronic radicular low back pain following anterior discectomy and fusion at L5-S1 in July 2004.

### REFERRAL QUESTIONS

1.  Are the restrictions and limitations of the December 25, 2005 FCE supported?
2.  Does it appear that the claimant's condition has deteriorated since that functional capacity evaluation?
3.  Do the medical records support that the insured is 100% disabled?

### DOCUMENTS REVIEWED

1.  Reports of cervical spine x-rays and a CT of the head obtained on September 22, 2003
2.  Records pertaining to an emergency room visit at Southeast Alabama Medical Center on November 17, 2003

UACL01576

McSwain
Page 2 of 8

3.  Physical therapy notes from Southeast Alabama Medical Center dated November 19, 2003 through March 15, 2004
4.  Reports of MRIs of the lumbar spine of December 17, 2003 and November 3, 2004.
5.  Records of Nicholas F. Voss, M.D. (neurosurgeon) from December 23, 2003 through April 7, 2006
6.  Records from David H. Evans, M.D. (pain management) from January 13, 2004 through April 26, 2006
7.  Records pertaining to an admission to Flowers Hospital from July 1, 2004 through July 5, 2004
8.  An operative report of July 1, 2004
9.  The report of x-rays of the lumbar spine of May 26, 2005
10. The report of lumbar CT/myelogram of September 19, 2005
11. The report of functional capacity evaluation obtained on December 27, 2005
12. The report of a Unum Provident Vocational Assessment of January 20, 2006
13. The report of bilateral knee x-rays obtained on February 3, 2006
14. Correspondence from attorney Joseph W. Lewis dated February 7, 2006
15. The report of a physical therapy evaluation of February 22, 2006 regarding disability rating
16. Correspondence from Attorney John E. Byrd, Jr. dated March 6, 2006
17. The report of an Orthopedic Review performed by George Z. Seiters, M.D. (orthopedic consultant for Unum Provident) dated March 22, 2006
18. Correspondence from Dr. Seiters to Dr. Voss dated March 23, 2006
19. Records of office visits with Dr. Michael O'Brien (family practice) of April 4, 2006 and April 20, 2006
20. Correspondence from Dr. Voss dated April 5, 2006
21. The record of a consultation with Edmund G. LaCour, M.D. (rheumatologist) of May 1, 2006
22. Unum Provident correspondence of May 11, 2006
23. A Vocational Evaluation report dated June 5, 2006
24. A Unum Provident medical response of June 29, 2006
25. A job description for the position of a surgical RN at Southeast Alabama Medical Center
26. Various other administrative records from Unum Provident

## MEDICAL SUMMARY

Ms. McSwain is a 41-year-old female registered nurse.

The reviewed medical records reflect that in September 2003, she had been thrown from a horse and approximately three days later (on September 22, 2003) underwent x-rays of her cervical spine and a CT of the head both, of which were normal. The reviewed records do not include any further material pertaining to this specific incident.

It would then appear that on or about November 13, 2003 Ms. McSwain sustained a pulling injury of her lower back at work while lifting a patient. It does not appear that she sought medical attention at the time, however, four days later, on November 17, 2003, she apparently fell down some steps at her home and noted an acute increase in her low back discomfort.

UACL01577

McSwain
Page 3 of 8

She presented to the emergency department of Southeast Alabama Medical Center on November 17, 2003 relating the above sequence of events and reporting non-radicular low back discomfort at the time. The diagnosis in the emergency department was a lumbar strain. Ms. McSwain was prescribed Vioxx/Robaxin/Lortab.

She subsequently underwent an MRI of her lumbar spine on December 17, 2003. This study reportedly documented a central disc herniation at L5-S1 contiguous with the S1 nerve roots bilaterally.

Ms. McSwain came under the care of Nicholas F. Voss, M.D. (neurosurgeon) on December 23, 2003. By this point Dr. Voss documented Ms. McSwain complaining of low back pain radiating into both of her lower extremities and, on neurologic examination, there was reported to be diminished sensation in the S1 nerve roots bilaterally. Dr. Voss reviewed the lumbar MRI, which he felt documented a central disc herniation at L5-S1. The overall impression was a moderate size disc herniation at L5-S1. Dr. Voss recommended initial continued conservative management. Ms. McSwain was prescribed Lortab and Celebrex. It was recommended that she undergo a lumbar epidural steroid injection.

Ms. McSwain thus consulted David H. Evans, M.D. (pain management) and underwent a lumbar epidural steroid injection on January 13, 2004. This injection was unsuccessful in relieving her radicular low back discomfort.

At a subsequent follow-up appointment with Dr. Voss in February 2004, Ms. McSwain was referred into physical therapy, which she was to attend twice weekly for two months.

It appears that she attended the therapy as directed and was said to be "worse."

At a subsequent follow-up appointment with Dr. Voss in April 2004 continued observation was recommended, although it was noted that Ms. McSwain would become a surgical candidate if there was no improvement. By June 2004 Dr. Voss was discussing surgical intervention.

Dr. Voss subsequently brought Ms. McSwain to the operating room on July 1, 2004 for anterior discectomy and decompression at L5-S1 with anterior interbody fusion with bone spacer and DBX allograft and anterior tension band plating at L5-S1.

It would appear that Ms. McSwain had an immediately uncomplicated postoperative course and was discharged from the hospital on July 5, 2004.

At a subsequent follow-up office visit with Dr. Voss in August 2004, it was noted that Ms. McSwain had some residual bilateral leg pain, although the neurologic examination was intact. Dr. Voss recommended that she wean from Lortab.

Dr. Voss also apparently recommended that Ms. McSwain follow up with Dr. Evans for continued pain management and she returned to this physician on September 22, 2004. Dr. Evans prescribed Wellbutrin, Celebrex, Topamax, Baclofen, and Lortab. Ms. McSwain basically continued to follow with Dr. Evans on a monthly basis. The overall diagnosis became one of a failed back syndrome/radiculitis and over time her various oral medications were adjusted, including periods of utilizing Lidoderm patches, Prozac, methadone, Cymbalta, and Lyrica.

UACL01578

McSwain
Page 4 of 8

At a follow-up appointment with Dr. Voss in October 2004, it was noted that Ms. McSwain was continuing with complains of lower back/right lower extremity symptomology. At this point, Dr. Voss referred her into physical therapy.

A postoperative MRI of the lumbar spine was obtained on November 3, 2004. This study reportedly documented some postoperative changes at L5-S1 with no evidence of stenosis or a residual/recurrent disc herniation.

At a follow-up office visit with Dr. Voss in November 2004 the MRI was reviewed. Dr. Voss reported the study "looks extremely good" with no residual nerve root compression at L5-S1.

At a subsequent follow-up appointment with Dr. Voss in May 2005 it was noted that Ms. McSwain was continuing to complain of low back pain with numbness/tingling/pain in the lower extremities. Dr. Voss noted that Ms. McSwain continued in chronic pain management with Dr. Evans. On physical examination the motor and sensory examinations were said to be intact. X-rays of the lumbar spine of May 26, 2005 were felt to be satisfactory, although Dr. Voss was unsure whether or not the fusion was solid. He also noted that Ms. McSwain was continuing to smoke, despite having been cautioned about the detrimental effect of smoking on the fusion healing.

Ultimately Ms. McSwain was referred for a lumbar CT/myelogram on September 19, 2005. This study reportedly documented that the anterior fusion at L5-S1 appeared to be solid.

At a follow-up appointment with Dr. Voss in September 2005, Ms. McSwain was documented to have continuing complaints of low back/lower extremity discomfort. Dr. Voss did note that she was managing her farm and her animals, but with some difficulty and with pain. The neurologic examination was reported to be intact and Ms. McSwain was instructed to return as needed.

Throughout this entire period Ms. McSwain had also continued to follow with Dr. Evans on a monthly or bimonthly basis. Her medications continued to be adjusted over time. Dr. Evans' records also reflect that at different times she also reported complaints regarding her neck, right shoulder, hips and knees.

Ms. McSwain underwent a functional capacity evaluation on December 27, 2005, which basically found her performing in the sedentary to light categories of work with occasional lifting/carrying up to 10-20 pounds. There were, however, some discrepancies noted in the course of the testing along with the report of some self-limiting behaviors. In the course of this FCE Ms. McSwain was observed to sit for a period of 10 minutes and apparently reported a sitting tolerance of up to 30 minutes at a time. She was observed to walk for a period of nine minutes before requesting a break, and apparently was observed to walk total of 1488 feet. The longest observed interval of standing/walking was said to have been 25 minutes. On the basis this functional capacity evaluation she was also deemed to be able to engage in kneeling, crouching, and overhead reaching on an occasional basis with occasional to frequent bending. She was found to be able to reach below shoulder level on frequent basis and there were reported to be no restrictions of hand use.

UACL01579

McSwain
Page 5 of 8

The reviewed records include a job description for the position of a surgical RN at Southeast Alabama Medical Center. Basically the job falls into the medium category of work with occasional lifting up to 50 pounds.

Prior to the formal FCE, Dr. Voss had issued an Attending Physician Statement dated June 2, 2005 in which restriction/limitations were those of no lifting, twisting, turning, bending, etc.

Dr. Voss had then responded to a Unum Provident correspondence of July 20, 2005 (requesting clarification) and allowed Ms. McSwain to lift up to 21-30 pounds.

Dr. Evans had also issued an Attending Physician's Statement dated August 1, 2005, in which he deferred to Dr. Voss regarding any restrictions/limitations. Dr. Evans had also noted that a functional capacity evaluation would be the best way to delineate Ms. McSwain's specific limitations.

Again, prior to the FCE, Dr. Voss had responded to Unum Provident correspondence of December 6, 2005, indicating that the same restrictions of June 2, 2005 and July 20, 2005 were still in effect.

Following the FCE, a Unum Provident Vocational Assessment was performed on January 20, 2006. However, it does not appear that the FCE was taken into consideration, and instead this assessment relied on Dr. Voss's Attending Physician's Statement of June 2, 2005 and Dr. Voss's subsequent responses to the Unum Provident correspondences of July 20, 2005 and December 6, 2005. This vocational assessment identified three specific job positions of school nurse, office nurse, and hospital admitting clerk within the light duty category, which were felt to be consistent with Ms. McSwain's physical capabilities.

Dr. Evans subsequently responded to Unum Provident correspondence of January 31, 2006, again deferring any opinions regarding restrictions/limitations to Dr. Voss and to the functional capacity evaluation.

Because of bilateral knee complaints, Dr. Evans referred Ms. McSwain for x-rays of both knees, which were obtained on February 3, 2006, and which were reportedly normal.

An Orthopedic Review for Unum Provident was subsequently performed by George Z. Seiters M.D. on March 22, 2006. Dr. Seiters opined that the functional capacity evaluation represented the most detailed assessment of Ms. McSwain's functional capacity. He did note, however, that there were validity issues with the FCE and there was the possibility that Ms. McSwain might have greater functional capacity than had been measured on the FCE. Dr. Seiters intended to discuss these issues with Dr. Voss.

Dr. Seiters then sent Dr. Voss a correspondence dated March 23, 2006, requesting Dr. Voss to review the FCE and provide current restrictions/limitations.

Dr. Voss subsequently replied to Dr. Seiters in correspondence of April 5, 2006. This correspondence reflects that Dr. Voss had reviewed the FCE and concurred with the restrictions/limitations as outlined.

UACL01580

McSwain
Page 6 of 8

In the meantime, on April 4, 2006, Ms. McSwain had consulted Dr. Michael O'Brien
(family practice) with respect to both of her knees.

Dr. O'Brien ordered blood work for a rheumatologic work-up and prescribed Lodine. At a
subsequent followup appointment on April 20, 2006 the Lodine was discontinued and
Ms. McSwain was begun on Mobic 7.5 mg daily.

Dr. Evans subsequently referred Ms. McSwain to Edmund G. LaCour, M.D.
(rheumatology) for an evaluation on May 1, 2006. Dr. LaCour documented a history of
bilateral knee pain since February 2006. He noted that the blood work had come back
with a low positive ANA, on ESR of 7, a negative rheumatoid factor and a weekly
positive anti-CCP. Dr. LaCour also noted that Ms. McSwain had a significant family
history of rheumatoid arthritis, with both a sister and a maternal grandfather having the
disease. On physical examination Dr. LaCour reported very mild discomfort with knee
range of motion bilaterally in the absence of any swelling, warmth, or instability. Overall,
Dr. LaCour felt that given the results of the blood testing and Ms. McSwain's family
history, early rheumatoid arthritis was a possibility. He recommended that her Mobic be
increased to 15 mg. daily and he also prescribed Plaquenil 200 mg. twice daily. Ms.
McSwain was to return in two months for a follow-up.

At an office visit with Dr. Voss on April 7, 2006 Ms. McSwain was documented to have
continuing right-sided low back/lower extremity discomfort with numbness/tingling in the
feet. The motor examination remained intact. There was reported to be some
diminished sensation in the second, third, and fourth toes of the right foot. It would
appear that Dr. Voss had a discussion with Ms. McSwain regarding the rationale behind
the functional capacity evaluation and an impairment rating (a 10% impairment rating
had been recommended based upon a physical therapy evaluation of February 22,
2006). It appears that Dr. Voss also explained to Ms. McSwain that he had not and was
not totally disabling her from work. She was discharged to return as needed.

At the same time, Ms. McSwain has continued following with Dr. Evans, and at a office
visit in April 2006 was noted to be on MS Contin, Ambien, and Provigil.

In Unum Provident correspondence of May 11, 2006, Ms. McSwain was notified that her
long-term disability benefits were being terminated on the basis of her not being disabled
from any occupation.

The medical records then reflect a date of appeal of May 15, 2006.

Ms. McSwain's attorneys had referred her to Michael McClanahan Ph.D. for a vocational
evaluation. The date of testing was April 5, 2006 and a subsequent vocational
evaluation report was generated on June 5, 2006. In this report Dr. McClanahan
documented that Ms. McSwain's self-report of physical abilities included sitting for 20
minutes at a time, standing for five minutes at a time with the ability to walk 200 feet and
drive for short distances. Lifting was said to be limited to 10 pounds and Ms. McSwain
reported difficulties with balance. It was also noted that she avoided climbing, stooping,
kneeling, crouching, and crawling. In the course of this report Dr. McClanahan also
theorized that Ms. McSwain's "condition may be worsening," and this statement appears
to be based on the fact that her pre-test and post-test reports of pain at the time of the
functional capacity evaluation (3 and 5) were less than pain in the range of 5-7 that was
reported at the time of the April 5, 2006 evaluation. Overall, Dr. McClanahan reached

UACL01581

McSwain
Page 7 of 8

two specific conclusions:    Firstly, that the functional capacity evaluation of December 27, 2005 would not allow work both suitable and gainful as defined in the "Alabama Code" and secondly, that Ms. McSwain's self-described abilities and pain would not allow for full-time work and therefore there was a vocational disability rating of 100%.

## MEDICAL ANALYSIS

Ms. McSwain sustained two injuries of her lower back within several days of each other in November 2003 and was subsequently found to have an L5-S1 disc herniation. After failing a course of conservative management she eventually came to surgical intervention in July 2004, which involved anterior discectomy and interbody fusion at L5-S1.    A later lumbar CT/myelogram, by report, documents the fusion to have consolidated, although it is well documented in the postoperative records that Ms. McSwain has continued residually symptomatic with respect to her lower back with chronic low back discomfort with an intermittently radicular component. She would fall into the general category of a post-laminectomy syndrome and, given the time that has elapsed since the surgical procedure, it is likely that she has reached maximum medical improvement following the surgery.

Ms. McSwain underwent a functional capacity evaluation on December 27, 2005, which found her performing in the sedentary to light categories of work with occasional lifting/carrying in range of 10-20 pounds,    occasional kneeling/crouching/overhead reaching, occasional to frequent bending, frequent reaching below shoulder level and no restrictions with respect to hand use. In the course of his functional capacity evaluation, Ms. McSwain was observed to sit for a period of 10 minutes (and was said to report a sitting tolerance of 30 minutes at a time). She was also observed to walk for a period of nine minutes and to walk a total distance of 1488 feet. The longest observed interval of standing/walking was said to be 25 minutes. There were some discrepancies noted in the course of the testing and some self-limiting behaviors.

It would be my overall opinion that the results of the functional capacity evaluation are valid for the purposes of determining Ms. McSwain's physical capabilities/work capabilities. The overall results of the functional capacity evaluation would be consistent with the surgery that was performed and the residual postoperative symptomology. Because of the discrepancies and the self-limited behaviors, it is certainly possible that Ms. McSwain's true physical capabilities/functional capabilities exceed what was documented at the time of the FCE, however, for the purposes of categorizing her potential level of employment and her overall work capabilities, I would deem the results of the functional capacity evaluation to be valid. This has also been the opinion of Ms. McSwain's operating surgeon, Dr. Voss, who has also opined that the functional capacity evaluation reasonably represents Ms. McSwain's abilities in combination with restrictions/limitations.

Since the functional capacity evaluation of December 27, 2005, Ms. McSwain has undergone evaluation and treatment of bilateral knee symptomology.    She has undergone x-rays of both knees, which were reportedly normal. She has undergone a rheumatologic work-up, which is borderline and, given that she has a family history of rheumatoid arthritis, it appears that the feeling at this point is that she may have early rheumatoid disease.    However, there is nothing in the reviewed medical records to suggest that her knee function is such that there is resulting disability (and indeed none

UACL01582

McSwain
Page 8 of 8

of the doctors who have seen her for her knees have imposed any specific
restrictions/limitations regarding the knees).

Ms. McSwain's attorneys referred her to Michael McClanahan Ph.D. for an occupational
evaluation in April 2006.  Dr. McClanahan did not perform any physical testing but
instead relied on Ms. McSwain's self-report of her physical abilities, and it should be
noted that her report of physical capabilities in some cases is inconsistent with what was
documented at the time of the functional capacity evaluation.  For example, Ms.
McSwain reported to Dr. McClanahan a standing tolerance of five minutes and walking
tolerance of 200 feet, while at the time of the functional capacity evaluation she was
observed to walk for up to nine minutes at one time, walk a total distance of 1488 feet
and stand/walk for an interval of 25 minutes.   This is a significant issue in that the
functional capacity evaluation is a more objective evaluation of overall physical
capabilities (although, admittedly, there is a subjective component as with self-limited
behaviors), while Ms. McSwain's report to Dr. McClanahan regarding her physical
capabilities was entirely subjective with no objective component.  Dr. McClanahan also
theorized that Ms. McSwain's condition might be worsening, and he again based this on
purely subjective criteria in that her numerical report of pain at the time of the functional
capacity evaluation differed from her numerical report of pain at the time of his
evaluation in April 2006.  Again, this was an opinion based purely on subjective criteria
with no objective basis.

With respect to Dr. McClanahan's overall conclusions, I have no opinion regarding the
"Alabama Code" as I am unfamiliar with this document.  As to Dr. McClanahan's
conclusion that Ms. McSwain's self-described abilities and pain do not allow for full-time
work, I would again hold to my opinion that she is physically capable of performing work
activities within the guidelines of the functional capacity evaluation performed on
December 27, 2005.

### CONCLUSIONS

In my opinion, Ms. McSwain is physically capable of performing work in the sedentary to
light category as per the restrictions/limitations outlined in the functional capacity
evaluation of December 27, 2005 (and as discussed above).

In my opinion, the medical records do not support a 100% disability.

In my opinion, there is no objective evidence in the reviewed material for any
deterioration of Ms. McSwain's condition since the FCE of December 27, 2005.

I hope this information will be of use to you.

Yours truly,

Victoria M. Langa, M.D.
Board Certified Orthopedic Surgeon
VML/anu
D: 07/14/06T: 07/15/06

UACL01583



**UNUMPROVIDENT**

Certification Statement for Medical Review Sheri Ann McSwain

VICTORIA LANGA, M.D.
MERCY HEALTH CENTER
1515 LOCUST STREET
2ND FLOOR, SUITE 225
PITTSBURGH, PA 15219

Please sign this document attesting to the following:

I have reviewed all information, records and data provided to me by the Company.
I have responded to the questions presented based on my education, training and experience.

_____            _____
Provider's signature                                   Date

Please attach this form to your report.

UACL01584

Claimant Name: Sherri Ann McSwain     Claim #: 1304988

## Vocational Assessment



| Insured: McSwain, Sherri Ann | Claim Number: 1304988 |
|---|---|
| Disability Benefit Specialist: Sibley Evans | |
| Vocational Rehabilitation Consultant:  G. Shannon O'Kelley, M.Ed., CRC | |

**Reason for Referral**

The insured is a 42 y.o. RN, schedule coordinator for the Southeast Alabama Medical Center who stands 5'7" 175 pounds. She presented a claim with the DOD of 12/24/03 and a diagnosis of HNP at L5-S1. Ms. McSwain had surgery (fusion) 7/1/04 peformed by neurosurgeon, Nicholas Voss, M.D. Following the surgery she began seeing a pain mgmt. physician, David Evans, M.D(anesth/pain mgmt). The initial R & L's were" no lifting,twisting, turning, bending, etc.".  On December 27, 2005, Dr. Voss initiated an FCE which indicated that the insured had the functional capacity to meet the guidelines between the sedentay to light physical demand, lifting and carrying between 10-20 pounds. A letter (3/23/06) was ultimately completed from Dr. George Seiters to Dr. Voss regarding the R & L's of Ms. McSwain. Dr. Voss agreed with Dr. Seiters and the FCE. The claim was brought to an end at CID.

The insured's atty. submitted all of the insured's medical records which included updated material at appeal. A new vocational evaluation which reflects that the insured is 100% disabled.

Please review these materials.

A newly received IA report form Victoria Langa, M.D. (ortho surgeon) has been completed 7/18/06.

Questions:

From the material within the file, it does not appear that the insured is TD any occ.  Are the occupations previously identified still viable?
If they are not viable, are there any occupations that would meet the R & L's presented in the FCE of 12/27/05?  The file appears to reflect that the insured's AP, Dr. Voss, Dr. Seiters and the IA physician, Dr. Langa all agree with the FCE.

**Information Reviewed**

Information presented for consideration includes all relevant materials in the claim file.  In keeping with the scope of this Vocational Assessment, this reviewer will confine remarks and attention to those portions of the claim file which address vocationally relevant factors.  Records pertinent to this endeavor have been identified as follows:

- Job Description, 5/19/04
- Functional Capacity Evaluation, Bobby Perkins, PT, OCS & Tony Bridges, MS, CSCS, CDE, CEES, 12/27/05
- Return to Work Services, Kellie Pickett, 3/15/06 - 4/12/06
- Vocational Assessment, Michael McClanahan, Ph.D., 6/5/06

- Training, Education and Experience Form, 5/20/04
- Vocational Assessment, Christy N. Searcy, MS, CRC, 1/20/06
- Vocational Assessment, Christy N. Searcy, MS, CRC, 5/2/06
- Medical Review, Victoria M. Langa, M.D., 7/18/06

**Job Description, 5/19/04**

RN/Surgery

*Position Summary:*

- Provides professional nursing care to patients of all ages undergoing a surgical procedure.
- Uses the nursing process in assessing, planning, implementing, and evaluating care provided to individuals in the Receiving Room.

UACL01605

- Actively accepts, understands, and practices appropriate standards of Medical/Surgical and Critical Care Nursing.
- Actively supports the mission, vision, and values of the hospital and department.
- Performs various activities related to the needs of adult arid geriatric Medical/Surgical patients In accordance with the hospital's established policies and procedures.
- Provides leadership in maintaining standards of care and direction of health care personnel.

*Qualifications:*

- Graduate of school of nursing with current registration a n RN in the State of Alabama.
- One year of OR nursing experience preferred.
- CNOR preferred.

*Language/Communication Skills:*

- Must be able to read, write and speak English.
- Must be able to maintain, complete, concise and legible documentation.
- Must be able to use effective communication skills

*Skills:*

- Successful course completion in Basic Cardiac Life Support.
- Successful course completion of Institutional Intermediate EKG Course.
- Successful completion of Advance Cardiac Life Support course (preferred)
- Annual completion of Unit Specific competency requirements as delineated in unit specific competency tool
- Successful completion of math competency requirements.
- Experience in operating computers, Including operation of computer software In a Windows environment preferred.

*Working Conditions:*

Individuals employed in this position may be exposed to one or more of the following: disagreeable odors; chemicals such as disinfectants, cleansers, soaps, etc.; latex, plastic, and other materials used for personal protective equipment; noise and distractions; unpredictable behaviors; and/or wet floors.

*Critical Success Factor: Best People*

Demonstrates job related skills in a safe appropriate, effective, and timely manner. Actions demonstrate an understanding of being a team member, not just a part of a work group. Demonstrates understanding of all people and roles in the organization. Demonstrates a positive attitude, ability, and actions to adapt to changes in work/work flow. Also includes this employee's accountability and performance related to Age Specific Issues, Management of Information, infection Control, Environment of Care standards and any applicable continuing education requirements (e.g., LAND BLITZ, basic life support, advanced life support, etc.)

*Responsibilities:*

- Manages all information obtained with strict confidentiality to safeguard patient information from use by unauthorized personnel
- Follows Southeast Alabama Medical Centers safety guidelines for self, patients, visitors and employees.
- Follows Southeast Alabama Medical Center's Infection prevention policies.
- Independently handles communications in a manner which decreases conflict
- Demonstrates assertiveness techniques in communications.
- Seeks resources for direction when necessary.
- Demonstrates responsibility for education requirements as evidenced by:
- Attending all annually required Inservice programs (e.g., Fire, infection, Safety, Infection Control).
- Attending non-required educational programs relative to patient care responsibilities as available.
- Completing annual competency evaluation requirements.
- Demonstrates knowledge of the principles of growth and development over the life span and the skills necessary to provide age appropriate care to the patient population served. Interprets data about the

UACL01606

Claimant Name: Sherri Ann McSwain    Claim #: 1304988

patient's status in order to identify each patient's age specific needs and provides appropriate care based on these needs:

| | | | | |
|---|---|---|---|---|
| ▪ Neonate | 0-28 days | | ▪ Adolescent | 12 - 18 years |
| ▪ Infant | 28 days to 1 year | | ▪ Adult | 18-65 years |
| ▪ Pediatric | 1 year to 12 year | | ▪ Geriatric | 65+ Years |

- Demonstrates the ability to be flexible, organized and function appropriately under stressful situations.
- Communicates with patients, families and other team members to meet physiological and psychological needs of the patient.
- Demonstrates knowledge of and adherence to AORN, FDA, JCAHO and OSHA guidelines and standards.
- Responsible and accountable for following chain of command at all times.
- Recognizes and performs non1outlne tasks which may not be directly assigned, but are necessary to the efficient and effective operation of the department.
- Uses the nursing process to guide in assessing, planning, implementing and evaluating care to Surgical patients.

- Exercises sound clinical judgment and critical thinking in all aspects of the nursing process and unit activities; develops creative solutions to problems.
- Demonstrates appropriate utilization of the skills of the Registered Nurse as approved by the Alabama Board of Nursing according to departmental policy and procedure.
- Efficiently and effectively performs circulating, scrubbing and assisting duties perioperatively as described in the Policy and Procedure Manual to meet the patient's needs, physicians orders hospital policy and Standards of Practice for perioperative nurses.
- Completes special assignments including cleaning, stocking of work areas, equipment and checking outdates.
- Demonstrates versatility by performing effectively in a variety of specialty area.
- Demonstrates the ability to operate the steam autoclave and Steris units. Including appropriate documentation.

*Critical Success Factor: Best People*

- Demonstrates behavior to uphold the Mission, fulfill the Vision, and live the Values Service, Excellence, Respect, Value, and Enthusiasm) of the Medical Center.
- Demonstrates the standards of performance as outlined in the Employee Performance Standards handbook regarding:

| | | | | |
|---|---|---|---|---|
| ▪ Attitude | | ▪ Commitment to | | ▪ Privacy |
| ▪ Appearance | | Coworkers | | ▪ Safety Awareness |
| ▪ Communication | | ▪ Patient Waiting | | ▪ Sense of Ownership |
| ▪ Call Lights/Alarms | | ▪ Elevator Etiquette | | |

- Takes pride in the workplace as demonstrated by keeping area neat and tidy, helping others to meet Customer needs and being positive about the work group.
- Works actively and cooperatively with co-workers as a team.
- Recognizes and employs team efforts to achieve departmental/organizational goals.
- Encourages and promotes positive behaviors In coworkers.
- Adheres to established Attendance & Punctuality policy regarding:

| | | |
|---|---|---|
| ▪ Attendance | ▪ Punctuality | ▪ Meals and breaks |

- Responds to patient and non-patient emergencies according to Southeast Alabama Medical Center's polices and procedures, as well as job requirements.
- Demonstrates ability to work with patients, families, visitors, and co-workers regardless of race, gender, disease process, lifestyle, religious or cultural beliefs.
- Demonstrates commitment to patients, co-workers, Surgeons and Department by working unscheduled hours to meet departmental needs.
- Demonstrates effective decision making with minimal guidance.

UACL01607

- Welcomes new employees, participates in orientation and serves as a positive role model. Cooperates with nursing instructors in facilitating a positive learning experience for students.
- Facilitates the process of educating the patient, significant others, family and staff
- Maintains a service oriented approach in delivery of instruction/supervision to staff and fosters a positive atmosphere conducive to team work. Communicates accurately to team members, supervisors and physicians information required to ensure smooth flow of surgical procedures and patient care.
- Accepts responsibility for call in order to maintain the continuity of patient care.

*Critical Success Factor: High Quality*

Actively improves and maintains accountability for job and role. Demonstrates a commitment to the provision of high quality service, and contributes to quality outcomes and performance improvement in the department as wail as the Medical Center. Demonstrates support of the Medical Center's Compliance Plan and a commitment to adhere to the standards it addresses.

- Adheres to the standards of the Medical Center's Compliance Plan.
- Demonstrates responsibility and accountability for maintaining quality care and work performance by attendance at departmental meetings and other team meetings as assigned.
- Participates in team/department quality improvement activities.
- Accepts accountability for own work and team outcomes when appropriate.
- Reports promptly any critical or unusual situations.
- Consistently follows all established policies and procedures and serves as a role model for co-workers.
- Serves as a resource person for team members and is available to assist co-workers as needed.
- Seeks opportunities independently to Improve knowledge and skills to facilitate performance Improvement.
- Monitors self-performance and takes ownership by being responsible and accountable for own actions.
- Performs accurate and legible documentation on all required records and reports in an efficient, effective and timely manner.
- Performs accurate count procedures and Is compliant to the departmental Policy & Procedure.
- Demonstrates the ability to assess the physiological health status of the patient.
- Demonstrates the ability to Identify, receive label and administer medications and solutions as prescribed.
- Demonstrates correct positioning alignment for all patients and provides protection for the patient from pressure abrasion and other Injuries.

*Critical Success Factor: Best Resource Management*

Effectively and appropriately uses own time. Utilizes organizational human, financial, equlpmen4 and supply resources efficiently and appropriately.

- Demonstrates effective time management techniques.
- Demonstrates appropriate utilization of supplies.
- Communicates and collaborates with other members of the health care team in order to provide optimal and cost effective care to the surgery patient.
- Demonstrates sensitivity to department need when requesting time off
- Consistently identifies cost containment opportunities and makes appropriate suggestions.
- Uses equipment and supplies appropriately to ensure maximum productivity and cost containment.

Physical Demands:

| PHYSICAL DEMANDS | AMOUNT OF TIME SPENT PERFORMING ACTIVITY | | | |
|---|---|---|---|---|
| | None | Up to 1/3 | 1/3 to2/3 | 2/3 and more |
| Stand | | | | x |
| Walk | | | | x |
| Sit | | x | | |
| Talk o hear | | | | x |
| Use hands to finger, handle or feel | | | | x |
| Push/Pull | | | | x |
| Stoop, kneel, crouch, or crawl | | x | | |
| Reach with hands and arms | | | | x |

UACI.01608

Claimant Name: Sherri Ann McSwain      Claim #: 1304988

| PHYSICAL DEMANDS | AMOUNT OF TIME SPENT PERFORMING ACTIVITY | | | |
|---|---|---|---|---|
| | None | Up to 1/3 | 1/3 to2/3 | 2/3 and more |
| Taste or smell | x | | | |
| Lift up to 10 pounds | | | | x |
| Lift up to 25 pounds | | | x | |
| Lift up to 50 pounds | | x | | |
| Lift up to 100 pounds | x | | | |
| Lift more than 100 pounds | x | | | |

| WORK ENVIRONMENT | AMOUNT OF TIME SPENT PERFORMING ACTIVITY | | | |
|---|---|---|---|---|
| | None | Up to 1/3 | 1/3 to2/3 | 2/3 and more |
| Wet, humid conditions (non- weather) | x | | | |
| Working near moving mechanical parts | | | x | |
| Fumes or airborne particles | | | x | |
| Toxic or caustic chemicals | | | x | |
| Outdoor weather conditions | x | | | |
| Extreme Cold (non-weather) | x | | | |
| Extreme Heat (non-weather) | x | | | |
| Risk of electrical shock | | | x | |
| Work with Explosives | x | | | |
| Risk of radiation | | x | | |
| Vibration | x | | | |

| REPETITIVE MOTION ACTIONS | | NUMBER OF HOURS | | | | |
|---|---|---|---|---|---|---|
| | | 0 | 1 – 2 | 3 – 4 | 5 – 6 | 7+ |
| Repetitive use of foot control | Right only | x | | | | |
| | Left only | x | | | | |
| | Both | x | | | | |
| Repetitive us of hands | Right only | x | | | | |
| | Left only | | | | | |
| | Both | | | | | x |
| Grasping: Simple / Light | Right only | x | | | | |
| | Left only | x | | | | |
| | Both | | | | | x |
| Grasping: Firm / Heavy | Right only | x | | | | |
| | Left only | x | | | | |
| | Both | | | x | | |
| Fine dexterity | Right only | x | | | | |
| | Left only | x | | | | |
| | Both | | | | | x |

**Training, Education and Experience Form, 5/20/04**

The insured completed a training, education and experience form on 5/20/04 that indicated that she worked as a Registered Nurse for Southeast Alabama Medical Center from 6/00 until the date of disability. She reported that her duties as follows:

"Circulator, get all equipment and supplies in room for pt. Take pt. from receiving room to OR – move pt. to bed, circulate during case. Move pt. to stretcher and take to receiving room when surgery is over."

The insured also worked as a registered nurse from 1997 through 6/00 for Baptist Surgery center. She notes that her duties were the same as above. The insured notes that she worked for Globe Motors as a machine operator from 1987 though 1990. In this job she reported that she made small equipment for airplanes. She also noted that this was a sit down job at a machine.

The insured completed a GED in 1982 and received an associate's degree in nursing in 1996.

Claimant Name: Sherri Ann McSwain    Claim #: 1304988

UACL01609

**Functional Capacity Evaluation, Bobby Perkins, PT, OCS & Tony Bridges, MS, CSCS, CDE, CEES 12/27/05**

Evaluation results indicate that Ms. McSwain's present strength and functional capacities meet guidelines between the sedentary to light physical demand level based on various ranges tested as evidenced by lifting and carrying between 10-20 pounds.

Lifting tolerances demonstrated include 20 pounds knuckle to shoulder, 10 pounds shoulder to overhead, and 10 pounds for carrying activities. All were demonstrated on an occasional basis Functional abilities of kneeling, crouching, as well as overhead reach were demonstrated occasionally. Bending would rate on an occasional to frequent basis. It would be felt for full body bending this would rate occasional while in less significant ranges, such as 20 inches fingertips to floor, she could do this frequently. Shoulder reach, in terms of repetitive lifting, would rate occasional while in non-weight bearing situations it is felt it could be performed frequently.

She performed activities of simple grasping, fine manipulation, push/pulling, and climbing stairs. Balancing is rated okay for ordinary locomotion. She stood on her feet at the longest interval for 25 minutes and was able to complete a walk for 12 minutes 47 seconds with the longest interval for this being 9 minutes.

The patient's pre-test pain was a 3 and her post-test pain was a 5. She states she formally worked as a RN. It is felt this job would rate medium based on DOT descriptions. She did not meet this from a strength standpoint. It was felt there was some self limitation with lifting and she did not demonstrate the ability to lift from floor level due to stated weakness of the right leg and low back pain. As it relates to her former job, she currently demonstrates deficits as it relates to gross strength. Based on her sedentary to light physical demand level, there may be other duties within this job that she would possibly be applicable for; this may include taking temperature, pulse, blood pressure, preparing rooms, sterilizing instruments, record physical findings, administering medication. Currently, based on the test results, she does not meet the physical demand level for her previous occupation as a nurse.

Walking was achieved for 1488 feet in 12 minutes 47 seconds. The patient terminates task stating low back and right leg pain. She did take a break at 9 minutes during this task.
Standing/Walking was maintained at the longest interval for 25 minutes, performed intermittently throughout the evaluation.
Sitting was observed for 10 minutes with a stated ability of 30 minutes.
Bending repetitively was achieved for 25 repetitions in 1 minute 48 seconds. She achieves 20 inches fingertips to floor.
Crouching repetitively with limited range of motion (1/4) was achieved for 7 repetitions in 27 seconds with stated low back and bilateral hip pain. Kneeling repetitively to the right knee was achieved with use of external support for 3 repetitions in 38 seconds with stated hip, back, and leg pain.
Balancing was maintained for 7 seconds on the right foot and 30 seconds on the left foot.

Evaluation Summary:

- Occasional and Frequent Lifting/Carrying Parameters: Shoulder – Overhead up to 10 pounds occasionally; knuckle – Shoulder up to 20 pounds occasionally; and Carry up to 10 pounds occasionally.
- Functional Activities: occasional to frequent bending; occasional kneeling, crouching, and overhead reach; and frequent shoulder reach.
- The patient can perform the following: Simple Grasping, Fine Manipulation, Pushing/Pulling, Climb Stairs and Balancing for ordinary locomotion
- Physical Demand classification: Sedentary to light. Weight Range: 10-20 lbs. occasional

**Vocational Assessment, Christy N. Searcy, MS, CRC, 1/20/06**

A vocational assessment was completed by Ms. Searcy on 1/20/06 that indicated that the insured would be able to perform other occupations with the restrictions and limitations presented. The restrictions and limitations were noted per the Attending Physician's Statement dated 6/2/05, completed by Dr. Voss, neurosurgeon, as no lifting, twisting, turning, bending, etc. In July 27, 2005 correspondence, Dr. Voss clarified the weight restriction to be 21-30 lbs. In December 6, 2005 correspondence, Dr. Voss indicated that these restrictions still apply.

UACL01610

Claimant Name: Sherri Ann McSwain     Claim #: 1304988

The insured was noted to have completed a GED in 1982 and received an Associate of Science in Nursing in 1996. The vocational profile included Operating Room Registered Nurse (075.374-420, 7, Medium) and Machine Operator (619.685-062, 4, Medium). Skills (an ability to do something that has been acquired by experience, training or education) were noted as follows:

- Adjusting to performing repetitious, uncomplicated work; following simple directions or instructions; observing safety rules; uses hands, arms, and fingers to move or lift varying weights; loading, unloading, or tending assorted machines; and being exposed to heat, dust, noise, and hazards.
- Applying technical knowledge, common sense, and special medical skills to care for or treat sick or handicapped people; using eyes, hands, and fingers skillfully; adapting quickly to emergency situations; instructing, planning, and directing work of others; keeping accurate records; and distinguishing shapes, forms, and colors.

The Specific Vocational Preparation (the amount of time required to learn the techniques, acquire the information and develop the facility needed for average performance in a specific job-worker situation) was demonstrated up to level 7 or 2 to 4 years. The General Education Development Levels: (those aspects of education that contribute to the worker's reasoning development, language and mathematical skills) were demonstrated at levels 5, 4 and 5 for reasoning, math and language.

Vocational options were noted to include School Nurse (075.124-010, 7, Light, $15.68), Office Nurse (075.374-014, 7, Light, $16.90) and Hospital Admitting Clerk (205.362-018, 4, Light, $8.72). The insured resides in Gordon, Alabama which is 24.3 miles from Dothan, Alabama. Dothan has a population of 57,737 and was used as the labor market in this assessment.

### Return to Work Services, Kellie Pickett, 3/15/06 - 4/12/06

Return to work services were initiated on 3/15/06 by Ms. Kellie Pickett to assist the insured with returning to work. Ms. Picket contacted the insured on 3/21/06 to discuss return to work services. The insured was aware that her benefits would be ending secondary to the change in definition but indicated that she does not feel she can work. She indicated she has a follow up appointment with her physician after the closure date of her benefits.

It was explained that there was a limited amount of time for providing services and an offer was made to contact the employer for other options. The insured noted that she did not think she would be able to return there. The restrictions and limitations that were supported in the vocational assessment of 1/20/06 were explained and the insured said she may be able to work within those restrictions and limitations. It was also explained there were local resources that may be able to assist with job placement services such as the State Division of Rehabilitation Services. The insured said she understood that her file will be closing however she will not be able to submit anything new until her next appointment. The insured was advised that if she changed her mind between now and when her claim closes to contact Ms. Pickett.

The employer was contacted on 4/3/06 to review the potential for other occupations that the insured could perform with the restrictions and limitation noted. The employer noted that they are uncertain of any vocational options as of the date of the contact. This information was shared with the insured. A follow-up contact was scheduled with the insured on 4/5/06.

The file was closed to vocational rehabilitation services as of 4/12/06 since the insured had not contact the vocational rehabilitation consultant.

### Vocational Assessment, Christy N. Searcy, MS, CRC, 5/2/06

A vocational assessment was completed by Ms. Searcy as new medical information was provided. This medical information is a Functional Capacity Evaluation (FCE) dated 12/27/05. The FCE results indicates that the insured is capable of functioning in the sedentary to light physical demand level with lifting/carrying between 10-20 lbs. occasionally. Kneeling, crouching and overhead reaching were demonstrated occasionally. Bending was demonstrated occasionally to frequently. Capacity was noted for simple grasping, fine manipulation, pushing, pulling, stair climbing and balancing. Functional activities involving walking, standing, sitting, repetitive bending, repetitive crouching, repetitive kneeling, reaching, stair climbing and balancing were expressed as actual observed times with no extrapolation to capacity per eight hour day.

UACL01611

Claimant Name:  Sherri Ann McSwain      Claim #:  1304988

Based on the FCE information, Ms. Searcy indicated that the occupations identified in the vocational assessment dated 1/20/06 would remain viable as vocational options.

**Vocational Assessment, Michael McClanahan, Ph.D., 6/5/06**

A vocational assessment was completed by Dr. McClanahan on 6/5/06 that indicated the following:

- The December 27,2005, Functional Capacity Evaluation does not allow lot work that is both suitable and gainful as defined in the Alabama Code, and indicates a Vocational Disability Rating of 100%;
- Ms. McSwain's self described abilities and pain do not allow for full time work and indicate a Vocational Disability Rating of 100%.

Dr. McLanahan basis this vocational opinion on the insured's self described functional limitations and pain do not allow for competitive employment. She can handle about ten pounds, requires postural changes (sit-stand) or shifting at five to 20 minute intervals. Any activity involving bending or flexion oft he spine is painful, so she avoids climbing, stooping, kneeling, crouching, and crawling. She described chronic and persistent pain in the low hack, right leg, and knees and rated the intensity in the moderate to moderately severe range daily, even with medication. Moderately severe to severe pain is considered occupationally debilitating due to the effect it has on concentration, persistence, and pace.

Dr. McClanahan indicated that the insured's pretest pain was three, and post test, five, less than the ratings she gave during the vocational evaluation (5-7) and suggests that this is an indication that the insured's condition may be deteriorating. The insured was contacted two or three days following the FCE and indicated that she was "in a lot of pain."

Dr. McClanahan completed vocational testing that included:

- Visual Analog Pain Rating Scale Technique
- Wide Range Achievement Test-Revision 3
- Kaufman Brief Intelligence Test
- Wonderlic Personnel Test
- Sage dexterity tests
- Purdue Pegboard
- Zung Depression Self-Rating Scale
- Review of referral information
- LifeStep software

On the date of testing, Ms. McSwain presented with complaints of pain and dysfunction of the low back, right leg, and knees. Prescribed medications included MS Contin, Topamax, Baclofin, Ibuprofen, Prozac, Ambien, and Provigil, all by Dr. David Evans. The insured reported that she experienced side effects that include sleepiness/drowsiness and occasionally uses a TENS unit.

The insured's perception of abilities were noted as follows:

"sit about 20 minutes before shifting, and she can stand about five minutes, She is able to walk 200 feet. She is able to drive short distances. She is able to reasonably lift about 10 pounds. She has difficulty with balance secondary to leg/back path and dysfunction, and she avoids climbing, stooping, kneeling, crouching and crawling as these arc painful activities. She is left-handed."

The Visual Analog Scale (zero is no pain and 10 requires an immediate trip to the emergency room) for the 30 days prior to the evaluation indicated that the pain reached 7 or greater.

The insured admitted to "periodic depression and indicated a need for treatment. She denied current severe symptoms such as suicidal ideation, psychosis. etc.

The insured dropped out of school in the eleventh grade and later obtained a GED. In 1996, she completed a three year nursing program at Troy State, and finished with a 3.7/4.0 GPA. The insured began working at Southeast Alabama Medical Center in July 2000 as a Registered Nurse. She was paid $19.67 hourly (plus benefits) and worked 40 hours per week. She described the position as heavy exertional and skilled. Prior to Southeast Alabama Medical Center, the insured worked as an RN for Baptist Surgery Center, Jackson Hospital, and Columbia Regional Hospital. She was in nursing school from 1993 -96. Employment prior to nursing school is beyond the accepted vocationally relevant time period (15 years), and unskilled.

The Wide Range Achievement Test (WRAT) is a brief achievement test measuring reading recognition, spelling, and arithmetic computation. Recommended uses for the test described in the manual include comparing achievement of one person to another, determining learning ability or learning disability,

UACL01612

comparing codes with comprehension in order to prescribe remedial programs, and informally assessing error patterns to plan instructional programs. The insured scored within the post high school grade score for reading; the 12th grade for spelling and 9th to 10th grade for arithmetic.

The K-BIT is a brief, individually administered measure of verbal and nonverbal cognitive ability and was administered to estimate intellectual ability. The K-BIT consists of three sub-tests covering two areas, Vocabulary and Matrices. The insured obtained a Composite, or full scale IQ of 96, which is in the Average range. Sub scales: Vocabulary - 92; Matrices – 101. The 9 point disparity between scales is not statistically significant.

The Wonderlic Personnel Test is a short form test of general cognitive ability. It is used to assess the level at which an individual learns, understands instructions and solves problems. It can provide insight into how easily individuals can be trained, how well they can adjust and solve problems on the job, and how well satisfied they are likely to be with the demands of a job. The insured's score is indicative of the ability to learn semi to skilled work tasks. In the central tendency of persons with ten years of formal education, and a predicted WAIS-R IQ of 95.

Aptitudes are the capacities or specific abilities that an individual must have in order to learn to perform a given work activity. For this analysis, the insured's work history, educational background, the previously referenced achievement, IQ, personnel scores, the Purdue Pegboard, and selected components from the Sage Vocational Aptitude Battery were considered. Her scores are compared to competitively employed workers and presented in DOL's classification system:

Below average in General Learning, Verbal, clerical perception, and motor coordination.
Average in Numerical, Spacial, Form Perception, Finger Dexterity and Manual Dexterity.

The insured's Zung Depression Self-Rating score (SDS Index 63) is in the "moderate to marked" range.

The Functional Rating Index (FRI) is a questionnaire of ten items that cover topics relating to general level of pain and ability to perform a variety of activities of daily living. Each item has five (5) answers arranged in a scale from 0 to 4. To obtain an overall score on the questionnaire, one must add the point values for each of the items answered by the patient. The maximum score is 40. Eight items refer to activities of daily living, and two refer to different attributes of pain. The insured's score of 74% is in "very severe disability" category.

The scores generated from present testing are felt to be valid estimates of Ms. Mc3wain's true abilities, as there is good internal consistency among the measures, and they are within the range of expectation given her history. Ms. McSwain obtained a GED after dropping out of school in the eleventh grade, and completed a three year nursing program. Accordingly, she demonstrated functional academics at the post high school level in Reading (word recognition), twelfth grade in Spelling, and at the 9h to IQ grade in Arithmetic. A comparison of the mean of standard scores from achievement testing (100) to the Composite IQ score (96) is an indication of consistency of effort and overall validity of the scores. Corroborating the achievement and IQ scores is her performance on the Wonderlic Personnel Test On this test, used in industry for selection and promotion and used in the present context for assessment of "workIQ" her score is in the central tendency of persons who have ten years of education (she has a GED plus three years of nursing school), indicative oft he ability to learn semi to skilled work tasks (her history is skilled), and predictive of a WAIS-R IQ of 95 (96 was measured using the K-BIT). Finger and manual dexterity scores are in the average range, whereas, motor coordination is below avenge.

**Medical Review, Victoria M. Langa, M.D., 7/18/06**

In my opinion. Ms. Mcswain is physically capable of performing work in the sedentary to light category as per the restrictions/limitations outlined in the functional capacity evaluation of December 27, 2005 (and as discussed above).

In my opinion, the medical records do not support a 100% disability.

In my opinion, there is no objective evidence in the reviewed material for any deterioration of Ms. McSwain's condition since the FCE of December 27, 2005.

UACL01613

Claimant Name: Sherri Ann McSwain      Claim #: 1304988

**Questions**

From the material within the file, it does not appear that the insured is TD any occ. Are the occupations previously identified still viable?

If they are not viable, are there any occupations that would meet the R & L's presented in the FCE of 12/27/05?   The file appears to reflect that the insured's AP, Dr. Voss, Dr. Seiters and the IA physician, Dr. Langa all agree with the FCE

**Discussion**

A review of the vocational assessment completed by Dr. McLanahan indicates that the insured is 100% disabled as the FCE would prevent the insured from performing work that is "both suitable and gainful as defined in the Alabama Code;" the insured's "self described abilities and pain do not allow for full time work" and indicates a Vocational Disability Rating of 100%.

The medical review completed by Dr. Langa indicated that the insured should be able to perform work in the sedentary to light category as per the restrictions/limitations outlined in the functional capacity evaluation of December27, 2005. This is inconsistent with Dr. McLanahan's assertions that the insured's self reported pain complaints would interfere with full time work. It is also noted that Dr. McLanahan suggests that the insured's ascribing of a higher pain rating as an indicated that the insured's condition is deteriorating. This too is inconsistent with the medical review provided by Dr. Langa.

Dr. McLanahan indicates that the insured has demonstrated average intelligence and academic accomplishments that are consistent with the training, education and experience. The aptitudes, however, indicated below average in General Learning, Verbal, clerical perception, and motor coordination; and average in Numerical, Spacial, Form Perception, Finger Dexterity and Manual Dexterity. This is inconsistent with the insured's past work history that would suggest above average aptitude in General Learning Ability, Verbal Aptitude and Clerical Aptitude; and average aptitude in Motor Coordination. It would also be expected that one with a tested IQ of 96 and tested academic functioning within the high school range would have at least average General Learning Ability and Verbal Aptitude. The testing performed and the relevant scores were not presented in the development of the aptitudinal profile.

This consultant is not an expert on the Alabama Code and cannot speak to the specific of the insured's ability to be considered "100% disabled" since the vocational assessment does not provide any definitions of "suitable and gainful." The Unum contract indicates the following:

HOW DOES UNUM DEFINE DISABILITY?

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 36 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

The loss of a professional or occupational license or certification does not, in itself, constitute disability. We may require you to be examined by and/or vocational expert of our choice. require an examination as often as it is you to be interviewed by an authorized a physician, other medical practitioner Unum will pay for this examination. We can reasonable to do so. We may also require Unum Representative.

The contract defines GAINFUL OCCUPATION as an occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work. As of the change in definition, gross disability benefits were noted to be $1,560.00 per month or $9.00 per hour.

Based on this definition from Unum; the insured's training, education and experience; the Functional Capacity Evaluation; and the Medical Review from Dr. Langa, the original occupations identified as vocational alternative per Christy Searcy would remain viable. These occupations are within the sedentary to

UACL01614

Claimant Name: Sherri Ann McSwain    Claim #: 1304988

light range and can be performed with the restrictions and limitations identified in the Functional Capacity Evaluation.

The insured would be capable of performing other gainful occupations for which she is fitted by training, education and experience with the supported restrictions and limitations identified.

I have reviewed all occupational and vocational evidence provided to me by Company personnel, including analysis of current limitations and restrictions by medical and clinical personnel, bearing on the vocational assessment(s) which I am by training and experience capable to perform.

G. Shannon O'Kelley, M.Ed., C.R.C.
Senior Vocational Rehabilitation Consultant
7/26/06

UACL01615

Claimant Name: Sherri Ann McSwain     Claim #: 1304988



August 2, 2006

JOSEPH W. LEWIS
LAW OFFICES
JOHN E BYRD JR JOSEPH W LEWIS & DAVID A JONES
PO BOX 536
DOTHAN, AL 36302

RE:   McSwain, Sherri Ann       DOB: September 08, 1964
       Claim Number:           1304988
       Policy Number:          578048
       Unum Life Insurance Company of America

Dear Attorney Lewis:

We are writing to let you know that we have completed the requested appellate review of the claim presented under your client's group Long Term Disability (LTD). After careful review of all of the documentation contained within the claim file, we find the previous decision to deny benefits is appropriate and we have upheld it. This letter will serve to provide the rationale for our determination in accordance with the group LTD policy and the provisions therein.

The group LTD policy states in part:

HOW DOES UNUM DEFINE DISABILITY ?

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience.

You mist be under the regular care of a physician in order to be considered disabled.

The loss of a professional or occupational license or certification does not, in itself,

Unum Life Insurance Company of America
The Benefits Center Compliance Department
P.O. Box 180138
Chattanooga, TN 37402
Phone: 1-800-451-8464
Fax: 423-755-8383
www.unumprovident.com

1242-03

UACL01620

constitute disability.

We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Unum Representative.

GAINFUL OCCUPATION means an occupation that is or can be expected to provide you with an income at least equal to your gross disability payments within 12 months of your return to work.

Our records reflect that Ms. McSwain presented a claim with the Date of Disability (DOD) of December 24, 2003 and a diagnosis of a "Herniated disk at L5-S1". Conservative treatment was initiated by Nicholas Voss, M.D (neurosurgeon), but he ultimately performed surgery on July 7, 2004. The initial restrictions and limitations were indicated as "No lifting, twisting, turning, bending, etc.". Ms. McSwain also received treatment from David Evans, M.D. (pain management) who indicated that the patient was referred by Dr. Voss.

On July 27, 2005, Dr. Voss responded to our questionnaire requesting his comment on the amount of weight Ms. McSwain would be able to lift. He indicated that she would be able to lift 21-30 pounds. A similar questionnaire was sent to Dr. Evans soliciting his input in regards to Ms. McSwain's functional capacity. Dr. Evans deferred comment to Dr. Voss and to the Functional Capacity Exam (FCE) performed on December 27, 2005 which Dr. Voss had requested to help clarify Ms. McSwain's condition.

The FCE reflects that Ms. McSwain was capable of lifting up to 20 pounds and was classified in the sedentary to light category. Our in house orthopedic surgeon contacted Dr. Voss by mail to solicit his comments regarding Ms. McSwain's abilities. Dr. Voss responded with a letter of April 5, 2006 in which he agreed with the FCE and our physician in that Ms. McSwain would be able to lift up to 20 pounds and be classified in the sedentary to light category.

As such, our file indicates that the claim was brought to an end with a letter of May 11, 2006.

We received your letter of appeal, dated May 15, 2006, along with the accompanying records for Ms. McSwain including a vocational assessment from Michael McClanahan, PhD. These were reviewed by our medical department and were forwarded to an independent orthopedic surgeon.

This surgeon commented that, "It would be my overall opinion that the results of the functional capacity evaluation are valid for the purposes of determining Ms. McSwain's physical capabilities/work capabilities". She goes on to say, "Since the functional capacity evaluation of December 27, 2005, Ms. McSwain has undergone evaluation and treatment of bilateral knee symptomology. She has undergone x-rays of both knees, which were reportedly normal. She has undergone a rheumatologic work-up, which is borderline, and, given that she has a family history of rheumatoid arthritis, it appears that the feeling at this point is that she may have early rheumatoid disease. However, there is nothing in the reviewed medical records to suggest that her knee function is such that there is resulting disability (and indeed none of he doctors who have seen her for her knees have imposed any specific restrictions and limitations regarding her knees".

UACL01621

1242-03

Claimant Name: McSwain, Sherri Ann
Claim Number: 1304988

August 2, 2006
Page 3 of 4

She continues regarding the additional vocational evaluation by Dr. McClanahan by stating, "Dr. McClanahan did not perform any physical testing but instead relied on Ms. McSwain's self-report of her physical abilities, and it should be noted that her report of physical capabilities in some cases is inconsistent with what was documented at the time of the functional capacity evaluation". This reviewing orthopedic surgeon concludes by stating, " in my opinion, Ms. McSwain is physically capable of performing work in the sedentary to light category as per the restrictions/limitations outlined in the functional capacity evaluation of December 27, 2005 ( as discussed above)". "In my opinion, the medical records do not support a 100% disability. In my opinion, there is no objective evidence in the reviewed material for any deterioration of Ms. McSwain's condition since the FCE of December 27, 2005".

We also requested an evaluation of an additional vocational specialist. As previously indicated in the original evaluation, it was determined that the occupation of registered nurse was considered to be in the medium category.  He stated that "the original occupations identified as vocational alternatives per Christy Searcy would remain viable. These occupations are within the sedentary to light range and can be performed with the restrictions and limitations identified in the Functional Capacity Evaluation. The insured would be capable of performing other gainful occupations for which she is fitted by training, education and experience with the supported restrictions and limitations identified".

This examiner has completed a thorough and objective appellate review. Based upon the totality of information contained within Ms. McSwain's file, it appears that the available medical data does not provide support for restrictions and limitations that would limit her from performing the duties of any gainful occupation, as defined by the policy. We have no recourse but to find the original decision to deny LTD disability benefits to be contractually and factually supported and we are upholding that determination.

Your client is entitled to receive, upon request and without charge, reasonable access to or copies of all documents, records or other information that are relevant to her benefit determination.

If your client disputes this determination, she has a right to bring a civil suit under section 502(a) of the Employee Retirement Income Security Act of 1974.

In addition, your client's plan may have other voluntary alternative dispute resolution options, such as mediation.  You can learn what options are available by contacting your local U.S. Department of Labor office and your state insurance regulatory agency.

Unum Life Insurance Company of America has completed our review of your client's appeal. No further review is available and your client's appeal is now closed.

UACL01622

1242-03

Claimant Name: McSwain, Sherri Ann
Claim Number: 1304988

August 2, 2006
Page 4 of 4

Mr. Lewis, if you have any questions, please contact me at 1-800-451-8464, extension 47156.

Sincerely,

*Sibley Evans*

Sibley Evans
Appeals Consultant
Unum Life Insurance Company of America


CC:        Sherri McSwain
           SOUTHEAST ALABAMA MEDICAL/KECIA CULP/PERSONAL &
           CONFIDENTIAL

UACL01623

1242-03

**EXHIBIT**

tabbies  **3**



**GROUP INSURANCE POLICY**
**NON-PARTICIPATING**

**POLICYHOLDER:**    Southeast Alabama Medical Center

**POLICY NUMBER:**    578048 001

**POLICY EFFECTIVE DATE:**    July 1, 2003

**POLICY ANNIVERSARY DATE:** July 1

**GOVERNING JURISDICTION:**    Alabama

Unum Life Insurance Company of America (referred to as Unum) will provide benefits under this policy. Unum makes this promise subject to all of this policy's provisions.

The policyholder should read this policy carefully and contact Unum promptly with any questions. This policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments. This policy consists of:

-    all policy provisions and any amendments and/or attachments issued;
-    employees' signed applications; and
-    the certificate of coverage.

This policy may be changed in whole or in part. Only an officer or a registrar of Unum can approve a change. The approval must be in writing and endorsed on or attached to this policy. No other person, including an agent, may change this policy or waive any part of it.

Signed for Unum at Portland, Maine on the Policy Effective Date.

President                           Secretary

**Unum Life Insurance Company of America**
2211 Congress Street
Portland, Maine 04122

Copyright 1993, Unum Life Insurance Company of America

# TABLE OF CONTENTS

BENEFITS AT A GLANCE.................................................................................B@G-LTD-1

LONG TERM DISABILITY PLAN .....................................................................B@G-LTD-1

CLAIM INFORMATION.......................................................................................LTD-CLM-1

LONG TERM DISABILITY ...................................................................................LTD-CLM-1

POLICYHOLDER PROVISIONS.........................................................................EMPLOYER-1

CERTIFICATE SECTION ...................................................................................CC.FP-1

GENERAL PROVISIONS ...................................................................................EMPLOYEE-1

LONG TERM DISABILITY ...................................................................................LTD-BEN-1

BENEFIT INFORMATION...................................................................................LTD-BEN-1

OTHER BENEFIT FEATURES ...........................................................................LTD-OTR-1

OTHER SERVICES..............................................................................................SERVICES-1

GLOSSARY ...........................................................................................................GLOSSARY-1

# BENEFITS AT A GLANCE

### LONG TERM DISABILITY PLAN

This long term disability plan provides financial protection for you by paying a portion of your income while you are disabled. The amount you receive is based on the amount you earned before your disability began. In some cases, you can receive disability payments even if you work while you are disabled.

**EMPLOYER'S ORIGINAL PLAN**
**EFFECTIVE DATE:**    July 1, 2003

**POLICY NUMBER:**    578048  001

**ELIGIBLE GROUP(S):**

All Employees in active employment in the United States with the Employer

**MINIMUM HOURS REQUIREMENT:**

Employees must be working at least 32 hours per week.

**WAITING PERIOD:**

For employees in an eligible group on or before July 1, 2003:   None

For employees entering an eligible group after July 1, 2003:  First of the month following the date you enter an eligible group

**REHIRE:**

If your employment ends and you are rehired within 12 months, your previous work while in an eligible group will apply toward the waiting period. All other policy provisions apply.

**WHO PAYS FOR THE COVERAGE:**

You pay the cost of your coverage.

**ELIMINATION PERIOD:**

90 days

Benefits begin the day after the elimination period is completed.

**MONTHLY BENEFIT:**

60% of monthly earnings to a maximum benefit of $5,000 per month.

Your payment may be reduced by deductible sources of income and disability earnings. Some disabilities may not be covered or may have limited coverage under this plan.

**MAXIMUM PERIOD OF PAYMENT:**

| Age at Disability | Maximum Period of Payment |
|---|---|
| Less than age 60 | To age 65, but not less than 5 years |
| Age 60 | 60 months |
| Age 61 | 48 months |
| Age 62 | 42 months |
| Age 63 | 36 months |
| Age 64 | 30 months |
| Age 65 | 24 months |
| Age 66 | 21 months |
| Age 67 | 18 months |
| Age 68 | 15 months |

Age 69 and over                    12 months

No premium payments are required for your coverage while you are receiving payments under this plan.

**REHABILITATION AND RETURN TO WORK ASSISTANCE BENEFIT:**

10% of your gross disability payment to a maximum benefit of $1,000 per month.

In addition, we will make monthly payments to you for 3 months following the date your disability ends if we determine you are no longer disabled while:

- you are participating in the Rehabilitation and Return to Work Assistance program; and
- you are not able to find employment.

**DEPENDENT CARE EXPENSE BENEFIT:**

While you are participating in Unum's Rehabilitation and Return to Work Assistance program, you may receive payments to cover certain dependent care expenses limited to the following amounts:

Dependent Care Expense Benefit Amount:  $350 per month, per dependent

Dependent Care Expense Maximum Benefit Amount:  $1,000 per month for all eligible dependent care expenses combined

**TOTAL BENEFIT CAP:**

The total benefit payable to you on a monthly basis (including all benefits provided under this plan) will not exceed 100% of your monthly earnings.  However, if you are participating in Unum's Rehabilitation and Return to Work Assistance program, the total benefit payable to you on a monthly basis (including all benefits provided under this plan) will not exceed 110% of your monthly earnings.

**OTHER FEATURES:**

Continuity of Coverage

Minimum Benefit

Pre-Existing: 3/12

Survivor Benefit

Work Life Assistance Program

**The above items are only highlights of this plan.  For a full description of your coverage, continue reading your certificate of coverage section.**

B@G-LTD-2  (7/1/2003)

# CLAIM INFORMATION

# LONG TERM DISABILITY

### *WHEN DO YOU NOTIFY UNUM OF A CLAIM?*

We encourage you to notify us of your claim as soon as possible, so that a claim decision can be made in a timely manner. Written notice of a claim should be sent within 30 days after the date your disability begins. However, you must send Unum written proof of your claim no later than 90 days after your elimination period. If it is not possible to give proof within 90 days, it must be given no later than 1 year after the time proof is otherwise required except in the absence of legal capacity.

The claim form is available from your Employer, or you can request a claim form from us. If you do not receive the form from Unum within 15 days of your request, send Unum written proof of claim without waiting for the form.

You must notify us immediately when you return to work in any capacity.

### *HOW DO YOU FILE A CLAIM?*

You and your Employer must fill out your own sections of the claim form and then give it to your attending physician. Your physician should fill out his or her section of the form and send it directly to Unum.

### *WHAT INFORMATION IS NEEDED AS PROOF OF YOUR CLAIM?*

Your proof of claim, provided at your expense, must show:

- that you are under the **regular care** of a **physician**;
- the appropriate documentation of your monthly earnings;
- the date your disability began;
- the cause of your disability;
- the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation; and
- the name and address of any **hospital or institution** where you received treatment, including all attending physicians.

We may request that you send proof of continuing disability indicating that you are under the regular care of a physician. This proof, provided at your expense, must be received within 30 days of a request by us.

In some cases, you will be required to give Unum authorization to obtain additional medical information and to provide non-medical information as part of your proof of claim, or proof of continuing disability. Unum will deny your claim, or stop sending you payments, if the appropriate information is not submitted.

### *TO WHOM WILL UNUM MAKE PAYMENTS?*

Unum will make payments to you.

### WHAT HAPPENS IF UNUM OVERPAYS YOUR CLAIM?

Unum has the right to recover any overpayments due to:

- fraud;
- any error Unum makes in processing a claim; and
- your receipt of deductible sources of income.

You must reimburse us in full.  We will determine the method by which the repayment is to be made.

Unum will not recover more money than the amount we paid you.

# POLICYHOLDER PROVISIONS

### *WHAT IS THE COST OF THIS INSURANCE?*

## <u>LONG TERM DISABILITY</u>

The initial premium for each **plan** is based on the initial rate(s) shown in the Rate Information Amendment(s).

### *WAIVER OF PREMIUM*

Unum does not require premium payments for an insured while he or she is receiving Long Term Disability payments under this plan.

### *INITIAL RATE GUARANTEE AND RATE CHANGES*

Refer to the Rate Information Amendment(s).

### *WHEN IS PREMIUM DUE FOR THIS POLICY?*

Premium Due Dates:  Premium due dates are based on the Premium Due Dates shown in the Rate Information Amendment(s).

The **Policyholder** must send all premiums to Unum on or before their respective due date.  The premium must be paid in United States dollars.

### *WHEN ARE INCREASES OR DECREASES IN PREMIUM DUE?*

Premium increases or decreases which take effect during a policy month are adjusted and due on the next premium due date following the change.  Changes will not be pro-rated daily.

If premiums are paid on other than a monthly basis, premiums for increases and decreases will result in a monthly pro-rated adjustment on the next premium due date.

Unum will only adjust premium for the current policy year and the prior policy year. In the case of fraud, premium adjustments will be made for all policy years.

### *WHAT INFORMATION DOES UNUM REQUIRE FROM THE POLICYHOLDER?*

The Policyholder must provide Unum with the following on a regular basis:

- information about employees:
  - who are eligible to become insured;
  - whose amounts of coverage change; and/or
  - whose coverage ends;
- occupational information and any other information that may be required to manage a claim; and
- any other information that may be reasonably required.

Policyholder records that, in Unum's opinion, have a bearing on this policy will be available for review by Unum at any reasonable time.

Clerical error or omission by Unum will not:

- prevent an employee from receiving coverage;
- affect the amount of an insured's coverage; or
- cause an employee's coverage to begin or continue when the coverage would not otherwise be effective.

### WHO CAN CANCEL OR MODIFY THIS POLICY OR A PLAN UNDER THIS POLICY?

This policy or a plan under this policy can be cancelled:

- by Unum; or
- by the Policyholder.

Unum may cancel or modify this policy or a plan if:

- there is less than 75% participation of those eligible employees who pay all or part of their premium for a plan; or
- there is less than 100% participation of those eligible employees for a Policyholder paid plan;
- the Policyholder does not promptly provide Unum with information that is reasonably required;
- the Policyholder fails to perform any of its obligations that relate to this policy;
- fewer than 10 employees are insured under a plan;
- the premium is not paid in accordance with the provisions of this policy that specify whether the Policyholder, the employee, or both, pay(s) the premiums;
- the Policyholder does not promptly report to Unum the names of any employees who are added or deleted from the eligible group;
- Unum determines that there is a significant change, in the size, occupation or age of the eligible group as a result of a corporate transaction such as a merger, divestiture, acquisition, sale, or reorganization of the Policyholder and/or its employees; or
- the Policyholder fails to pay any portion of the premium within the 31 day **grace period.**

If Unum cancels or modifies this policy or a plan for reasons other than the Policyholder's failure to pay premium, a written notice will be delivered to the Policyholder at least 31 days prior to the cancellation date or modification date. The Policyholder may cancel this policy or a plan if the modifications are unacceptable.

If any portion of the premium is not paid during the grace period, Unum will either cancel or modify the policy or plan automatically at the end of the grace period. The Policyholder is liable for premium for coverage during the grace period. The Policyholder must pay Unum all premium due for the full period each plan is in force.

The Policyholder may cancel this policy or a plan by written notice delivered to Unum at least 31 days prior to the cancellation date. When both the Policyholder and Unum agree, this policy or a plan can be cancelled on an earlier date. If Unum or the Policyholder cancels this policy or a plan, coverage will end at 12:00 midnight on the last day of coverage.

If this policy or a plan is cancelled, the cancellation will not affect a **payable claim.**

### *WHAT HAPPENS TO AN EMPLOYEE'S COVERAGE UNDER THIS POLICY WHILE HE OR SHE IS ON A FAMILY AND MEDICAL LEAVE OF ABSENCE?*

We will continue the employee's coverage in accordance with the policyholder's Human Resource policy on family and medical leaves of absence if premium payments continue and the policyholder approved the employee's leave in writing.

Coverage will be continued until the end of the later of:

1. the leave period required by the federal Family and Medical Leave of Absence Act of 1993 and any amendments; or
2. the leave period required by applicable state law.

If the policyholder's Human Resource policy doesn't provide for continuation of an employee's coverage during a family and medical leave of absence, the employee's coverage will be reinstated when he or she returns to active employment.

We will not:

- apply a new waiting period;
- apply a new pre-existing conditions exclusion; or
- require evidence of insurability.

### *DIVISIONS, SUBSIDIARIES OR AFFILIATED COMPANIES INCLUDE:*

NAME/LOCATION (CITY AND STATE)

None

# CERTIFICATE SECTION

Unum Life Insurance Company of America (referred to as Unum) welcomes you as a client.

This is your certificate of coverage as long as you are eligible for coverage and you become insured.  You will want to read it carefully and keep it in a safe place.

Unum has written your certificate of coverage in plain English.  However, a few terms and provisions are written as required by insurance law.  If you have any questions about any of the terms and provisions, please consult Unum's claims paying office.  Unum will assist you in any way to help you understand your benefits.

If the terms and provisions of the certificate of coverage (issued to you) are different from the policy (issued to the policyholder), the policy will govern.  Your coverage may be cancelled or changed in whole or in part under the terms and provisions of the policy.

The policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments.  When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

For purposes of effective dates and ending dates under the group policy, all days begin at 12:01 a.m. and end at 12:00 midnight at the Policyholder's address.

Unum Life Insurance Company of America
2211 Congress Street
Portland, Maine 04122

# GENERAL PROVISIONS

### WHAT IS THE CERTIFICATE OF COVERAGE?

This certificate of coverage is a written statement prepared by Unum and may include attachments. It tells you:

- the coverage for which you may be entitled;
- to whom Unum will make a payment; and
- the limitations, exclusions and requirements that apply within a plan.

### WHEN ARE YOU ELIGIBLE FOR COVERAGE?

If you are working for your Employer in an eligible group, the date you are eligible for coverage is the later of:

- the plan effective date; or
- the day after you complete your **waiting period**.

### WHEN DOES YOUR COVERAGE BEGIN?

When your Employer pays 100% of the cost of your coverage under a plan, you will be covered at 12:01 a.m. on the date you are eligible for coverage.

When you and your Employer share the cost of your coverage under a plan or when you pay 100% of the cost yourself, you will be covered at 12:01 a.m. on the latest of:

- the date you are eligible for coverage, if you apply for insurance on or before that date;
- the date you apply for insurance, if you apply within 31 days after your eligibility date; or
- the date Unum approves your application, if **evidence of insurability** is required.

Evidence of insurability is required if you:

- are a late applicant, which means you apply for coverage more than 31 days after the date you are eligible for coverage; or
- voluntarily cancelled your coverage and are reapplying.

An evidence of insurability form can be obtained from your Employer.

### WHAT IF YOU ARE ABSENT FROM WORK ON THE DATE YOUR COVERAGE WOULD NORMALLY BEGIN?

If you are absent from work due to injury, sickness, temporary layoff or leave of absence, your coverage will begin on the date you return to **active employment**.

### ONCE YOUR COVERAGE BEGINS, WHAT HAPPENS IF YOU ARE TEMPORARILY NOT WORKING?

If you are on a temporary **layoff**, and if premium is paid, you will be covered through the end of the month that immediately follows the month in which your temporary layoff begins.

If you are on a **leave of absence**, and if premium is paid, you will be covered through the end of the month that immediately follows the month in which your leave of absence begins.

## WHEN WILL CHANGES TO YOUR COVERAGE TAKE EFFECT?

Once your coverage begins, any increased or additional coverage will take effect immediately if you are in active employment or if you are on a covered layoff or leave of absence.  If you are not in active employment due to injury or sickness, any increased or additional coverage will begin on the date you return to active employment.

Any decrease in coverage will take effect immediately but will not affect a **payable claim** that occurs prior to the decrease.

## WHEN DOES YOUR COVERAGE END?

Your coverage under the policy or a plan ends on the earliest of:

- the date the policy or a plan is cancelled;
- the date you no longer are in an eligible group;
- the date your eligible group is no longer covered;
- the last day of the period for which you made any required contributions; or
- the last day you are in active employment except as provided under the covered layoff or leave of absence provision.

Unum will provide coverage for a payable claim which occurs while you are covered under the policy or plan.

## WHAT ARE THE TIME LIMITS FOR LEGAL PROCEEDINGS?

You can start legal action regarding your claim 60 days after proof of claim has been given and up to 3 years from the time proof of claim is required, unless otherwise provided under federal law.

## HOW CAN STATEMENTS MADE IN YOUR APPLICATION FOR THIS COVERAGE BE USED?

Unum considers any statements you or your Employer make in a signed application for coverage a representation and not a warranty.  If any of the statements you or your Employer make are not complete and/or not true at the time they are made, we can:

- reduce or deny any claim; or
- cancel your coverage from the original effective date.

We will use only statements made in a signed application as a basis for doing this.

If the Employer gives us information about you that is incorrect, we will:

- use the facts to decide whether you have coverage under the plan and in what amounts; and
- make a fair adjustment of the premium.

EMPLOYEE-2   (7/1/2003)

### *HOW WILL UNUM HANDLE INSURANCE FRAUD?*

Unum wants to ensure you and your Employer do not incur additional insurance costs as a result of the undermining effects of insurance fraud. Unum promises to focus on all means necessary to support fraud detection, investigation, and prosecution.

It is a crime if you knowingly, and with intent to injure, defraud or deceive Unum, or provide any information, including filing a claim, that contains any false, incomplete or misleading information. These actions, as well as submission of materially false information, will result in denial of your claim, and are subject to prosecution and punishment to the full extent under state and/or federal law. Unum will pursue all appropriate legal remedies in the event of insurance fraud.

### *DOES THE POLICY REPLACE OR AFFECT ANY WORKERS' COMPENSATION OR STATE DISABILITY INSURANCE?*

The policy does not replace or affect the requirements for coverage by any workers' compensation or state disability insurance.

### *DOES YOUR EMPLOYER ACT AS YOUR AGENT OR UNUM'S AGENT?*

For purposes of the policy, your Employer acts on its own behalf or as your agent. Under no circumstances will your Employer be deemed the agent of Unum.

# LONG TERM DISABILITY

# BENEFIT INFORMATION

### HOW DOES UNUM DEFINE DISABILITY?

You are disabled when Unum determines that:

- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
- you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Unum Representative.

### HOW LONG MUST YOU BE DISABLED BEFORE YOU ARE ELIGIBLE TO RECEIVE BENEFITS?

You must be continuously disabled through your **elimination period.** Unum will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

Your elimination period is 90 days.

During your elimination period you will be considered disabled if:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you are under the regular care of a physician.

You are not required to have a 20% or more loss in your indexed monthly earnings due to the same injury or sickness to be considered disabled during the elimination period.

### CAN YOU SATISFY YOUR ELIMINATION PERIOD IF YOU ARE WORKING?

Yes. If you are working while you are disabled, the days you are disabled will count toward your elimination period.

### *WHEN WILL YOU BEGIN TO RECEIVE PAYMENTS?*

You will begin to receive payments when we approve your claim, providing the elimination period has been met and you are disabled. We will send you a payment monthly for any period for which Unum is liable.

### *HOW MUCH WILL UNUM PAY YOU IF YOU ARE DISABLED?*

We will follow this process to figure your payment:

1. Multiply your monthly earnings by 60%.
2. The maximum **monthly benefit** is $5,000.
3. Compare the answer from Item 1 with the maximum monthly benefit. The lesser of these two amounts is your **gross disability payment.**
4. Subtract from your gross disability payment any **deductible sources of income.**

The amount figured in Item 4 is your **monthly payment**.

### *WILL UNUM EVER PAY MORE THAN 100% OF MONTHLY EARNINGS?*

The total benefit payable to you on a monthly basis (including all benefits provided under this plan) will not exceed 100% of your monthly earnings. However, if you are participating in Unum's Rehabilitation and Return to Work Assistance program, the total benefit payable to you on a monthly basis (including all benefits provided under this plan) will not exceed 110% of your monthly earnings.

### *WHAT ARE YOUR MONTHLY EARNINGS?*

"Monthly Earnings" means your gross monthly income from your Employer in effect just prior to your date of disability. It includes your total income before taxes. It is prior to any deductions made for pre-tax contributions to a qualified deferred compensation plan, Section 125 plan, or flexible spending account. It does not include income received from commissions, bonuses, overtime pay, any other extra compensation, or income received from sources other than your Employer.

### *WHAT WILL WE USE FOR MONTHLY EARNINGS IF YOU BECOME DISABLED DURING A COVERED LAYOFF OR LEAVE OF ABSENCE?*

If you become disabled while you are on a covered layoff or leave of absence, we will use your monthly earnings from your Employer in effect just prior to the date your absence begins.

### *HOW MUCH WILL UNUM PAY YOU IF YOU ARE DISABLED AND WORKING?*

We will send you the monthly payment if you are disabled and your monthly **disability earnings**, if any, are less than 20% of your indexed monthly earnings, due to the same sickness or injury.

If you are disabled and your monthly disability earnings are 20% or more of your indexed monthly earnings, due to the same sickness or injury, Unum will figure your payment as follows:

LTD-BEN-2   (7/1/2003)

During the first 12 months of payments, while working, your monthly payment will not be reduced as long as disability earnings plus the gross disability payment does not exceed 100% of indexed monthly earnings.

1. Add your monthly disability earnings to your gross disability payment.
2. Compare the answer in Item 1 to your indexed monthly earnings.

If the answer from Item 1 is less than or equal to 100% of your indexed monthly earnings, Unum will not further reduce your monthly payment.

If the answer from Item 1 is more than 100% of your indexed monthly earnings, Unum will subtract the amount over 100% from your monthly payment.

After 12 months of payments, while working, you will receive payments based on the percentage of income you are losing due to your disability.

1. Subtract your disability earnings from your indexed monthly earnings.
2. Divide the answer in Item 1 by your indexed monthly earnings. This is your percentage of lost earnings.
3. Multiply your monthly payment by the answer in Item 2.

This is the amount Unum will pay you each month.

During the first 24 months of disability payments, if your monthly disability earnings exceed 80% of your indexed monthly earnings, Unum will stop sending you payments and your claim will end.

Beyond 24 months of disability payments, if your monthly disability earnings exceed the gross disability payment, Unum will stop sending you payments and your claim will end.

Unum may require you to send proof of your monthly disability earnings at least quarterly. We will adjust your payment based on your quarterly disability earnings.

As part of your proof of disability earnings, we can require that you send us appropriate financial records which we believe are necessary to substantiate your income.

After the elimination period, if you are disabled for less than 1 month, we will send you 1/30 of your payment for each day of disability.

### HOW CAN WE PROTECT YOU IF YOUR DISABILITY EARNINGS FLUCTUATE?

If your disability earnings routinely fluctuate widely from month to month, Unum may average your disability earnings over the most recent 3 months to determine if your claim should continue.

If Unum averages your disability earnings, we will not terminate your claim unless:

- During the first 24 months of disability payments, the average of your disability earnings from the last 3 months exceeds 80% of indexed monthly earnings; or
- Beyond 24 months of disability payments, the average of your disability earnings from the last 3 months exceeds the gross disability payment.

We will not pay you for any month during which disability earnings exceed the amount allowable under the plan.

### WHAT ARE DEDUCTIBLE SOURCES OF INCOME?

Unum will subtract from your gross disability payment the following deductible sources of income:

1) The amount that you receive or are entitled to receive under:

   - a workers' compensation law.
   - an occupational disease law.
   - any other **act** or **law** with similar intent.

2) The amount that you receive or are entitled to receive as disability income payments under any:

   - state compulsory benefit **act** or **law**.
   - automobile liability insurance policy.
   - other group insurance plan.
   - governmental retirement system as a result of your job with your Employer.

3) The amount that you, your spouse and your children receive or are entitled to receive as disability payments because of your disability under:

   - the United States Social Security Act.
   - the Canada Pension **Plan**.
   - the Quebec Pension Plan.
   - any similar plan or act.

4) The amount that you receive as retirement payments or the amount your spouse and children receive as retirement payments because you are receiving retirement payments under:

   - the United States Social Security Act.
   - the Canada Pension Plan.
   - the Quebec Pension Plan.
   - any similar plan or act.

5) The amount that you:

   - receive as disability payments under your Employer's **retirement plan**.
   - voluntarily elect to receive as retirement payments under your Employer's retirement plan.
   - receive as retirement payments when you reach the later of age 62 or normal retirement age, as defined in your Employer's retirement plan.

   Disability payments under a retirement plan will be those benefits which are paid due to disability and do not reduce the retirement benefit which would have been paid if the disability had not occurred.

   Retirement payments will be those benefits which are based on your Employer's contribution to the retirement plan. Disability benefits which reduce the retirement benefit under the plan will also be considered as a retirement benefit.

Regardless of how the retirement funds from the retirement plan are distributed, Unum will consider your and your Employer's contributions to be distributed simultaneously throughout your lifetime.

Amounts received do not include amounts rolled over or transferred to any eligible retirement plan.  Unum will use the definition of eligible retirement plan as defined in Section 402 of the Internal Revenue Code including any future amendments which affect the definition.

6)  The amount that you receive under Title 46, United States Code Section 688 (The Jones Act).

7)  The amount that you receive from a third party (after subtracting attorney's fees) by judgment, settlement or otherwise.

With the exception of retirement payments, Unum will only subtract deductible sources of income which are payable as a result of the same disability.

We will not reduce your payment by your Social Security retirement income if your disability begins after age 65 and you were already receiving Social Security retirement payments.

## WHAT ARE NOT DEDUCTIBLE SOURCES OF INCOME?

Unum will not subtract from your gross disability payment income you receive from, but not limited to, the following:

- 401(k) plans
- profit sharing plans
- thrift plans
- tax sheltered annuities
- stock ownership plans
- non-qualified plans of deferred compensation
- pension plans for partners
- military pension and disability income plans
- credit disability insurance
- franchise disability income plans
- a retirement plan from another Employer
- individual retirement accounts (IRA)
- individual disability income plans
- **salary continuation** or **accumulated sick leave** plans

## WHAT IF SUBTRACTING DEDUCTIBLE SOURCES OF INCOME RESULTS IN A ZERO BENEFIT? (Minimum Benefit)

The minimum monthly payment is the greater of:

- $100; or
- 10% of your gross disability payment.

Unum may apply this amount toward an outstanding overpayment.

LTD-BEN-5   (7/1/2003)

### WHAT HAPPENS WHEN YOU RECEIVE A COST OF LIVING INCREASE FROM DEDUCTIBLE SOURCES OF INCOME?

Once Unum has subtracted any deductible source of income from your gross disability payment, Unum will not further reduce your payment due to a cost of living increase from that source.

### WHAT IF UNUM DETERMINES YOU MAY QUALIFY FOR DEDUCTIBLE INCOME BENEFITS?

When we determine that you may qualify for benefits under Item(s) 1), 2) and 3) in the deductible sources of income section, we will estimate your entitlement to these benefits. We can reduce your payment by the estimated amounts if such benefits:

- have not been awarded; and
- have not been denied; or
- have been denied and the denial is being appealed.

Your Long Term Disability payment will NOT be reduced by the estimated amount if you:

- apply for the disability payments under Item(s) 1), 2) and 3) in the deductible sources of income section and appeal your denial to all administrative levels Unum feels are necessary; and
- sign Unum's payment option form. This form states that you promise to pay us any overpayment caused by an award.

If your payment has been reduced by an estimated amount, your payment will be adjusted when we receive proof:

- of the amount awarded; or
- that benefits have been denied and all appeals Unum feels are necessary have been completed. In this case, a lump sum refund of the estimated amount will be made to you.

If you receive a lump sum payment from any deductible sources of income, the lump sum will be pro-rated on a monthly basis over the time period for which the sum was given. If no time period is stated, we will use a reasonable one.

### HOW LONG WILL UNUM CONTINUE TO SEND YOU PAYMENTS?

Unum will send you a payment each month up to the **maximum period of payment**. Your maximum period of payment is based on your age at disability as follows:

| Age at Disability | Maximum Period of Payment |
|---|---|
| Less than age 60 | To age 65, but not less than 5 years |
| Age 60 | 60 months |
| Age 61 | 48 months |
| Age 62 | 42 months |
| Age 63 | 36 months |
| Age 64 | 30 months |
| Age 65 | 24 months |
| Age 66 | 21 months |

LTD-BEN-6   (7/1/2003)

|            |           |
|------------|-----------|
| Age 67     | 18 months |
| Age 68     | 15 months |
| Age 69 and over | 12 months |

## WHEN WILL PAYMENTS STOP?

We will stop sending you payments and your claim will end on the earliest of the following:

- during the first 24 months of payments, when you are able to work in your regular occupation on a **part-time basis** but you choose not to;
- after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to;
- the end of the maximum period of payment;
- the date you are no longer disabled under the terms of the plan, unless you are eligible to receive benefits under Unum's Rehabilitation and Return to Work Assistance program;
- the date you fail to submit proof of continuing disability;
- after 12 months of payments if you are considered to reside outside the United States or Canada. You will be considered to reside outside these countries when you have been outside the United States or Canada for a total period of 6 months or more during any 12 consecutive months of benefits;
- the date your disability earnings exceed the amount allowable under the plan;
- the date you die.

## WHAT DISABILITIES HAVE A LIMITED PAY PERIOD UNDER YOUR PLAN?

The lifetime cumulative maximum benefit period for all disabilities due to **mental illness** and disabilities based primarily on **self-reported symptoms** is 24 months. Only 24 months of benefits will be paid for any combination of such disabilities even if the disabilities:

- are not continuous; and/or
- are not related.

Unum will continue to send you payments beyond the 24 month period if you meet one or both of these conditions:

1. If you are confined to a **hospital or institution** at the end of the 24 month period, Unum will continue to send you payments during your confinement.

   If you are still disabled when you are discharged, Unum will send you payments for a recovery period of up to 90 days.

   If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, Unum will send payments during that additional confinement and for one additional recovery period up to 90 more days.

2. In addition to Item 1, if, after the 24 month period for which you have received payments, you continue to be disabled and subsequently become confined to a hospital or institution for at least 14 days in a row, Unum will send payments during the length of the reconfinement.

LTD-BEN-7   (7/1/2003)

Unum will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs first.

Unum will not apply the mental illness limitation to dementia if it is a result of:

- stroke;
- trauma;
- viral infection;
- Alzheimer's disease; or
- other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

## WHAT DISABILITIES ARE NOT COVERED UNDER YOUR PLAN?

Your plan does not cover any disabilities caused by, contributed to by, or resulting from your:

- intentionally self-inflicted injuries.
- active participation in a riot.
- loss of a professional license, occupational license or certification.
- commission of a crime for which you have been convicted.
- pre-existing condition.

Your plan will not cover a disability due to war, declared or undeclared, or any act of war.

Unum will not pay a benefit for any period of disability during which you are incarcerated.

## WHAT IS A PRE-EXISTING CONDITION?

You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to your effective date of coverage; and
- the disability begins in the first 12 months after your effective date of coverage.

## WHAT HAPPENS IF YOU RETURN TO WORK FULL TIME WITH THE POLICYHOLDER AND YOUR DISABILITY OCCURS AGAIN?

If you have a **recurrent disability**, Unum will treat your disability as part of your prior claim and you will not have to complete another elimination period if:

- you were continuously insured under the plan for the period between the end of your prior claim and your recurrent disability; and
- your recurrent disability occurs within 6 months from the end of your prior claim.

Your recurrent disability will be subject to the same terms of the plan as your prior claim and will be treated as a continuation of that disability.

Any disability which occurs after 6 months from the date your prior claim ended will be treated as a new claim. The new claim will be subject to all of the policy provisions, including the elimination period.

If you become entitled to payments under any other group long term disability plan, you will not be eligible for payments under the Unum plan.

# LONG TERM DISABILITY

# OTHER BENEFIT FEATURES

### *WHAT BENEFITS WILL BE PROVIDED TO YOU OR YOUR FAMILY IF YOU DIE OR ARE TERMINALLY ILL? (Survivor Benefit)*

When Unum receives proof that you have died, we will pay your **eligible survivor** a lump sum benefit equal to 3 months of your gross disability payment if, on the date of your death:

- your disability had continued for 180 or more consecutive days; and
- you were receiving or were entitled to receive payments under the plan.

If you have no eligible survivors, payment will be made to your estate, unless there is none.  In this case, no payment will be made.

However, we will first apply the survivor benefit to any overpayment which may exist on your claim.

You may receive your 3 month survivor benefit prior to your death if you have been diagnosed as terminally ill.

We will pay you a lump sum amount equal to 3 months of your gross disability payment if:

- you have been diagnosed with a terminal illness or condition;
- your life expectancy has been reduced to less than 12 months; and
- you are receiving monthly payments.

Your right to exercise this option and receive payment is subject to the following:

- you must make this election in writing to Unum; and
- your physician must certify in writing that you have a terminal illness or condition and your life expectancy has been reduced to less than 12 months.

This benefit is available to you on a voluntary basis and will only be payable once.

If you elect to receive this benefit prior to your death, no 3 month survivor benefit will be payable upon your death.

### *WHAT IF YOU ARE NOT IN ACTIVE EMPLOYMENT WHEN YOUR EMPLOYER CHANGES INSURANCE CARRIERS TO UNUM? (Continuity of Coverage)*

When the plan becomes effective, Unum will provide coverage for you if:

- you are not in active employment because of a sickness or injury; and
- you were covered by the prior policy.

Your coverage is subject to payment of premium.

Your payment will be limited to the amount that would have been paid by the prior carrier.  Unum will reduce your payment by any amount for which your prior carrier is liable.

**WHAT IF YOU HAVE A DISABILITY DUE TO A PRE-EXISTING CONDITION WHEN YOUR EMPLOYER CHANGES INSURANCE CARRIERS TO UNUM? (Continuity of Coverage)**

Unum may send a payment if your disability results from a pre-existing condition if, you were:

- in active employment and insured under the plan on its effective date; and
- insured by the prior policy at the time of change.

In order to receive a payment you must satisfy the pre-existing condition provision under:

1. the Unum plan; or
2. the prior carrier's plan, if benefits would have been paid had that policy remained in force.

If you do not satisfy Item 1 or 2 above, Unum will not make any payments.

If you satisfy Item 1, we will determine your payments according to the Unum plan provisions.

If you only satisfy Item 2, we will administer your claim according to the Unum plan provisions. However, your payment will be the lesser of:

a. the monthly benefit that would have been payable under the terms of the prior plan if it had remained inforce; or
b. the monthly payment under the Unum plan.

Your benefits will end on the earlier of the following dates:

1. the end of the maximum benefit period under the plan; or
2. the date benefits would have ended under the prior plan if it had remained in force.

**HOW CAN UNUM'S REHABILITATION AND RETURN TO WORK ASSISTANCE PROGRAM HELP YOU RETURN TO WORK?**

Unum has a vocational Rehabilitation and Return to Work Assistance program available to assist you in returning to work. We will determine whether you are eligible for this program, at our sole discretion. In order to be eligible for rehabilitation services and benefits, you must be medically able to engage in a return to work program.

Your claim file will be reviewed by one of Unum's rehabilitation professionals to determine if a rehabilitation program might help you return to gainful employment. As your file is reviewed, medical and vocational information will be analyzed to determine an appropriate return to work program.

We will make the final determination of your eligibility for participation in the program.

We will provide you with a written Rehabilitation and Return to Work Assistance plan developed specifically for you.

The rehabilitation program may include at our sole discretion, but is not limited to, the following services and benefits:

- coordination with your Employer to assist you to return to work;
- adaptive equipment or job accommodations to allow you to work;
- vocational evaluation to determine how your disability may impact your employment options;
- job placement services;
- resume preparation;
- job seeking skills training; or
- education and retraining expenses for a new occupation.

**WHAT ADDITIONAL BENEFITS WILL UNUM PAY WHILE YOU PARTICIPATE IN A REHABILITATION AND RETURN TO WORK ASSISTANCE PROGRAM?**

We will pay an additional disability benefit of 10% of your gross disability payment to a maximum benefit of $1,000 per month.

This benefit is not subject to policy provisions which would otherwise increase or reduce the benefit amount such as Deductible Sources of Income.  However, the Total Benefit Cap will apply.

In addition, we will make monthly payments to you for 3 months following the date your disability ends if we determine you are no longer disabled while:

- you are participating in the Rehabilitation and Return to Work Assistance program; and
- you are not able to find employment.

This benefit payment may be paid in a lump sum.

**WHEN WILL REHABILITATION AND RETURN TO WORK ASSISTANCE BENEFITS END?**

Benefits for the Rehabilitation and Return to Work Assistance program will end on the earliest of the following dates:

- the date Unum determines that you are no longer eligible to participate in Unum's Rehabilitation and Return to Work Assistance program; or
- any other date on which monthly payments would stop in accordance with this plan.

**WHAT ADDITIONAL BENEFIT IS AVAILABLE FOR DEPENDENT CARE EXPENSES TO ENABLE YOU TO PARTICIPATE IN UNUM'S REHABILITATION AND RETURN TO WORK ASSISTANCE PROGRAM?**

While you are participating in Unum's Rehabilitation and Return to Work Assistance program, we will pay a Dependent Care Expense Benefit when you are disabled and you:

1. are incurring expenses to provide care for a child under the age of 15; and/or

2. start incurring expenses to provide care for a child age 15 or older or a family member who needs personal care assistance.

The payment of the Dependent Care Expense Benefit will begin immediately after you start Unum's Rehabilitation and Return to Work Assistance program.

Our payment of the Dependent Care Expense Benefit will:

1. be $350 per month, per **dependent**; and
2. not exceed $1,000 per month for all dependent care expenses combined.

To receive this benefit, you must provide satisfactory proof that you are incurring expenses that entitle you to the Dependent Care Expense Benefit.

Dependent Care Expense Benefits will end on the earlier of the following:

1. the date you are no longer incurring expenses for your dependent;
2. the date you no longer participate in Unum's Rehabilitation and Return to Work Assistance program; or
3. any other date payments would stop in accordance with this plan.

# OTHER SERVICES

These services are also available from us as part of your Unum Long Term Disability plan.

## IS THERE A WORK LIFE ASSISTANCE PROGRAM AVAILABLE WITH THE PLAN?

We do provide you and your dependents access to a work life assistance program designed to assist you with problems of daily living.

You can call and request assistance for virtually any personal or professional issue, from helping find a day care or transportation for an elderly parent, to researching possible colleges for a child, to helping to deal with the stress of the workplace. This work life program is available for everyday issues as well as crisis support.

This service is also available to your Employer.

This program can be accessed by a 1-800 telephone number available 24 hours a day, 7 days a week or online through a website.

Information about this program can be obtained through your plan administrator.

## HOW CAN UNUM HELP YOUR EMPLOYER IDENTIFY AND PROVIDE WORKSITE MODIFICATION?

A worksite modification might be what is needed to allow you to perform the material and substantial duties of your regular occupation with your Employer. One of our designated professionals will assist you and your Employer to identify a modification we agree is likely to help you remain at work or return to work. This agreement will be in writing and must be signed by you, your Employer and Unum.

When this occurs, Unum will reimburse your Employer for the cost of the modification, up to the greater of:

- $1,000; or
- the equivalent of 2 months of your monthly benefit.

This benefit is available to you on a one time only basis.

## HOW CAN UNUM'S SOCIAL SECURITY CLAIMANT ADVOCACY PROGRAM ASSIST YOU WITH OBTAINING SOCIAL SECURITY DISABILITY BENEFITS?

In order to be eligible for assistance from Unum's Social Security claimant advocacy program, you must be receiving monthly payments from us. Unum can provide expert advice regarding your claim and assist you with your application or appeal.

Receiving Social Security benefits may enable:

- you to receive Medicare after 24 months of disability payments;
- you to protect your retirement benefits; and
- your family to be eligible for Social Security benefits.

We can assist you in obtaining Social Security disability benefits by:

- helping you find appropriate legal representation;
- obtaining medical and vocational evidence; and
- reimbursing pre-approved case management expenses.

# GLOSSARY

**ACTIVE EMPLOYMENT** means you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation. You must be working at least the minimum number of hours as described under Eligible Group(s) in each plan.

Your work site must be:

- your Employer's usual place of business;
- an alternative work site at the direction of your Employer, including your home; or
- a location to which your job requires you to travel.

Normal vacation is considered active employment.
Temporary and seasonal workers are excluded from coverage.

**DEDUCTIBLE SOURCES OF INCOME** means income from deductible sources listed in the plan which you receive or are entitled to receive while you are disabled. This income will be subtracted from your gross disability payment.

**DEPENDENT** means:

- your child(ren) under the age of 15; and
- your child(ren) age 15 or over or a family member who requires personal care assistance.

**DISABILITY EARNINGS** means the earnings which you receive while you are disabled and working, plus the earnings you could receive if you were working to your **maximum capacity**.

**ELIMINATION PERIOD** means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum.

**EMPLOYEE** means a person who is in active employment in the United States with the Employer.

**EMPLOYER** means the Policyholder, and includes any division, subsidiary or affiliated company named in the policy.

**EVIDENCE OF INSURABILITY** means a statement of your medical history which Unum will use to determine if you are approved for coverage. Evidence of insurability will be at Unum's expense.

**GAINFUL OCCUPATION** means an occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work.

**GRACE PERIOD** means the period of time following the premium due date during which premium payment may be made.

**GROSS DISABILITY PAYMENT** means the benefit amount before Unum subtracts deductible sources of income and disability earnings.

**HOSPITAL OR INSTITUTION** means an accredited facility licensed to provide care and treatment for the condition causing your disability.

**INDEXED MONTHLY EARNINGS** means your monthly earnings adjusted on each anniversary of benefit payments by the lesser of 10% or the current annual percentage increase in the Consumer Price Index. Your indexed monthly earnings may increase or remain the same, but will never decrease.

The Consumer Price Index (CPI-U) is published by the U.S. Department of Labor. Unum reserves the right to use some other similar measurement if the Department of Labor changes or stops publishing the CPI-U.

Indexing is only used as a factor in the determination of the percentage of lost earnings while you are disabled and working and in the determination of gainful occupation.

**INJURY** means a bodily injury that is the direct result of an accident and not related to any other cause. Disability must begin while you are covered under the plan.

**INSURED** means any person covered under a plan.

**LAW, PLAN OR ACT** means the original enactments of the law, plan or act and all amendments.

**LAYOFF** or **LEAVE OF ABSENCE** means you are temporarily absent from active employment for a period of time that has been agreed to in advance in writing by your Employer.

Your normal vacation time or any period of disability is not considered a temporary layoff or leave of absence.

**LIMITED** means what you cannot or are unable to do.

**MATERIAL AND SUBSTANTIAL DUTIES** means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Unum will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

**MAXIMUM CAPACITY** means, based on your restrictions and limitations:

- during the first 24 months of disability, the greatest extent of work you are able to do in your regular occupation, that is reasonably available.
- beyond 24 months of disability, the greatest extent of work you are able to do in any occupation, that is reasonably available, for which you are reasonably fitted by education, training or experience.

**MAXIMUM PERIOD OF PAYMENT** means the longest period of time Unum will make payments to you for any one period of disability.

**MENTAL ILLNESS** means a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a disability. Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders, or

disorders relatable to stress.  If the DSM is discontinued or replaced, these disorders will be those classified in the diagnostic manual then used by the American Psychiatric Association as of the start of a disability.

**MONTHLY BENEFIT** means the total benefit amount for which an employee is insured under this plan subject to the maximum benefit.

**MONTHLY EARNINGS** means your gross monthly income from your Employer as defined in the plan.

**MONTHLY PAYMENT** means your payment after any deductible sources of income have been subtracted from your gross disability payment.

**PART-TIME BASIS** means the ability to work and earn 20% or more of your indexed monthly earnings.

**PAYABLE CLAIM** means a claim for which Unum is liable under the terms of the policy.

**PHYSICIAN** means:

- a person performing tasks that are within the limits of his or her medical license; and
- a person who is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or
- a person with a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or
- a person who is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction.

Unum will not recognize you, or your spouse, children, parents or siblings as a physician for a claim that you send to us.

**PLAN** means a line of coverage under the policy.

**POLICYHOLDER** means the Employer to whom the policy is issued.

**PRE-EXISTING CONDITION** means a condition for which you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines for your condition during the given period of time as stated in the plan.

**RECURRENT DISABILITY** means a disability which is:

- caused by a worsening in your condition; and
- due to the same cause(s) as your prior disability for which Unum made a Long Term Disability payment.

**REGULAR CARE** means:

- you personally visit a physician as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and
- you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a physician

whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

**REGULAR OCCUPATION** means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

**RETIREMENT PLAN** means a defined contribution plan or defined benefit plan. These are plans which provide retirement benefits to employees and are not funded entirely by employee contributions. Retirement Plan includes but is not limited to any plan which is part of any federal, state, county, municipal or association retirement system.

**SALARY CONTINUATION OR ACCUMULATED SICK LEAVE** means continued payments to you by your Employer of all or part of your monthly earnings, after you become disabled as defined by the Policy. This continued payment must be part of an established plan maintained by your Employer for the benefit of all employees covered under the Policy. Salary continuation or accumulated sick leave does not include compensation paid to you by your Employer for work you actually perform after your disability begins. Such compensation is considered disability earnings, and would be taken into account in calculating your monthly payment.

**SELF-REPORTED SYMPTOMS** means the manifestations of your condition which you tell your physician, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

**SICKNESS** means an illness or disease. Disability must begin while you are covered under the plan.

**SURVIVOR, ELIGIBLE** means your spouse, if living; otherwise your children under age 25 equally.

**TOTAL COVERED PAYROLL** means the total amount of monthly earnings for which employees are insured under this plan.

**WAITING PERIOD** means the continuous period of time (shown in each plan) that you must be in active employment in an eligible group before you are eligible for coverage under a plan.

**WE, US** and **OUR** means Unum Life Insurance Company of America.

**YOU** means an employee who is eligible for Unum coverage.

## UnumProvident's Commitment to Privacy

UnumProvident understands your privacy is important. We value our relationship with you and are committed to protecting the confidentiality of nonpublic personal information (NPI). This notice explains why we collect NPI, what we do with NPI and how we protect your privacy.

### Collecting Information

We collect NPI about our customers to provide them with insurance products and services. This may include telephone number, address, date of birth, occupation, income and health history. We may receive NPI from your applications and forms, medical providers, other insurers, employers, insurance support organizations, and service providers.

### Sharing Information

We share the types of NPI described above primarily with people who perform insurance, business, and professional services for us, such as helping us pay claims and detect fraud. We may share NPI with medical providers for insurance and treatment purposes. We may share NPI with an insurance support organization. The organization may retain the NPI and disclose it to others for whom it performs services. In certain cases, we may share NPI with group policyholders for reporting and auditing purposes. We may share NPI with parties to a proposed or final sale of insurance business or for study purposes. We may also share NPI when otherwise required or permitted by law, such as sharing with governmental or other legal authorities. *When legally necessary, we ask your permission before sharing NPI about you.* Our practices apply to our former, current and future customers.

*Please be assured we do not share your health NPI to market any product or service.* We also do not share any NPI to market non-financial products and services. For example, we do not sell your name to catalog companies.

The law allows us to share NPI as described above (except health information) with affiliates to market financial products and services. The law does not allow you to restrict these disclosures. We may also share with companies that help us market our insurance products and services, such as vendors that provide mailing services to us. We may share with other financial institutions to jointly market financial products and services. *When required by law, we ask your permission before we share NPI for marketing purposes.*

When other companies help us conduct business, we expect them to follow applicable privacy laws. We do not authorize them to use or share NPI except when necessary to conduct the work they are performing for us or to meet regulatory or other governmental requirements.

UnumProvident companies, including insurers and insurance service providers, may share NPI about you with each other. The NPI might not be directly related to our transaction or experience with you. It may include financial or other personal information such as employment history. Consistent with the Fair Credit Reporting Act, we ask your permission before sharing NPI that is not directly related to our transaction or experience with you.

GLB-1  (7/1/2003)

## Safeguarding Information

We have physical, electronic and procedural safeguards that protect the confidentiality and security of NPI. We give access only to employees who need to know the NPI to provide insurance products or services to you.

## Access to Information

You may request access to certain NPI we collect to provide you with insurance products and services. You must make your request in writing and send it to the address below. The letter should include your full name, address, telephone number and policy number if we have issued a policy. If you request, we will send copies of the NPI to you. If the NPI includes health information, we may provide the health information to you through a health care provider you designate. We will also send you information related to disclosures. We may charge a reasonable fee to cover our copying costs.

This section applies to NPI we collect to provide you with coverage. It does not apply to NPI we collect in anticipation of a claim or civil or criminal proceeding.

## Correction of Information

If you believe NPI we have about you is incorrect, please write to us. Your letter should include your full name, address, telephone number and policy number if we have issued a policy. Your letter should also explain why you believe the NPI is inaccurate. If we agree with you, we will correct the NPI and notify you of the correction. We will also notify any person who may have received the incorrect NPI from us in the past two years if you ask us to contact that person.

If we disagree with you, we will tell you we are not going to make the correction. We will give you the reason(s) for our refusal. We will also tell you that you may submit a statement to us. Your statement should include the NPI you believe is correct. It should also include the reason(s) why you disagree with our decision not to correct the NPI in our files. We will file your statement with the disputed NPI. We will include your statement any time we disclose the disputed NPI. We will also give the statement to any person designated by you if we may have disclosed the disputed NPI to that person in the past two years.

## Coverage Decisions

If we decide not to issue coverage to you, we will provide you with the specific reason(s) for our decision. We will also tell you how to access and correct certain NPI.

## Contacting Us

For additional information about UnumProvident's commitment to privacy, please visit www.unumprovident.com/privacy or www.coloniallife.com or write to: Privacy Officer, UnumProvident Corporation, 2211 Congress Street, M347, Portland, Maine 04122. We reserve the right to modify this notice. We will provide you with a new notice if we make material changes to our privacy practices.

*UnumProvident Corporation is providing this notice to you on behalf of the following insuring companies: Unum Life Insurance Company of America, First Unum Life Insurance Company, Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, Colonial Life & Accident*

GLB-2   (7/1/2003)

*Insurance Company, The Paul Revere Life Insurance Company and The Paul Revere Variable Annuity Insurance Company.*

UnumProvident is the marketing brand of, and refers specifically to, UnumProvident Corporation's insuring subsidiaries. © 2003 UnumProvident Corporation.  The name and logo combination is a service mark of UnumProvident Corporation. All rights reserved.